Adam J. Kaiser
John M. Aerni
Matthew A. Stark
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700
(212) 294-4700 (fax)
akaiser@winston.com
jaerni@winston.com
mstark@winston.com
*Attorneys for Plaintiffs*
.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

BANKERS CONSECO LIFE INSURANCE
COMPANY and WASHINGTON NATIONAL
LIFE INSURANCE COMPANY,

          Plaintiffs,

    v.

MOSHE M. FEUER, SCOTT TAYLOR, and
DAVID LEVY,

          Defendants.

------------------------------------------------------------ x

Case No. 16-cv-7646

**COMPLAINT AND DEMAND FOR**
**TRIAL BY JURY**

      Plaintiffs Bankers Conseco Life Insurance Company ("BCLIC") and Washington

National Insurance Company ("WNIC"), by and through their counsel, hereby allege as follows

for their Complaint against Defendants:

<u>**NATURE OF THE ACTION**</u>

      1.    This action emanates from the widely-publicized Platinum fraud.  To date, the

Platinum fraud has resulted in a criminal prosecution against one scheme participant, and other

co-conspirators remain under investigation by multiple agencies of the federal government. Plaintiffs are victims of that fraud.

2.      For years, Platinum Partners, LP has managed investment funds – also bearing the name "Platinum" (Platinum Partners, LP, the Platinum funds and their affiliates shall be referred to as "Platinum" in the Complaint) – that reported outsized  returns, purportedly by investing in high-risk and speculative investments.   Those investments were often with disreputable principals and companies.  Platinum was owned and managed by Murray Huberfeld and Mark Nordlicht, each of whom have checkered pasts.  Huberfeld, for example, has a criminal record.

3.      Institutional investors such as insurance companies typically would not make significant (or any) investments in high-risk funds like Platinum.  However, Platinum sought new investors and especially institutional investors for their funds.

4.      In 2012 and 2013, Platinum's founders, Huberfeld and Nordlicht, stepped up their efforts to acquire funds from institutional investors with the goal to continue the Platinum fraud. Platinum, however, could not successfully and credibly seek investments directly from institutional investors, so Huberfeld and Nordlicht hatched a plan to obtain institutional investor capital through fraudulent means.

5.      Specifically, and hidden from Plaintiffs until recently, Huberfeld and Nordlicht partnered and conspired with Defendants Moshe M. Feuer, Scott Taylor and David Levy (Huberfeld's nephew) to form a reinsurance company, Beechwood Re Ltd ("Beechwood").  The co-conspirators established Beechwood with the objective of entering into one or more reinsurance treaties with insurance companies, so that they could take control of reinsurance trust fund assets and use those assets to benefit Platinum, thereby enriching Platinum's and Beechwood's owners.

6.     On September 17, 2016, the *Wall Street Journal* reported ("9/17 *WSJ* Article")[1] that "[f]or years, Platinum had little success attracting insurance-company money and considered starting a reinsurer to do so . . . .  It didn't proceed, but after Feuer and Taylor opened Beechwood Re, more than 40% of Beechwood's equity was held by family-member trusts of Platinum's founders as well as by a former Platinum employee."

7.     Also reported in the 9/17 *WSJ* Article was that "Feuer had long known some at Platinum, whose executives were active in the same religious community on New York's Long Island.  He and Huberfeld served at a charity together, and Feuer's sister went to the same school as Platinum co-founder Mark Nordlicht . . . ."  The ties between them ran deep.

8.     At the time that the co-conspirators established Beechwood, Huberfeld already had a criminal background, and Nordlicht had an entrenched reputation for making speculative investments with unsavory companies. Platinum's funds likewise enjoyed the disreputable reputation as its founders.

9.     Upon information and belief, the co-conspirators agreed that (a) Platinum's founders would own a significant part of Beechwood and provide it with capital and employees to further the scheme, and (b) Platinum's control over Beechwood would remain a closely-guarded secret, while Feuer, Taylor and Levy served as the front men.

10.    In 2013, Plaintiffs went to the reinsurance marketplace to seek reinsurance for certain long term care blocks of business.  Several reinsurers were interested in the business, including Beechwood.

---

[1] *Adviser With Ties to Hedge Fund Platinum Put Client Funds in It*, WSJ, Sept. 17, 2016, available at http://www.wsj.com/articles/adviser-with-ties-to-hedge-fund-platinum-put-client-funds-in-it-1473997753.

11.     At the time, Beechwood was a start-up company with no other reinsurance business.  Pursuant to its founders' fraud scheme, Beechwood sought Plaintiffs' business based upon the sterling reputations of Feuer and Taylor.   Accordingly, Feuer and Taylor made numerous verbal and written promises to Plaintiffs indicating that they would expertly administer policy claims and prudently invest trust assets for the protection of policyholders and Plaintiffs.  Relying upon Defendants' representations, and the representations from Defendants' paid advisors and professional consultants, Plaintiffs selected Beechwood as their reinsurer.

12.     As part of their design to induce Plaintiffs to enter into reinsurance agreements with Beechwood, representatives of Beechwood repeatedly told Plaintiffs that Beechwood was owned by Feuer and Taylor, who represented themselves as two upstanding professionals, who capitalized Beechwood with family money and the fortunes earned during their professional careers, with a third principal, David Levy.

13.     Due to Feuer's and Taylor's representations, it was carefully and intentionally hidden from Plaintiffs for over two years that Beechwood was actually largely capitalized with a $100 million note from a series of trusts owned or controlled by Nordlicht, his family and other confederates.  In fact, Plaintiffs were only made aware of this after (a) Huberfeld was arrested, (b) Plaintiffs commenced an audit and investigation of the trusts, (c) the Platinum-Beechwood alliance received scrutiny in the *Wall Street Journal* and other publications, and (d) repeated requests for information from the New York State Department of Financial Services.

14.     During a series of meetings in late 2013, when Plaintiffs were selecting a reinsurer, Beechwood consistently misrepresented Platinum employees as being senior officers of Beechwood.  As Plaintiffs later learned, every single purported senior officer of Beechwood was actually an employee of Platinum, with only one exception other than Feuer and Taylor.

4

15.     Moreover, numerous individuals who would work for Beechwood after Plaintiffs entered into the reinsurance agreements, including employees who directed Plaintiffs' reinsurance trust assets, were former Platinum employees, Platinum employees seconded to Beechwood from Platinum, or relatives of the co-conspirators. For example, Huberfeld's nephew, David Levy, Huberfeld's son, and Huberfeld's son-in-law all held positions at Beechwood at some time.  Until very recently, Beechwood's Chief Investment Officers were all former Platinum employees.  Beechwood's Chief Underwriting Officer was a Platinum secondment.

16.     The substantial overlap between the workforces of Beechwood and Platinum hidden from Plaintiffs enabled the Defendants and their co-conspirators to invest reinsurance trust assets in Platinum and Platinum-related entities, without any scrutiny from other senior level executives who might otherwise question such transactions.

17.     During the negotiation of the reinsurance agreements, Feuer and Taylor advised Plaintiffs that there was a $100 million demand note capitalizing Beechwood.  Despite Plaintiffs' requests that Beechwood disclose the identity of the backers of the demand note, Beechwood refused, citing "confidentiality agreements."

18.     Unbeknownst to Plaintiffs until very recently, those investors were the founders of Platinum and trusts in the names of their families and confederates.

19.     The parties entered into the reinsurance agreements signed in February 2014 ("Reinsurance Agreements").  According to the 9/17 *WSJ* Article, Feuer and Taylor contacted Huberfeld and Nordlicht within ten minutes of the arrival of the reinsurance trust funds at

Beechwood upon the closing of the transaction.[2]  The scheme to attract institutional investors in the Platinum funds had succeeded:  Plaintiffs gave Beechwood the keys to a $550 million reinsurance trust, without ever suspecting that they were in reality doing business with Platinum.

20.     After entering into the Reinsurance Agreements and taking control of the trust assets, Beechwood, which owed fiduciary duties to Plaintiffs, immediately began using the trust funds to aid Platinum.  Among other things, Beechwood (a) invested directly in the Platinum funds, which would help Platinum meet investor redemption demands in further aid of the Platinum fraud scheme; (b) entered into transactions with known criminals who were friends and associates of Huberfeld and Nordlicht; and (c) loaned money to or entered into other transactions with at least a dozen entities controlled by Platinum that any reasonable investment manager would pass on because they were too risky for reinsurance trusts.  Indeed, these transactions were in violation of state laws pertaining to the investment of reinsurance trust assets, as well as the express terms of the Reinsurance Agreement's investment guidelines. Collectively, these transactions accounted for more than $150 million of the trust assets.

21.     Shortly after effectuating the Reinsurance Agreements, Platinum also proceeded to use Beechwood as Platinum's piggybank.  For example, throughout 2014, Beechwood made short-term loans to an investment company owned by Platinum, without having those loans valued and rated as required by the Reinsurance Agreements.

22.     Under the Reinsurance Agreements, Beechwood is required to submit quarterly reports that demonstrate the actual value of assets in the reinsurance trusts.  The Reinsurance Agreements also required that non-conventional investments such as loans and real estate,

---

[2] "Less than 10 minutes after Beechwood received word that money for its first transaction had arrived, Beechwood's founders notified Nordlicht and Huberfeld, documents reviewed by the Journal show."  *See* 9/17 *WSJ* Article.

among others, were independently valued and rated.  If the assets in the trust fell below a certain amount, Beechwood was required to top up the trusts with its own funds.  If the assets in the trust exceeded that amount, Beechwood could take surplus amounts as profits.

23.     In order to conceal their fraudulent scheme, Defendants and other purported employees of Beechwood submitted quarterly reports that contained inflated, and in some cases actually fraudulent, valuations.  Defendants then used these erroneous valuations of trust assets to support their removal of $134 million from the trusts as purported "surplus."  However, unknown to Plaintiffs at the time, the trusts were undervalued at all times Beechwood submitted reports, or, given the facts and circumstances of many trust investments, valuations could not be verified sufficiently to allow any surplus withdrawals.

24.     In mid-to-late 2014, Plaintiffs learned that Beechwood had invested trust assets in the Platinum funds, and brought to Feuer and Taylor's attention that these investments were not suitable.  Feuer and Taylor represented to Plaintiffs that these improper investments were the work of Levy (Huberfeld's nephew), who had left Platinum to become the Chief Investment Officer ("CIO") of Beechwood.  They conceded that these investments were not suitable for the reinsurance trusts.  Around December 2014, they also told Plaintiffs that Levy had left Beechwood.  Levy immediately returned to Platinum, after having breached his fiduciary duties by serving Platinum's interests while he was Beechwood's CIO.

25.     Defendants also told Plaintiffs that the reinsurance trusts' Platinum investments would be unwound and that, by dint of Levy's resignation, Beechwood's ties to Platinum had been cut.  That statement was false because, unknown by Plaintiffs until recently, numerous Platinum employees still worked directly for Beechwood; Platinum routinely consulted with Beechwood; and Huberfeld, Levy and Nordlicht still owned 40% of Beechwood, between

themselves and their family trusts.  These significant ties between Beechwood and Platinum meant that Platinum could influence Beechwood's operations, including the investment of reinsurance trust assets.  Platinum continued to do so even after Levy returned to Platinum.

26.     Throughout the life of the reinsurance relationship, Defendants and their paid advisors and consultants submitted false valuation reports to Plaintiffs purporting to show that the trusts' Platinum-related investments were performing well and that the reinsurance trusts were adequately funded.

27.     During this time, Defendants continually hid Beechwood's deep ties to Platinum, and removed $134 million from the trusts as purported "surplus," while continually misrepresenting to Plaintiffs that Beechwood would unwind investments made to Platinum-related entities.

28.     In fact, Beechwood did not unwind the trusts' Platinum investments as promised, but rather continued to make massive additional Platinum investments.  This continued even after Huberfeld was arrested in June 2016.

29.     Beechwood and its paid advisors and consultants also continued to submit false quarterly valuations to Plaintiffs in order to declare surpluses and support further depletion of the trusts.

30.     Moreover, Beechwood continued to hide its true connections to Platinum, including the fact that Huberfeld, Nordlicht and Levy owned 40% of Beechwood and that its professional staff, including those in charge of investments, were serving Platinum.

31.     The scheme to defraud Plaintiffs began to unravel on June 8, 2016, when Huberfeld was arrested and charged with bribing a union official to make a $20 million investment in one of Platinum's funds.  In connection with Huberfeld's arrest, Beechwood's

offices were raided by the FBI.  Moreover, and unbeknownst to Plaintiffs, it was reported by the media at that time that Huberfeld maintained an office at Beechwood.

32.    Over the summer of 2016, the *Wall Street Journal* and other publications exposed Beechwood's deep ties to Platinum, and these publications reported that Huberfeld and Nordlicht used Beechwood to attract institutional investors for the Platinum funds.  The United States Attorneys for both the Eastern and Southern Districts of New York are currently investigating Platinum and its founders.

33.    Plaintiffs, alarmed by the trusts' continued deep investments with Platinum-related entities, the raid of Beechwood's offices, Huberfeld's arrest, and media reports concerning the same, began their own audit of the trust's investments with the aid of counsel and an independent financial consultant, Cornerstone Research ("Cornerstone").

34.    The audit and investigation, which is ongoing, revealed that Beechwood, the Defendants and their paid advisors and consultants overvalued the trusts' assets and that, as a result of the co-conspirators' self-dealing, conflicts of interest and non-arm's length transactions, many assets had been improperly valued.

35.    The audit and investigation also revealed that Defendants and their co-conspirators engaged in a continuous stream of misrepresentations since the inception of the relationship, concerning Beechwood's ownership structure, the nature and value of assets in the trusts, Beechwood's relationship with Platinum, and Defendants' knowledge of, and participation, in the fraud.

36.    On September 29, 2016, state insurance departments in New York (where BCLIC is domiciled) and Indiana (where WNIC is domiciled), after a lengthy investigation of the reinsurance trusts (in which Beechwood and two of its law firms participated), concluded that

9

many assets in the trusts were "not compliant" with the conservative investment guidelines prescribed by applicable state law.

37.    The state regulator in New York gave Plaintiffs ten days to bring the trust into compliance, but that will not be possible given the structure of the assets and, Beechwood advised that it would take months if not years to unwind all of the trusts' Platinum-related investments.

38.    As a result of Beechwood's material breaches of the Reinsurance Agreements, as well as the regulatory directives Plaintiffs received from two state insurance departments, Plaintiffs initiated the termination of the reinsurance agreements on September 29, 2016.  At the same time, Plaintiffs advised the trustee, Wilmington Trust, to return all trust assets to Plaintiffs as required by the relevant agreements.  Plaintiffs also initiated the process to take control of all claims administration and commenced an arbitration against Beechwood seeking money damages and emergent relief enforcing Plaintiffs' audit and inspection rights under the relevant terms of the Reinsurance Agreements.

39.    As stated in the 9/17 *WSJ* Article, "Platinum's fund investors have been largely concentrated in a tight-knit group of observant Jewish businesspeople.  Exposure to Platinum reached a far wider realm as a result of Beechwood's having directed insurance-client money into Platinum funds and related investments."  The co-conspirators' plan to bring institutional investor money into Platinum succeeded, by having Feuer and Taylor serve as the front men to induce insurance companies to unwittingly invest in Platinum.  But the co-conspirators' success has caused immense damage to Plaintiffs.

40.    According to the 9/17 *WSJ* Article, "Since early 2014, Beechwood has put more than $200 million of client money in Platinum-linked investments, according to public filings

and people familiar with the matter."  The 9/17 *WSJ* Article reported that this $200 million came from Plaintiffs and another insurance company, Senior Health Insurance Co. of Pennsylvania ("SHIP"), which was formerly affiliated with Plaintiffs before being spun off years ago.

41.    Also according to the 9/17 *WSJ* Article, "The CEO of Beechwood, Mark Feuer, said he didn't tell SHIP and other clients about his firm's ties to Platinum because the ownership stakes were passive and didn't come with a management role."  But the real reason that Feuer did not reveal Beechwood's ties to Platinum is that no insurance company would invest in Platinum or enter into a reinsurance agreement with a reinsurer tied to Platinum, and Feuer and Taylor were in cahoots with Platinum to bring institutional investor money to Platinum without the institutional investors' knowledge of Beechwood's Platinum ties.

42.    That is, Beechwood's massive and risky investments with reinsurance trust fund assets in Platinum and Platinum-related entities was not some grand coincidence, or the result of an analytical process in which investment professionals decided that, among many thousands if not millions of different investment opportunities available to the reinsurance trusts, investing in Platinum-related companies represented the best and most prudent investments.  To the contrary, Beechwood's massive and risky investments with Platinum and Platinum-related entities was the *goal* of the fraudulent scheme hatched by Defendants and others to bamboozle institutional investors like Plaintiffs out of their money by tricking them into indirectly investing with Platinum.

43.    Plaintiffs now bring this action to recover damages against Defendants for their participation in the fraudulent scheme.

## PARTIES

44.    BCLIC is an insurance company domiciled in New York with its principal place of business in Carmel, Indiana.

11

45.     WNIC is an insurance company domiciled in Indiana with its principal place of business in Carmel, Indiana.

46.     Upon information and belief, Moshe M. Feuer is a resident of Long Island, New York.

47.     Upon information and belief, Scott Taylor is a resident of New York, New York.

48.     Upon information and belief, David Levy is a resident of Long Island, New York.

## JURISDICTION AND VENUE

49.     This Complaint is filed, and this Court has subject matter jurisdiction of the matters complained of, pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1961, et seq.

50.     This Court has supplemental jurisdiction over Plaintiffs' state law and common law claims pursuant to 28 U.S.C. § 1367, as the claims against Defendants are related to the claims upon which subject matter jurisdiction is based.

51.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, actions, or omissions giving rise to the dispute occurred in this District.

## FACTUAL BACKGROUND

**A.      Origin Of The Reinsurance Agreements.**

52.     BCLIC is an insurance company domiciled in New York.  WNIC is an insurance company domiciled in Indiana.  Both are indirect subsidiaries of CNO Financial Group, Inc. ("CNO"), a publicly traded insurance holding company.

53.     In 2013, BCLIC and WNIC turned to the reinsurance marketplace to explore transferring certain long term care liabilities to a qualified reinsurer.  As part of that process, Rick Hodgdon and Michael Kaster of Willis Re Inc. ("Willis Re"), a reinsurance subsidiary of Willis Group Holdings plc, introduced Plaintiffs to Beechwood.

54.     Kaster had formerly worked for CNO companies, and thus he had some familiarity with the lines of business to be ceded.  Kaster was known to be a credible insurance professional.  Hodgdon purportedly joined Beechwood while Plaintiffs were evaluating competing reinsurance proposals.  However, in another recent admission of truth, Defendants admitted that Hodgdon was actually a Platinum employee seconded to Beechwood during this time period.

55.     At that time, Beechwood was a new reinsurance company with no existing business.  Feuer and Taylor advised Plaintiffs that Beechwood was founded by two reputable businessmen, attorney Feuer, who had been the Chief Executive Officer of Marsh USA Inc., and Taylor, who at different times had been an executive of Marsh & McLennan and Chief Operating Officer for Merrill Lynch Wealth Management's Private Banking and Investments Group.

56.     Beechwood's pitch for BCLIC's and WNIC's business was twofold.  *First*, Feuer and Taylor represented that they had strategies to more effectively manage claims, which they learned from their stints at prior companies. *Second*, they were experienced investment professionals, who would bring superior management of trust assets, allowing for greater returns.

57.     Beechwood's written materials, which were prepared by Defendants, promised its investment team had "extensive experience" with "strong risk management processes."  These written materials also stated, "Beechwood Re Must Deploy a Responsible Investment Strategy Capable of Generating Adequate Returns."   The written materials also promised that, "Beechwood Re's management team has extensive experience utilizing credit-based investment strategies to generate returns while using strong risk management processes."

58.     Defendants recognized that Plaintiffs would not select Beechwood as reinsurer unless it made "responsible" investments, as the reinsurance trust funds would secure policyholder claims.

59.     Defendants repeatedly advised Plaintiffs, verbally and in writing, that the reinsurance trust assets would be managed responsibly, with proper risk management, for the benefit of protecting policyholders.

60.     Between improving policyholder morbidities and increasing investment returns, Beechwood, under the guidance of these seasoned professionals, represented that it would be able to effectively manage the transferred blocks of business.

61.     In 2013, Feuer and Taylor, on behalf of Beechwood, sent Plaintiffs a document titled "Beechwood Re/Discussion Document/June 2013."  In that document, Feuer and Taylor represented to Plaintiffs that Beechwood "is capitalized with over $100MM in capital, with access and intent to fund up to $500 million additional over coming years."  Defendants wanted Plaintiffs to believe that Feuer and Taylor brought to the table significant capital to shoulder the burden and risk of a reinsurance relationship.

62.     Throughout June, July, August and September of 2013, Feuer and Taylor represented to Plaintiffs that Beechwood was owned by just three individuals, with no connection to any private equity investors, and that they had initial "non-redeemable capital" of over $100 million.

63.     In November 2013, Beechwood sent a team to meet with Plaintiffs.  In connection with that meeting, Hodgdon, at the direction of Defendants, sent Plaintiffs an email dated November 5, 2013, identifying the representatives from Beechwood who would be attending the

meeting.  Hodgdon, by this time, had left Willis Re to work for Platinum, but Defendants deceitfully advised Plaintiffs that Hodgdon worked for Beechwood.

64.     Beechwood, through Hodgdon, advised Plaintiffs that the following Beechwood personnel would join the meeting:  Feuer and Taylor; Will Slota, who was designated as the "COO" of Beechwood; Paul Poteat, who was designated as the "CTO" of Beechwood; David Ottensoser, who was designated as the "General Counsel" of Beechwood; Dan Small, who was designated as the "Senior Secured Collateralized Loans PM" of Beechwood; and David Leff, who was designated as the "US Fixed Income PM" of Beechwood.

65.     In fact, unknown to Plaintiffs but now recently discovered, Slota, Poteat, Ottensoser and Small *were at that time employees of Platinum, not Beechwood*.  Only Leff appears to have been an actual Beechwood employee.  Hence, Beechwood misrepresented to Plaintiffs that individuals who were employed by Platinum were actually Beechwood employees. Defendants were aware of this misrepresentation at the time it was made, directed it and intentionally concealed it.

66.     As discussions between Beechwood and Plaintiffs progressed in November 2014, Plaintiffs began its due diligence on Beechwood.  Plaintiffs made several inquiries to Feuer and Taylor about Beechwood's ownership structure and capitalization.  Feuer and Taylor repeatedly told Plaintiffs that Beechwood was mostly owned by them personally, as well as Levy, and that they had capitalized Beechwood with their families' investments and with monies earned during their successful careers.

67.     Plaintiffs recently learned that those representations were false.  Beechwood was in substantial part owned by a series of family trusts owned by individuals other than Feuer and Taylor.  When Feuer and Taylor asked Beechwood about these family trusts, Beechwood refused

to identify the investors, citing to "confidentiality agreements." Feuer and Taylor also represented to Plaintiffs that these minority interests represented purely "passive" investments.

68. Unknown to Plaintiffs at that time, but recently discovered, Beechwood was in substantial part owned by a series of family trusts in the names of Huberfeld and Nordlicht, as well as their family members (including spouses and children). Levy and his family trusts owned another 5%. Together, Huberfeld and Nordlicht controlled over 35% of Beechwood's equity, and with Levy's interest, they controlled 40%.

69. Upon information and belief, Feuer, Taylor, Huberfeld, Nordlicht and Levy formed Beechwood for the purpose of entering into reinsurance agreements in which they would take control of trust assets and use them to benefit Platinum and enrich themselves. In fact, according to published reports, Feuer and Taylor notified Huberfeld and Nordlicht that the trust assets were available to invest less than ten minutes after receiving the news that the funds had arrived.

70. Most institutional investors like insurance companies would not ordinarily invest in Platinum, which made investments in unscrupulous companies and which engaged in unscrupulous acts.

71. Seeking additional investments from institutional investors to further fund their fraud scheme, Huberfeld and Nordlicht sought conspirators to form a reinsurance or other seemingly legitimate company for the purpose of obtaining large amounts of money to pilfer for the benefit of Platinum and the co-conspirators.

72. Ultimately, they found Feuer and Taylor, two professionals with excellent reputations who could serve as the front men for a purported reinsurance company and which

could, through reinsurance agreements, obtain control of trust assets for the benefit of furthering the Platinum fraud scheme and enriching scheme participants.  That company was Beechwood.

73.     While Feuer and Taylor were nominally in charge of Beechwood, it was actually controlled by Platinum, its founders and its employees, including Levy, who left Platinum to become the CIO of Beechwood, and then returned to Platinum.  Feuer, Taylor, and Levy proceeded to use the reinsurance trust assets to benefit Platinum.

**B.     The Reinsurance Agreements.**

74.     BCLIC and WNIC are cedents under two reinsurance agreements with reinsurer Beechwood.  Under the Reinsurance Agreements, BCLIC and WNIC transferred certain long term care liabilities to Beechwood and paid Beechwood over $42 million as a negative ceding commission (that is, BCLIC and WNIC paid Beechwood $42 million to enter into the Reinsurance Agreements).

75.     Beechwood assumed control over claims administration, and BCLIC and WNIC deposited approximately $550 million into reinsurance trusts ("Trusts") to be invested and managed by Beechwood, subject to investment guidelines prescribed by the Reinsurance Agreements and the insurance laws of New York and Indiana.  The assets in the Trusts were intended to serve as reliable (*i.e.*, safe and liquid) collateral for Beechwood's obligations to reimburse BCLIC and WNIC for claims on the transferred liabilities and for Plaintiffs to obtain reserve credits.

76.     Pursuant to the Reinsurance Agreements, Beechwood was required to deposit assets into the reinsurance Trust accounts with an aggregate fair market value of 102% of the statutorily required reserves (*i.e.*, policy liabilities) as collateral for Beechwood's obligation to pay future claims on the reinsured policies.  For purposes of this calculation, only Trust assets in

compliance with the Reinsurance Agreements' investment guidelines qualified as countable. The Reinsurance Agreements define Qualifying Trust Assets to include cash, certificates of deposit, or specific kinds of investments permitted under New York and Indiana insurance laws, not including investments in which either party or its affiliates has an interest, or investments in insolvent entities.

77.     Thereafter, the Reinsurance Agreements empower Beechwood to direct the Trustee to invest or reinvest the Trust assets in accordance with the Reinsurance Agreements' conservative investment guidelines.

78.     The Reinsurance Agreements require Beechwood to top-up the Trusts in the event that the market value of the assets in the Trusts fall below 102% of the amount of the statutory liabilities ceded to Beechwood.  Beechwood's promise to preserve the value of, and properly and prudently manage, the Trust assets was essential to BCLIC's and WNIC's agreement to reinsure the transferred business with Beechwood.

79.     The Reinsurance Agreements also allow Beechwood to remove from the Trusts for their benefit money as surplus if the Trusts' assets are greater than a threshold amount.

80.     The Reinsurance Agreements require Beechwood, at the end of each quarter, to provide written reports to BCLIC and WNIC that describe the fair market value of Qualifying Trust Assets.  The reports must contain supporting detail and other information necessary for BCLIC and WNIC to verify that the assets are Qualifying Trust Assets and that the investment guidelines have been followed.

81.     If the aggregate fair market value of Qualifying Trust Assets is determined to exceed 102% of the statutorily required reserves at the end of a quarter and the aggregate fair market value of the assets in the supplemental Trust accounts exceeds 5% of the Trust amount

and above the "Supplemental Trust Amount," the Reinsurance Agreements provide that Beechwood may ask BCLIC and WNIC to withdraw the excess amounts.

82.     If, however, the aggregate fair market value of the Qualifying Trust Assets is determined to be less than 102% of the statutorily required reserves at the end of a quarter, then Beechwood is required to make deposits into the Trusts to bring the aggregate fair market value of Qualifying Trust Assets to no less than 102% of the statutorily required reserves.

83.     Thus, to determine if Beechwood needed to add money to the Trusts or could withdraw money from the Trusts, the Reinsurance Agreements provide that Beechwood would provide quarterly reports of assets in the Trusts, with proper valuations.

84.     The Reinsurance Agreements also establish supplemental Trust accounts to be maintained as overcollateralization of Beechwood's obligations. Under the Reinsurance Agreements, the supplemental Trusts must contain assets with an aggregate fair market value equal to the greater of 5% of the Trust Amounts and the Supplemental Trust Amount.  Both the BCLIC and the WNIC supplemental Trust accounts are governed by investment guidelines very similar to or the same as the investment guidelines governing the WNIC Trust.

85.     With respect to the supplemental Trust accounts, Beechwood may ask BCLIC and WNIC to withdraw assets from the supplemental Trusts if, at the end of a quarter, the market value of the assets in the supplemental Trusts exceed the greater of 5% of the Trust amounts and the Supplemental Trust Amounts, and the value of Qualifying Trust Assets is determined to exceed 102% of the statutorily required reserves.  If, however, the market value of the assets in the supplemental Trusts are less than the greater of 5% of the Trust amounts and the Supplemental Trust Amounts at the end of a quarter, then Beechwood is required to make deposits into the supplemental Trusts to bring the aggregate fair market value of supplemental

Trust assets to no less than the greater of 5% of the Trust amounts and the Supplemental Trust Amount.

   **C.     In 2014, BCLIC and WNIC Object To Certain Investments, Including Transactions With Suspect Individuals And With Platinum.**

86.    As Levy began investing the Trust assets in 2014, BCLIC and WNIC began receiving quarterly reports from Beechwood.  Upon receiving these reports, BCLIC and WNIC began questioning a number of the investments into which Beechwood directed Trust assets. Among other things, BCLIC and WNIC learned that Beechwood:

- purchased a loan to George Levin, who was a principal in the Rothstein Rosenfeldt Adler PA Ponzi scheme (the "Rothstein Ponzi scheme").  Platinum apparently obtained a large judgment against Levin, forcing him into bankruptcy. BCLIC and WNIC did not know at the time of the 2014 quarterly reports, and just recently learned, that Beechwood purchased the loan to Levin from Platinum;

- loaned money to a Platinum-controlled entity which was run by Moshe Oratz and Aaron Elbogen.  Oratz was jailed in connection with a gambling ring, and Elbogen settled charges brought by the Securities Exchange Commission ("SEC") over fraudulent trade executions; and

- loaned money to Cashcall Inc., which was sued by the Consumer Financial Protection Bureau and 17 states for violating consumer protection and usury laws providing interest-rate caps.

87.    These investments were objectionable to Plaintiffs because they are not suitable investments for reinsurance trust funds, which should be conservative investments to ensure that there are sufficient assets to pay policyholder claims.  Additionally, for reputational reasons,

Plaintiffs could not possibly be seen as doing business with such disreputable firms and individuals.

88.     In addition, Beechwood had directly invested tens of millions of dollars of Trust assets in certain of Platinum's funds.  At the time, the Platinum funds were known to make aggressive investments in distressed and disreputable companies, and such investments were not consistent with the Reinsurance Agreements' investment guidelines or with Plaintiffs' business strategies and reputation.

89.     BCLIC and WNIC also raised questions concerning how Beechwood characterized and valued assets in the Trusts.  For example, Beechwood made numerous investments of Trust assets in notes collateralized not by assets, but rather by the borrowers' equity or other borrowers' debt instruments.  Yet, Beechwood inflated the value of these tenuous forms of collateral to conclude that the Trusts were over-collateralized.  In addition, Beechwood had invested assets in risky businesses, including start-up and severely distressed companies.

90.     At no time during all of the 2013 and 2014 discussions between Plaintiffs and Defendants, did anyone advise Plaintiffs of the significant interests that Platinum and its principals, Huberfeld and Nordlicht, had in Beechwood, that Huberfeld had an office at Beechwood, that Huberfeld's son-in-law worked at Beechwood affiliate and asset manager, B Asset Manager ("BAM"), or that Huberfeld's son interned at BAM.  Nor did Feuer and Taylor advise Plaintiffs of the significant number of Platinum employees who worked for Beechwood, who were seconded to Beechwood, or who were advising Beechwood.

91.     Instead, Defendants, and others at Beechwood, kept all of these connections secret and represented to Plaintiffs that these high-risk investments were appropriate and properly valued.

21

**D.      The Black Elk Investment; Levy Leaves Beechwood And Returns To Platinum.**

92.     According to a special report by Reuters,[3] Platinum obtained the majority interest in Black Elk Energy LLC ("Black Elk"), a Houston-based company that purchased unproductive oil wells, sometime after 2009.  In 2012, an explosion on a Black Elk rig off the Louisiana coast killed three workers, seriously injured another three workers, and spilled oil into the Gulf of Mexico.  Prior to this incident, the rig received hundreds of safety citations from the U.S. Department of the Interior's Bureau of Safety and Environmental Enforcement, and after an investigation, the same agency concluded that the safety culture on the rig was "poor at best." Eventually, the U.S. Department of Justice announced criminal charges against Black Elk.  Black Elk was forced into bankruptcy in August 2015.

93.     In or around February, 2014, immediately upon closing the transaction, however, before Black Elk entered bankruptcy, Beechwood invested $27 million of Trust assets in Black Elk high-yield junk bonds.  Also before going into bankruptcy, however, Black Elk sold its main assets to a third party for $149 million.  The majority of the proceeds from this sale went to a subsidiary of Platinum, and not to the senior creditors that included Beechwood.  Black Elk's remaining assets were also sold to a different Platinum subsidiary.  Not long after, Black Elk's secured creditors demanded to know how, in light of their first priority status, Platinum was paid from the asset sale before payment was made to them.

94.     In fact, Platinum managed to subordinate the interests of the secured creditors through trickery.  Just prior to the first asset sale, Platinum used a consent solicitation to ask bondholders of $150 million of Black Elk's high-yield junk bonds to approve a measure that

---

[3] *See* Lawrence Delevingne, *The Top-Performing Hedge Fund Manager That's Too Hot For Big Money To Handle*, Reuters, Apr. 13, 2016, available at http://www.reuters.com/investigates/special-report/usa-hedgefunds-platinum.

would let Platinum receive proceeds of the asset sale ahead of bondholders and other secured creditors.  The bondholders approved this absurd request – to strip themselves and secured creditors of their priority – because of varying methods of control Huberfeld and Nordlicht's fund exerted over 70% of the bonds.  Levy, then at Beechwood, exploited his role as Beechwood's CIO to approve the consent on behalf of the junk bonds Beechwood had purchased with Plaintiffs' Trust assets (in addition to bonds Beechwood had purchased while managing others' funds).

95.     In short, Beechwood, in the person of David Levy, voted the Beechwood-purchased bonds, including the Trusts' bonds, against the interests of the Trusts and Beechwood, and in favor of subordinating them to Platinum's interests, even though this vote meant that the Trusts' bonds would be exposed to greater risk of loss, because all the value of Black Elk's assets was paid to Platinum.

96.     Feuer and Taylor offered no justification for the vote.  Instead, they pinned all of Beechwood's actions to assist Platinum on  Levy.  Levy left Beechwood to immediately return to Platinum, where he and others could continue to direct the Trusts' investments through their control of numerous Platinum employees who worked at Beechwood, who were seconded to Beechwood, or who were consulting with Beechwood employees on a regular basis.

**E.     Feuer and Taylor Promise To Cut The Ties Between Beechwood And Platinum, But They Do Just The Opposite.**

97.     In late 2014, Feuer and Taylor promised Plaintiffs that Beechwood would begin to unwind Beechwood's significant investments in companies controlled by Platinum.  Plaintiffs were thus led to believe that Beechwood would take steps to divest itself of such investments. Beechwood partially redeemed its direct investments in the Platinum funds, but found other ways to support Platinum, namely, by investing in companies that Platinum owned or controlled.

23

98.     To lull Plaintiffs into a false sense of security, Feuer and Taylor represented to Plaintiffs in late 2014 that Beechwood's ties to Platinum had been "cut" with Levy's departure. Thus, Plaintiffs were led to believe that Beechwood, under the supervision of Feuer and Taylor and a dedicated team of investment professionals, would unwind and properly value the questionable investment of Trust assets, and replace such investments with suitable investments.

99.     That did not occur.  According to the 9/16 *WSJ* Article, Beechwood has invested more than $200 million of client funds with Platinum-linked entities since 2014. And Beechwood made investments with Trust assets throughout 2015 and 2016 totaling tens of millions of dollars in Platinum-related companies, including after Huberfeld was arrested.  In 2016, Beechwood again invested Trust assets directly into Platinum's funds.

100.     Moreover, as Plaintiffs learned recently, Feuer and Taylor hid troubling facts concerning Huberfeld's and Nordlicht's involvements with Beechwood. Huberfeld and Nordlicht owned much of Beechwood's equity, and without their investments, Beechwood would not have had the capital to top-up the Trusts, as required by the Reinsurance Agreements, in the event of a shortfall.  Defendants never disclosed this conflict to Plaintiffs.

101.     Instead, Feuer and Taylor advised Plaintiffs in 2013, when Plaintiffs were in the process of selecting a reinsurer, that it had a demand note in the amount of $100 million for extra security in case a top-up of the Trusts was necessary, and access to an additional $500 million in capital.  As Plaintiffs recently learned, however, the issuer of that note was none other than Nordlicht, and trusts created substantially for his benefit and related parties.[4]

---

[4] Some portion of the Note was also guaranteed by trusts in the name of David Bodner and his family members.  Bodner, who also has a criminal record, had long and deep ties to Huberfeld and Nordlicht.

102.    And, in May 2014, the demand note was reduced, without explanation or disclosure, to $25 million, an amount wholly insufficient given the magnitude of the Trusts' assets then.  Moreover, the additional $500 million in capital simply does not exist.

103.    Beechwood recently has advised Plaintiffs it is about to run out of cash and that Feuer and Taylor will have to fund operations with their own money.  Feuer and Taylor have complained about the strain of that economic burden, and are now seeking additional surplus funds from the Trusts to fund Beechwood's operations.    Thus, Feuer and Taylor's representations to Plaintiffs in 2013 concerning its access to capital were false and misleading.

**F.    Beechwood's Significant Ties With Platinum.**

104.    In addition to Beechwood being owned in substantial part by Platinum's principals (and their trusts), Huberfeld having an office at Beechwood, Beechwood employing Huberfeld's nephew (Levy) as its CIO, and Huberfeld's son and son-in-law working for Beechwood and BAM, many of Platinum's employees (in addition to Levy) left Platinum to work for Beechwood, or consulted with Beechwood about significant matters.  For example:

a.    Rick Hodgdon was seconded to Beechwood by Platinum and serves as Beechwood's Chief Underwriting Officer;

b.    Daniel Saks, a former Platinum employee, served as BAM's CIO after Levy "resigned";

c.    Naftali Manela, an employee of Platinum, provided consulting services to Beechwood related to general operations; and

d.    Eli Rakower, an employee of Platinum, provided consulting services to Beechwood related to interaction with valuation firms that would value Trust assets.

105.   The individuals set forth above were either aware that Platinum was engaging in a fraud against Plaintiffs, or were willfully blind to it, and in any event were sent to work at Beechwood, or consulted with Beechwood, on Platinum's behalf, to facilitate the fraud.

**G.   Huberfeld Is Arrested; Nordlicht Is Investigated For Fraud; The Platinum Funds Begin Liquidating.**

106.   According to published reports, on June 8, 2016, the U.S. Attorney for the Southern District of New York arrested Huberfeld and announced that criminal charges were being brought against him and Platinum in connection with bribing a union official to make a $20 million investment in a fund owned and operated by Platinum.[5]

107.   Both Huberfeld and Platinum have a long history of unscrupulous conduct.  In 1992, for example,  Huberfeld pled guilty to a misdemeanor for sending an imposter to take his Series 7 brokerage licensing exam.[6]  He was sentenced to two years' probation and paid a substantial fine to the SEC.[7]  Just a few years later, in 1998,  Huberfeld and another co-founder of Platinum, David Bodner (who is also one of the investors in Beechwood through his participation in the initial $100 million capitalization), settled civil allegations that they sold

---

[5] *See* Jody Godoy, *NYC Fund Manager, Union Head Accused of $20M Fraud*, Law360, June 8, 2016, available at http://www.law360.com/articles/804854/ nyc-fund-manager-union-head-accused-of-20m-fraud.

[6] *See* Zeke Faux, *No Blow Up Is Big Enough to Tarnish Platinum Partners' Returns*, Bloomberg, Oct. 21, 2015, available at http://www.bloomberg.com/ news/articles/2015-10-21/no-blow-up-is-big-enough-to-tarnish-platinum-partners-returns.

[7] *Id.*

more than 513,000 shares of restricted stock in a particular company.[8]  Huberfeld made an even

larger payment to the SEC, in addition to the fine imposed on his then-fund.[9]

108.    Several years later, in 2012, Platinum and Nordlicht's other fund, Centurion,

entered into a sizeable settlement with the Chapter 11 Trustee of the Rothstein Ponzi scheme in

relation to fraudulent transfers made to the funds.[10]  And Platinum's subsidiary, BDL Manager,

entered into yet another settlement with the SEC in 2014 in connection with a scheme to profit

from the imminent deaths of terminally ill patients in nursing homes and hospice care.[11]

Specifically, BDL Manager's brokers tricked dying patients into providing personal information

that the brokers then used to make risky investments in variable annuities, which paid benefits to

BDL Manager when the patients died.[12]

109.    Nordlicht, Huberfeld's longtime partner and co-founder of Platinum, likewise has

a checkered past.  According to published reports, both Huberfeld and Nordlicht and their wives

were sued in connection with the Rothstein Ponzi scheme.  In addition, one of  Nordlicht's

previous funds, Optionable Inc., collapsed in a trading scandal in 2007 when another of its co-

founders, Kevin Cassidy, was arrested for deliberately misstating the value of natural gas

---

[8] *See* Lorena Mongelli and Bruce Golding, *Hedgie Accused of Bribing Union Boss Has Criminal Past*, NY Post, June 8, 2016, available at http://nypost.com/2016/06/08/hedgie-accused-of-bribing-union-boss-has-criminal-past.

[9] *Id.*

[10] *See* Sindhu Sundar, *Fund Managers Put Up $32M To End Rothstein Trustee Claims*, Law360, available at http://www.law360.com/articles/359744/fund-managers-put-up-32m-to-end-rothstein-trustee-claims.

[11] *See* SEC Press Release: SEC Announces Charges Against Brokers, Adviser, and Others Involved in Variable Annuities Scheme to Profit From Terminally Ill, Mar. 13, 2014, available at https://www.sec.gov/News/PressRelease/Detail /PressRelease/1370541121951.

[12] *Id.*

derivatives.[13] Cassidy, who served two prior stints in prison, was sentenced to another 30 months.[14] When he was released, Platinum hired him as the managing director of Agera Energy, a distressed company that Platinum had taken over and in which David Levy, while serving as Beechwood's Chief Investment Officer, had invested Trust assets in its high-risk debt.[15]

110.    According to published reports, Nordlicht is currently under investigation along with Platinum. On June 22, 2016, the FBI and the U.S. Postal Inspection Service raided Platinum.[16] According to the *New York Post*, the FBI is "expected to look at Platinum's valuation of its hard-to-value illiquid assets."[17]

111.    According to a July 25, 2016 article in the *Wall Street Journal* ("7/25 *WSJ* Article"),[18] the government has launched a "fraud investigation" against Platinum.  Platinum had for years boasted of its outsized returns on investments, but those returns are likely fictitious and designed to induce others to invest money in the Platinum scheme.

---

[13] *See* SEC Press Release: SEC Charges Banker and Brokerage Executives With Multi-Million Dollar Financial Fraud, Nov. 18, 2008, available at https://www.sec.gov/news/press/2008/2008-274.htm.

[14] *See* Bill Singer, *Commodities CEO Gets 30 Months in Prison in Mark to Market Scheme*, Forbes, Apr. 26, 2012, available at http://www.forbes.com /sites/billsinger /2012/04/26/commodities-ceo-gets-30-months-in-prison-in-mark-to-market-scheme/#62116c652089.

[15] *Id*.

[16] *See* Kaja Whitehouse and Josh Kosman, *FBI Raids Hedge Fund Linked to Union Head's Kickback Probe*, NY Post, June 22, 2016, available at http://nypost.com/ 2016/06/22/fbi-raids-hedge-fund-linked-to-union-heads-kickback-probe/.

[17] *Id*.

[18] *See* Rob Copeland, *Fraud Probe Ricochets through Platinum Partners, a Hedge Fund With Ties to Jewish Community*, available at http://www.wsj.com/articles/fraud-investigation-ricochets-through-hedge-fund-known-for-ties-to-jewish-community-1469439181.

112.     As explained in the 7/25 *WSJ* Article, Platinum began borrowing money to repay investors starting in 2012, when investors began asking for their money back.  The 7/25 *WSJ* Article reported that Platinum has recently suspended all redemptions from its funds and could not commit to investors that the Platinum funds would pay investors "cash matching the full investment gains the firm has reported."  In other words, the money Platinum represented was in the Platinum funds is not actually there.

113.     The government, according to the 7/25 *WSJ* Article, is investigating whether "Platinum had been paying some reported investment gains to existing investors with money from incoming ones."  The 7/25 *WSJ* Article also reported that Nordlicht is a target of the investigation, along with Huberfeld, who, as noted above, has a criminal record and is presently under indictment for bribing a union official.

114.     Due to its ties to Platinum, government agents also raided Beechwood's offices on the morning of Huberfeld's arrest.  As explained in the 7/25 *WSJ* Article – but which was news to Plaintiffs at the time of its publication – Huberfeld and Nordlicht had started and funded Beechwood.

115.     According to the 7/25 *WSJ* Article, and contrary to Defendants' assertions preceding the execution of the Reinsurance Agreements that the company was "owned by three individuals," Huberfeld maintained an office at Beechwood and his son and son-in-law worked at a Beechwood affiliate, BAM.  His nephew,  Levy, controlled Beechwood's investments for over a year and funneled Trust assets into numerous Platinum-related schemes, investments and entities.

116.     Plaintiffs would not have entered into the Reinsurance Agreements if they had known of Beechwood's ties to Platinum, Huberfeld and Nordlicht. Indeed,  no insurance

company would knowingly invest its assets backing policyholder liabilities with such unscrupulous characters, and insurance regulators would not have knowingly permitted insurers to do anything of the kind.

117.   According to the 7/25 *WSJ* Article, Platinum began running out of cash in 2015 as Platinum investors began increasing redemption requests. To fund those redemptions, Beechwood lent money to Platinum and purchased parts of Platinum's portfolio, so that "Platinum ended up owing Beechwood around $70 million." Beechwood appears to have been funding Platinum's redemptions to defrauded investors who were demanding an exit from Platinum funds.

118.   This is further confirmed by an article appearing in the *New York Observer* on June 23, 2016.[19] The *Observer* reported that Platinum lacked funds in November 2015 to meet redemption demands. The *Observer* reported that the Fruchthandler family (real estate moguls whose holdings include the Woolworth Building) could not redeem $600,000 from the Platinum Funds and filed a complaint with the SEC.

119.   Tellingly, the *Observer* reprinted a letter written by the Fruchthandler family's attorney to the General Counsel of Platinum, David Ottensoser – *the same person Beechwood told Plaintiffs in November 2013 was the General Counsel of Beechwood*. The *Observer* also reported that Platinum could not come up with $7.5 million in November 2015 to satisfy a put to New Mountain Finance Corporation.

120.   Around the same time, in October 2015, New Zealand's Parris Investments Ltd. ("Parris Investments") submitted a redemption request to Platinum, asking for the return of its

---

[19] *See* Ken Lurson, *Exclusive: Bribe Suspect Huberfeld Accused of Stiffing Previous Platinum Investors*, Observer, June 23, 2016, available at http://observer.com/2016/06/exclusive-bribe-suspect-huberfeld-stiffed-previous-platinum-investors/.

funds.  Platinum failed to return the money to Parris Investments by the end of December, which was the due date specified by the parties' agreement.  According to Parris Investments' court filings, Platinum then made a series of promises over the next several months, indicating it would return the funds.  It never did, and in July 2016, Parris Investments filed a complaint against Platinum in the Cayman Islands where Platinum is domiciled.  A month later, the Cayman Islands judge issued an order that validated concerns about Platinum's inability to repay investors.[20]  The order turned over the international unit of Platinum's main fund to court-appointed liquidators.

### H.   The Cornerstone Investigation And BCLIC And WNIC's Realization That Trust Assets Are Overvalued

121.   Plaintiffs invoked the audit provisions of the Reinsurance Trust Agreements shortly after Huberfeld's arrest in June 2016.  In light of the arrest and related press coverage, Plaintiffs specified that the audit would encompass (1) whether the investment of Trust assets complied with the terms of the Reinsurance Agreements and associated investment guidelines, (2) Beechwood's valuation of those assets, and (3) Beechwood's relationship with Platinum.

122.   Plaintiffs hired Cornerstone Research ("Cornerstone") to perform the audit of the investments. Cornerstone's work consisted of analyzing (1) the transactions and interconnections between Beechwood's investments of Trust assets and any Platinum related entities; (2) potential sources for conflict of interest between Beechwood and BAM, on the one hand, and Platinum, on the other; (3) whether the terms of Beechwood's investments of Trust assets were economically reasonable; and (4) the valuations of the Trust assets performed by Duff & Phelps on behalf of Beechwood.

---

[20]   *See* Kaja Whitehouse, *Hedge Fund Linked to Prison Guards' Union Goes to 'Liquidators,'* NY Post, Aug. 24, 2016, available at http://nypost.com/2016/08/24/hedge-fund-linked-to-prison-guards-union-goes-to-liquidators/.

123. By August 2016, Plaintiffs had determined that approximately $280 million of the $591 million assets held in Trust are Level 3 assets, which is the category of most-difficult-to-value assets, and approximately *$116 million* of the $302 million of Level 3 assets are inextricably intertwined with Platinum.[21]

124. Cornerstone also uncovered significant problems with the valuation reports that Duff & Phelps prepared and that Beechwood submitted to Plaintiffs. For example, their valuations (a) generally provided no explanations or evidence to support the valuations, (b) were often based on unsubstantiated, incorrect and sometimes irrelevant assumptions and questionable methodologies, (c) ignored evidence that the transactions were not at arm's-length, and (d) ignored the extensive dealings between Beechwood and Platinum that illustrated Beechwood's conflicts of interest. Plaintiffs believe that their reinsurance Trusts are underfunded.

125. Plaintiffs recently learned through the audit that many investments of Trust assets Beechwood made were with Platinum-linked companies, and that Beechwood and Duff & Phelps have improperly valued such investments. These include at least the following:

    a.    Agera Energy. Agera Energy was owned by a Platinum, which had purchased its assets from a distressed company. Beechwood initially invested Trust assets in Agera. Later, on June 9, 2016, one day after Huberfeld was indicted for bribing a union official to invest the union's funds with Platinum, Beechwood invested more of the Trusts' assets in loans to Agera as part of a restructuring. Platinum brought the transaction to Beechwood, informing it that Platinum needed cash and was hoping Beechwood would assist it by arranging a deal to provide it. Beechwood acceded to Platinum's request by agreeing to a deal to cash out

---

[21] *See Fitch Places CNO Financial Group on Rating Watch Negative*, Reuters, Aug. 3, 2016, available at www.reuters.com/article/idUSFit969502.

Platinum's interest in Agera. To justify these loans, Beechwood claimed that Agera's enterprise value had increased by 550% between Platinum's 2014 acquisition of Agera and June 2016. In June 2016 alone, Beechwood and Duff & Phelps reported that Agera's enterprise valuation had increased by 46% *in just 3 weeks*. The Agera restructuring was represented by Feuer and Taylor to Plaintiffs as mechanism to allow the Trusts to divest other bad Platinum-related investments. In fact, the June 9 restructuring was a continuation of the pattern of using the Trusts to benefit Platinum because the Trusts put in new money which was used to cash out Platinum-related investments.

b. <u>Newel Trading</u>. Beechwood made tens of millions of dollars of short term loans to Newel Trading, a company owned by Platinum, using Trust assets, but Beechwood failed to value these loans in its quarterly reports to Plaintiffs. Beechwood was using the Trust funds as Platinum's piggybank.

c. <u>LC Energy Operations</u>. LC Energy Operations is owned by Platinum. Beechwood invested trust assets in a loan to LC Energy that was used to retire Platinum's preferred securities. Many of Beechwood's investments of Trust assets have been used to retire Platinum securities or cash out Platinum's positions.

d. <u>Implant Sciences Corp</u>. Platinum owns enough of the convertible debt of Implant Sciences Corp. to obtain a majority stake in the company. Implant Sciences' business consists of an explosive trace detection product, but it has announced plans to sell that business and transition to jet-powered hoverboards. Implant Sciences is a distressed company and was de-listed from the New York Stock

Exchange in 2009.  In March 2015, Beechwood loaned Implant Sciences money from the Trusts, the proceeds of which were used to reduce a Platinum loan.  The loan's maturity date has repeatedly been extended due to Implant Sciences inability to pay.  The Trusts' current exposure to this investment is just under $7 million.  Beechwood and Defendants continue to value this investment at par.

e.  <u>China Horizon Investment Group</u>.   Platinum was a significant shareholder in China Horizon Investments Group. Beechwood invested Trust assets in a loan to it, the proceeds of which were used to repay "shareholder loans."

f.  <u>Golden Gate Oil LLC</u>.  Platinum had a significant equity stake in Golden Gate Oil LLC.  Beechwood used Trust assets for a loan to it, the proceeds of which were used to purchase Platinum's loan. Beechwood's valuation of Golden Gate relies on an assumption that oil will sell for $90 per barrel and that Golden Gate's wells will be productive, when oil is currently selling for $50 per barrel and less than 2% of Golden Gate's wells have been developed.  It is producing 30 barrels per day.  Beechwood and Defendants still value this asset at par.

g.  <u>Northstar GOM LLC</u>.  Platinum has a significant equity stake in Northstar GOM LLC.  Beechwood invested Trust assets in a loan in which the proceeds were used to fund Platinum's purchase of the company.

h.  <u>ALS Capital Ventures/Credit Strategies</u>.   Credit Strategies is a non-operating entity owned by Platinum.  Credit Strategies owns 83% of ALS Capital Ventures ("ALS"), a life insurance settlement fund that owns life insurance policies.  ALS pays the premiums on the policies and depends on death benefits to make profits. Beechwood invested Trust assets in loans to Credit Strategies, the non-operating

company owned by Platinum, presumably to allow ALS to continue to make premium payments on the policies. As of August 31. 2016, Beechwood's loan of Trust assets to Credit Strategies has created an exposure of more than $10 million for the Trusts.  This loan is nothing more than a manner of using Trust assets to subsidize Credit Strategies' indirect investment in life insurance policies.  The 2014 audited financial statements for ALS show that, in 2014, ALS' "members" withdrew $26.3 million in "capital," or equity, while the Trusts' loan remains unpaid.

i.  Pedevco:  Pedevco is another distressed oil and gas development company, similar to GGO, discussed above.  Like GGO, Pedevco has numerous interrelationships with Platinum.  Platinum owns 100% of Pedevco's Series A preferred, along with 9.9% of its common stock.  Platinum also holds tranches A & B of Pedevco's senior secured debt and a Platinum representative sits on the Pedevco board of directors.  Beechwood invested millions of dollars of Trust assets in Pedevco's tranche B notes.

j.  PPCO:  In March 2016, a year and a half after Defendants advised Plaintiffs that Defendants would unwind the Trusts' investments with Platinum and Platinum-related entities, Beechwood directly invested Trust assets with PPCO, a Platinum fund. This fund is now in liquidation, and the Trusts' exposure to PPCO is approximately $6.8 million.  Beechwood's investment of Trust assets in PPCO occurred within a couple of months of the June 9, 2016 Agera transaction, which was initiated when Platinum informed Beechwood of Platinum's need for liquidity and its desire to obtain that liquidity from Beechwood.  Beechwood and

Defendants continue to value this investment at or near par, that is, in the range of $6.725 million to $6.86 million.  Given that PPCO is in liquidation and has suspended redemptions, that the FBI has raided Platinum's office, that Platinum is under federal investigation and that one of Platinum's founders is now under indictment for bribing a union official to invest union funds in Platinum, the Trusts' may  suffer a considerable loss in this Platinum-related investment.

   k.   <u>Black Elk</u>:  Beechwood invested Trust assets in junk bonds issued by Black Elk Energy LLC, an oil company.  With Black Elk in financial distress following an oil rig explosion, it sought to sell its principal assets.  Platinum, which owned a majority interest in the company, asked owners of the junk bonds to subordinate their interests and allow Platinum to receive the proceeds of the asset sales.  Beechwood voted the Trusts' shares of its junk bond in favor of self-subordination to Platinum, contrary to the interests of the Trusts. Platinum succeeded in obtaining all proceeds of the asset sales.

**I.   Feuer and Taylor Admit They Hid Huberfeld And Nordlicht's Interests In Beechwood.**

126.    In August 2016, after Huberfeld was indicted, Feuer and Taylor admitted with feigned disdain that they discovered Levy was using Trust assets to provide liquidity and profits to Platinum.  Feuer and Taylor stated that they were "surprised" by how Levy used the Trust assets and that they "woke up to a new reality" that  Levy was actually using the Trusts' funds to benefit Platinum.  Feuer and Taylor admitted that Levy had loaned Trust assets to "highly questionable parties." Feuer and Taylor nonetheless replaced Levy as CIO with another employee of Platinum and continued to direct that Trust assets be used to aid Platinum.

36

127.     In another surprise bout of honesty, Feuer and Taylor recently (just this month) explained to Plaintiffs that they have been associates of Huberfeld for many years.  According to Feuer and Taylor, Huberfeld learned that they were starting a reinsurance company, and Huberfeld and Nordlicht then invested in Beechwood, taking a significant stake in the company. Once Huberfeld and Nordlicht became part of Beechwood, they used Beechwood to benefit Platinum.  Feuer and Taylor also admitted that Huberfeld and his family still owned preferred shares in Beechwood and that they are also creditors of Beechwood.

**J.     The Regulatory Orders.**

128.     On September 29, 2016, the New York State Department of Financial Services ("NYDFS") and the Indiana Department of Insurance (IDOI) sent letters concerning BCLIC and WNIC, respectively, declaring that, after their investigation of the Trust assets, "a substantial portion of the current assets held within the Trust[s] are not in compliance" with state law requirements.

129.     The NYDFS required Plaintiffs to remediate this deficiency within ten days, and the IDOI directed that corrective actions be taken immediately.

130.     The letter from the NYDFS states, in pertinent part:

> The New York State Department of Financial Services (the "Department") has conducted a review of the New York Insurance Regulation 114 Trust (the "Trust"), established pursuant to 11 NYCRR 126, which collateralizes the reinsurance treaty between Bankers Conseco Life Insurance Company ("Bankers Conseco") and Beechwood Re, Ltd. ("Beechwood Re").
>
> As a result of this review, which included a detailed analysis of assets and multiple rounds of communication between the Department, Bankers Conseco and Beechwood Re, ***the Department has concluded that a substantial portion of the current assets held within the Trust are not in compliance with the standards set under 11 NYCRR § 126 (Insurance Regulation 114), which is also required under the express terms of the***

*reinsurance treaty.* The Department observed that certain assets within the Trust were removed subsequent to the Department's approval of the reinsurance treaty and replaced with assets that do not comply with 11 NYCRR § 126(a)(2) …

*Bankers Conseco is hereby directed to remediate this deficiency within ten days* of the date of this letter by ensuring the assets held within the Trust meet the requirements of Insurance Regulation 114.  Failure to bring the Trust into compliance may result in the denial of reserve credit and disciplinary action from the Department.

(emphasis added)

131.   The letter from IDOI states, in pertinent part:

The Indiana Department of Insurance ("IDOI") has reviewed the above referenced Reinsurance Agreement and related trust funds ("Trust") as part of its Confidential Target Examination of WNIC, Appointment # 3920 ("Exam").

*The Reinsurance Agreement and related Trust are not in compliance with 760 IAC 1-55-4 ("Rule 55") …  At least some of the Level 3 Trust assets cannot be relied upon*. …

*Additionally, BRE is in violation of IC 27-6-10-11 (a).*   That section of the Indiana Code requires BRE to report annually to the Indiana Commissioner substantially the same information as that required to be reported by licensed insurers on the National Association of Insurance Commissioners' annual statement form. *BRE has failed to file any such reports…*

Credit for reinsurance ceded under the Reinsurance Agreement shall not be allowed WNIC, for all of the above reasons, unless corrective measures, satisfactory to the IDOI, *are taken immediately*…

WNIC, BRE, and the Trustee, are subject to potential disciplinary action, based on the above violations.

(emphasis added).

132.   Feuer and Taylor have advised Plaintiffs that the non-qualified assets cannot be liquidated for months or perhaps years, given that, for example, PPCO is in liquidation and

redemptions have been suspended.   Hence, Plaintiffs were required by their regulators to recapture the business or else face disciplinary action, including the loss of its reinsurance credit for the ceded risks.

### K.   BCLIC and WNIC Terminate The Reinsurance Agreements.

133.   On September 29, 2016, Plaintiffs issued a Notice of Termination to Beechwood, immediately terminating all Reinsurance Agreements between the parties.  Plaintiffs terminated the Agreements due to Beechwood's numerous incurable breaches of the Reinsurance Agreements and fraud upon Plaintiffs since the inception of the relationship, among other reasons.

### L.   BCLIC and WNIC Exercise Their Contractual Right To Take Control Of Trust Assets.

134.   On September 29, 2016, Plaintiffs issued a notice to Wilmington Trust, the trustee of the Trusts, to transfer all Trust assets to Plaintiffs.  Upon information and belief, Wilmington Trust is in the process of effectuating that transfer.

### M.   BCLIC and WNIC Commence Arbitration and Seek Emergent Relief Before The Interim Arbitrator.

135.   On September 29, 2016, Plaintiffs commenced an arbitration pursuant to the arbitration provisions of the Reinsurance Agreements.  They seek damages against Beechwood, and have also sought the appointment, on an emergency and expedited basis, of an interim arbitrator to hear Plaintiffs' application for emergency relief, specifically, to obtain books, records and other information from Beechwood.

## COUNT ONE

### (Breach of Fiduciary Duty)

136.   Plaintiffs incorporate each and every allegation above as if set forth fully and verbatim herein.

137.    Beechwood, as reinsurer, owed fiduciary duties to Plaintiffs.

138.    Defendants, as the three most senior officers of Beechwood, also owed Plaintiffs fiduciary duties.

139.    Based on Defendants' assurances that Beechwood would invest Trust assets prudently and in the best interests of policyholders and Plaintiffs, and other representations including the ownership structure of Beechwood, Plaintiffs reposed trust and confidence in Defendants.

140.    Defendants owed Plaintiffs a duty of candor and a duty of loyalty.

141.    Defendants knowingly breached those fiduciary duties by the acts set forth above, including, without limitation:  (a) failing to advise Plaintiffs of the true ownership structure of Beechwood and deliberately concealing such information in order to induce Plaintiffs to enter into the Reinsurance Agreements so they could misuse and pilfer assets in the Trusts to further their fraudulent scheme; (b) over a course of almost three years, deliberately concealing Platinum's many connections with Beechwood, including that Platinum employees worked directly for Beechwood, were seconded to Beechwood, and routinely advised Beechwood; (c) continually using Trust assets to benefit Platinum, its founders and the fraudulent scheme, and deliberating misleading Plaintiffs as to the true nature of Beechwood's relationship to Platinum; (d) deliberately applying false and erroneous valuations to assets of the Trusts tied to Platinum, including in quarterly reports, to create the erroneous impression that the Trusts were fully funded when in fact they not; (e) using false and erroneous valuations of Trust assets to remove more than $134 million from the Trusts as purported "surplus"; (f) advising Plaintiffs that Beechwood's ties to Platinum were cut with the departure of Levy, when in fact those ties remained and remain to this day; (g) voting the Trusts' Black Elk bonds in favor of Platinum and

to the detriment of Plaintiffs; (h) engaging in numerous other investments to benefit Platinum and not Plaintiffs; and (i) continually providing Plaintiffs with assurances that Trust assets were properly invested when in fact they were not.

142.    As a result of Defendants' conduct, Plaintiffs have suffered damages of at least $50 million.

## COUNT TWO

**(Aiding and Abetting a
Breach of Fiduciary Duty)**

143.    Plaintiffs incorporate each and every allegation above as if set forth fully and verbatim herein.

144.    Beechwood owed Plaintiffs fiduciary duties.

145.    Defendants were aware of Beechwood's breaches of fiduciary duties and knowingly participated in them and induced them.

146.    As a result of Defendants' conduct, Plaintiffs have suffered damages of at least $50 million.

## COUNT THREE

**(Fraudulent Misrepresentation/Fraudulent Concealment)**

147.    Plaintiffs incorporate each and every allegation above as if set forth fully and verbatim herein.

148.    Defendants knowingly made numerous false representations of material fact to Plaintiffs, knowing such statements were false when making them, as detailed above, concerning the ownership of Beechwood, Beechwood's ties to Platinum, Beechwood's supposed effort to cut ties with Platinum, and the value of trust assets, among others, with the intent of inducing

Plaintiffs into entering into the Reinsurance Agreements and not terminating the Reinsurance Agreements after they were entered into.

149.    Defendants continually concealed their fraud, by repeatedly misrepresenting: (a) the true purpose of Beechwood, which was to further the Platinum fraud scheme; (b) who actually ran Beechwood, which was Platinum through its employees, seconded employees and former employees who worked at Beechwood; (c) why Beechwood was investing in Platinum's funds and Platinum-related entities, which was to benefit Platinum; and (d) the valuation of the Trust assets by providing false and erroneous quarterly reports and annual statements, which contained inflated valuations designed to lull Plaintiffs into believing that the Trusts were overfunded and served as proper collateral for the transferred liabilities, all of which is false.

150.    Plaintiffs justifiably relied upon such misrepresentations to their detriment, by both entering into the Reinsurance Agreements and then not terminating them earlier.

151.    As a result of Defendants' conduct, Plaintiffs have suffered damages of at least $50 million.

## COUNT FOUR

### (Aiding and Abetting a Fraud)

152.    Plaintiffs incorporate each and every allegation above as if set forth fully and verbatim herein.

153.    Beechwood knowingly made numerous false representations of material fact to Plaintiffs, knowing such statements were false when making them, as detailed above, with the intent of inducing Plaintiffs into entering into the Reinsurance Agreements and not terminating the Reinsurance Agreements after they were entered into.

154.    Defendants were aware of the fraud being perpetrated on Plaintiffs by Beechwood and Platinum, and their founders, and Defendants provided substantial assistance to the fraud's commission.

155.    Plaintiffs justifiably relied upon Beechwood's misrepresentations to their detriment, by both entering into the Reinsurance Agreements and then not terminating them earlier.

156.    As a result of Defendants' conduct, Plaintiffs have suffered damages of at least $50 million.

### COUNT FIVE

### (Violation of RICO - 18 U.S.C. § 1962(c))

157.    Plaintiffs incorporate each and every allegation above as if set forth fully and verbatim herein.

158.    Plaintiffs are "persons" as defined in 18 U.S.C. § 1961(3).

159.    Defendants are "persons," as that term is defined in 18 U.S.C. § 1961(3).

### The Enterprise

160.    In addition to Platinum and Beechwood being "enterprises" for purposes of RICO, at all relevant times, there was an association-in-fact between and among Feuer, Taylor, Levy, Beechwood, Huberfeld, Nordlicht and Platinum employees and entities.  The association-in-fact's purpose was to fraudulently secure reinsurance arrangements with insurance companies, take control of reinsurance trust funds, use those assets to conceal and perpetuate Platinum's ongoing fraud scheme, and ultimately enrich the scheme's founders.

161.    Each of these enterprises, including the association-in-fact, had an ascertainable structure and organization and existed apart from its predicate acts.

162.     That the association-in-fact was an enterprise for purposes of RICO can be inferred from their shared business and familial relationships and from their common participation in the fraudulent scheme.  Specifically:

a.     Huberfeld and Nordlicht founded Beechwood with Feuer, Taylor, and Levy. Beechwood was largely capitalized by a $100 million note from a series of trusts owned or controlled by Nordlicht, his family and his confederates.

b.     Huberfeld maintained an office at Beechwood.

c.     At meetings between Plaintiffs and Beechwood, most of the purported Beechwood employees were in fact Platinum employees.

d.     Numerous individuals who worked for Platinum, including Huberfeld's nephew, son, and son-in-law, worked for Beechwood, specifically directing reinsurance trust assets.

e.     Beechwood's Chief Investment Officers, who directed trust fund assets were all former Platinum employees, and they directed the trusts' investments to Platinum or entities controlled by Platinum, except for the current CIO.

f.     Platinum seconded employees to Beechwood to direct trust fund investments, and Platinum employees consulted with Beechwood employees on both general operations interacting with valuation firms.

g.     Feuer and Taylor notified Huberfeld and Nordlicht within ten minutes of the reinsurance trust fund's arrival at Beechwood.

h.     Huberfeld and Nordlicht owned much of Beechwood's equity, and without their investments, Beechwood would not have had the capital to true-up the trusts, as required by the Reinsurance Agreements, in the event of a shortfall.

44

163.    Each of the enterprises set forth above constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

164.    At all relevant times, each of these Enterprises engaged in, and its activities affected, interstate commerce.

165.    Each Defendant is associated with each of the three Enterprise identified above and participated, directly or indirectly, in the management or direction of the Enterprise within the meaning of 18 U.S. C. §§ 1961(4) and 1962(c). The Defendants were "employed by or associated with" the Enterprise within the meaning of 18 U.S.C. Section 1962(c).

### Predicate Acts

166.    In the course of conducting and participating in the scheme to defraud investors and perpetuate the Platinum fraud scheme, each of the Defendants perpetrated numerous predicate acts of racketeering activity, which are indictable under provisions of the U.S. criminal code enumerated in 18 U.S.C. § 1961(1), as more specifically alleged below.

167.     Specifically, from 2013 to 2016, the Defendants engaged in repeated instances of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

168.    In furtherance of the scheme described above, and with intent to defraud the Plaintiffs and other institutional investors, each of the Defendants participated in or induced the following conduct that actually used – or foreseeably would have used – mail or wires:

    a.    In 2013, Defendants Feuer and Taylor advised Plaintiffs that they were the founders of Beechwood. They omitted any mention of their co-founders, Huberfeld and Nordlicht, who had founded Platinum and who had, respectively, a criminal record and a reputation for doing business with criminals.

b.       In June 2013, Feuer and Taylor caused to be sent to Plaintiffs a document entitled "Beechwood Re/Discussion Document/June 2013." In that document, Feuer and Taylor represented to Plaintiffs that Beechwood "is capitalized with over $100 million in capital, with access and intent to fund up to $500 million additional over coming years." Feuer and Taylor did not disclose that the capitalization came from Nordlicht and that Beechwood's access to further funds depended in large part on its close relationship with Platinum.

c.       Throughout June, July, August and September, 2013, Feuer and Taylor represented to Plaintiffs that Beechwood was owned by three individuals, them and Levy, with no connection to any private equity investors, and that they had initial "non-redeemable capital" of over $100 million.

d.       On November 5, 2013, Hodgdon, on behalf of Beechwood and with Beechwood's approval, sent an email arranging a meeting between Plaintiffs and "Beechwood" employees. In fact, most of the employees belonged to Platinum. The email was intended to and had the effect of concealing Beechwood's deep ties to Platinum.

e.       In or about November 2013, Feuer and Taylor told Plaintiffs that Beechwood was mostly owned by Feuer and Taylor, who had capitalized Beechwood themselves. In fact, undisclosed by Feuer and Taylor, Beechwood was in substantial part owned by a series of family trusts owned by Huberfeld, Nordlicht, Levy, and their family members.

f.       In February 2014, Beechwood closed its reinsurance agreement with Plaintiffs, obliging it to invest Trust assets in accordance with the investment guidelines prescribed by the Reinsurance Agreements and the insurance laws of New York

and Indiana.  In fact, Levy (a) invested directly in the Platinum funds, which would help Platinum meet investor redemption demands and further aid the Platinum fraud scheme; (b) voted to aid such funds even to the detriment of Beechwood's clients; (c) entered into transactions with known criminals who were friends and associates of Huberfeld and Nordlicht; and (d) loaned money to or entered into other transactions with at least a dozen entities controlled by Platinum that no reasonable investment manager would enter into because they were too risky for the reinsurance Trusts, in the collective amount of more than $150 million.

g.    Between July 16, 2014 and August 13, 2014, in his capacity as Beechwood's Chief Investment Officer, Levy voted Beechwood's Black Elk bonds in favor of a consent solicitation that benefited Platinum at the expense of Plaintiffs.

h.    In 2014, after Plaintiffs complained that Beechwood was making too many investments with known criminals and Platinum-related entities, Defendants Feuer and Taylor represented that the improper investments were the work of Levy, that Levy had resigned, and that the Platinum-related investments would be wound down. In fact, Levy had been fired, but he, Huberfeld, Nordlicht, and Platinum-related entities retained an aggregate 40% ownership stake in Beechwood.  Beechwood went on to invest more than $200 million of insurance client funds with Platinum-linked entities. Levy, Huberfeld, and Nordlicht retained a substantial ownership stake in Beechwood.

i. At the end of March 2016, Beechwood sent Trust assets to Platinum – which by then was unable to meet redemption demands – of $14.2 million in cash, as part of a transaction involving a $26.2 million Platinum Note balance.

j. The Defendants created, prepared, and submitted quarterly reports and annual statements falsely inflating the value of Trust assets in order to conceal their fraud and plunder an additional $134 million as "surplus." In fact, the Trusts are, and at the time of Beechwood's reports have always been, underfunded, or the assets in the Trusts are too speculative and risky to be capable of reasonable valuation.

k. Defendants continually engaged in self-dealing and fraud by investing Trust assets with Platinum-linked entities in order to provide cash to Platinum to both meet redemption demands and enrich the scheme participants.

169. In each of these instances, the Defendants acted willfully and with actual knowledge that the conduct was fraudulent.

**Pattern of Racketeering Activity**

170. The above acts of mail and wire fraud are part of a pattern of racketeering activity.

171. The racketeering acts are related to each other in that they have the same purpose, results, participants, victims, and methods of commission.

172. The racketeering acts are related to each of the Enterprises in that the misrepresentations enabled the Enterprises to obtain institutional investors, direct their funds to Platinum affiliates, and conceal Platinum's involvement, thus protecting the fraudulent scheme. Defendants were enabled to commit the predicate offenses solely by virtue of their positions in and control over both Beechwood and Platinum.  Specifically,

a.    Plaintiffs relied on Feuer and Taylor's aura of legitimacy in their decision to cede Beechwood control of assets in the Trusts.

b.    Levy's control over Trust investments made it possible to direct Trust funds to Platinum assets.

c.    Each Enterprise depended upon Beechwood to issue false or misleading valuation reports and annual statements, allowing further plunder of Trust assets.

d.    Each Enterprise also relied on Feuer and Taylor to act as fronts in persuading Plaintiffs that, with Levy no longer working for Beechwood as of late 2014, entanglements with Platinum would cease.

173.    The racketeering acts form a close-ended continuity, in that the acts targeted a wide swath of investors and extended over multiple years before the exposure of the Platinum fraud scheme finally brought them to a close

174.    In addition, the racketeering acts affected thousands of policyholders whose policies are tied to the assets in the Trust, as the Trust is used to pay policyholder claims.

175.    In addition, insurance departments in New York and Indiana have determined that Beechwood's use of Trust assets was improper, as Beechwood investment of such Trust assets was non-compliant with state law requirements.

**RICO Injury**

176.    Defendants' conduct and participation in the conduct of each of the Enterprises identified above through a pattern of racketeering activity has directly and proximately caused Plaintiffs to be injured in their business and property, including the loss of the value of Trust assets and the reputation to their business.

177.    By virtue of the Defendants' violations of 18 U.S.C. §1962(c), Plaintiffs are entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT SIX

### (Violation of RICO - 18 U.S.C. § 1962(a))

178.    Plaintiffs incorporate each and every allegation above as if set forth fully and verbatim herein.

179.    Each Defendant has received income derived, directly or indirectly, from the pattern of racketeering set forth above and used or invested, directly or indirectly, that income or the proceeds of that income in the acquisition of an interest in, or the establishment of the operation of, each of the Enterprises identified above, in violation of 18 U.S.C. §1962(a).

180.    Each Defendant's violation of 18 U.S.C. §1962(a) has directly and proximately injured Plaintiffs in their business and property by, among other things, reducing value of the assets in the Trusts through investments that are speculative, risky, or simply sham transactions, all of which were made to benefit Platinum.

181.    By virtue of the Defendants' violations of 18 U.S.C. §1962(a), Plaintiffs are entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT SEVEN

### (RICO Conspiracy 18 U.S.C. § 1962(d))

182.    Plaintiffs incorporate each and every allegation above as if set forth fully and verbatim herein.

183.    In violation of 18 U.S.C. § 1962(d), Defendants and others known and unknown persons have conspired with each other to violate 18 U.S.C. §§ 1962(a) and (c).

184.    The objects of the conspiracy included, without limitation, the misappropriation of funds from Plaintiffs and others by means of a scheme to defraud.  By these misappropriations,  Defendants gained personal benefits and supported Platinum's fraudulent scheme.

185.    Defendants agreed and combined with persons known and unknown to engage in a pattern of racketeering activity. Upon information and belief, Feuer, Taylor, Levy, , through their words and actions, each agreed to commit two or more predicate acts of wire fraud and/or mail fraud, as alleged above, in furtherance of their scheme to protect the Platinum fraud scheme and enrich its founders.  The Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme described above.

186.    Defendants' agreement can reasonably be inferred from their close professional ties and from their mutually dependent, coordinated efforts in achieving the objectives of each Enterprise.  Feuer and Taylor dutifully concealed Beechwood's role as a front for Platinum, and Levy directed Trust assets to Platinum investments.

187.    The predicate acts of mail fraud and wire fraud, described above, constitute overt acts of the foregoing conspiracy, in violation of 18 U.S.C. § 1962(d), by reason of which Plaintiffs have suffered a loss as set forth herein.

188.    Plaintiffs are entitled to recover three times the damage to their businesses or property.

## COUNT EIGHT

### (Civil Conspiracy to Commit Fraud)

189.    Plaintiffs incorporate each and every allegation above as if set forth fully and verbatim herein.

190.    Defendants, together and with others, including Platinum, conspired with each other for the unlawful objective of defrauding Plaintiffs.

191.    The civil conspirators reached an agreement or understanding to commit the fraud described herein, including the objective of the fraud and the manner in which it would be carried out.

192.    Defendants committed numerous overt acts in furtherance of the conspiracy, as detailed herein.

193.    Plaintiffs suffered damages as a result of the overt acts, in an amount of at least $50 million.

## COUNT NINE

### (In the Alternative, Negligent
### Misrepresentation)

194.    Plaintiffs incorporate each and every allegation above as if set forth fully and verbatim herein.

195.    As set forth herein, Plaintiffs allege that Defendants conspired with Platinum and its principals, and others, to defraud and harm Plaintiffs, by knowingly and intentionally participating in a fraudulent scheme to induce Plaintiffs to turn over approximately $550 million to be managed by Beechwood for the benefit of Platinum and its principals, and to bolster and further Platinum's fraud scheme, which was known to Defendants.

196.    Alternatively, in the event it is determined that Defendants were unaware that Platinum was a fraudulent scheme and did not conspire with others to defraud Plaintiffs in the manner set forth herein, Plaintiffs assert the following alternative claim for relief.

197.    Due to the Reinsurance Agreements and privity-like relationship between Plaintiffs and Defendants, Defendants were under a duty to impart correct and truthful information to Plaintiffs concerning, among other things, Beechwood's true ownership, why Beechwood was investing in Platinum's funds and companies owned or controlled by Platinum, Platinum's connections to Beechwood through employee sharing and secondments, the actual value of assets in the Trusts, and the difficulties in actually unwinding the Trusts' Platinum-related assets.

198.    Defendants did not provide Plaintiffs with correct and truthful information but instead continually misled Plaintiffs concerning the foregoing items.

199.    The Platinum fraud was easily visible to Defendants, but they acted with willful blindness out of their own self-interest.

200.    Plaintiffs reasonably relied upon the incorrect and untruthful information provided by Defendants, by entering into the Reinsurance Agreements and not terminating them for over two and a half years.

201.    Plaintiffs have been damaged by Defendants' conduct in an amount of at least $50 million.

## COUNT TEN

### (In the Alternative, Negligence)

202.    Plaintiffs incorporate each and every allegation above as if set forth fully and verbatim herein.

203.    As set forth herein, Plaintiffs allege that Defendants conspired with Platinum and its principals, and others, to defraud and harm Plaintiffs, by knowingly and intentionally participating in a fraudulent scheme to induce Plaintiffs to turn over approximately $550 million to be managed by Beechwood for the benefit of Platinum and its principals, and to bolster and further Platinum's fraud scheme, which was known to Defendants.

204.    Alternatively, in the event it is determined that Defendants were unaware that Platinum was a fraud scheme and did not conspire with others to defraud Plaintiffs in the manner set forth herein, Plaintiffs assert the following alternative claim for relief.

205.    Defendants owed Plaintiffs a duty to act with reasonable care in connection with directing the Trusts' assets.

206.    Defendants breached that duty of care by, among other things, making imprudent investments to benefit Platinum, failing to advise Plaintiffs of the reason for such investments, and improperly valuing such assets.

207.    The inappropriateness of Beechwood's investments with Trust assets was easily visible to Defendants, but they acted with willful blindness out of their own self-interest.

208.    Such negligence has actually caused and proximately caused damages to Plaintiffs, in an amount in excess of $50 million.

## COUNT ELEVEN

### (In the Alternative, Gross Negligence)

209.    Plaintiffs incorporate each and every allegation above as if set forth fully and verbatim herein.

210.    As set forth herein, Plaintiffs allege that Defendants conspired with Platinum and its principals, and others, to defraud and harm Plaintiffs, by knowingly and intentionally participating in a fraudulent scheme to induce Plaintiffs to turn over approximately $550 million to be managed by Beechwood for the benefit of Platinum and its principals, and to bolster and further Platinum's fraud scheme, which was known to Defendants.

211.    Alternatively, in the event it is determined that Defendants were unaware that Platinum was a fraud scheme and did not conspire with others to defraud Plaintiffs in the manner set forth herein, Plaintiffs assert the following alternative claim for relief.

212.    Defendants owed Plaintiffs a duty to act with reasonable care in connection with directing the Trust assets.

213.    Defendants' conduct evinces a reckless disregard for the right of Plaintiffs and policyholders and smacks of intentional wrongdoing.

214.    The inappropriateness of Beechwood's investments of Trust assets was easily visible to Defendants, but they acted with willful blindness out of their own self-interest.

215.    Such gross negligence has actually caused and proximately caused damages to Plaintiffs, in an amount in excess of $50 million.

## COUNT TWELVE

### (In the Alternative, Unjust Enrichment)

216.    Plaintiffs incorporate each and every allegation above as if set forth fully and verbatim herein.

217.    As set forth herein, Plaintiffs allege that Defendants conspired with Platinum and its principals, as well as others, to defraud and harm Plaintiffs, by knowingly and intentionally participating in a fraudulent scheme to induce Plaintiffs to turn over approximately $550 million to be managed by Beechwood for the benefit of Platinum and its principals, and to bolster and further Platinum's fraud scheme, which was known to Defendants.

218.    Alternatively, in the event it is determined that Defendants were unaware that Platinum was a fraudulent scheme and did not conspire with others to defraud Plaintiffs in the manner set forth herein, Plaintiffs assert the following alternative claim for relief.

219.    Defendants were unjustly enriched, at Plaintiffs' expense, when Defendants received portions of the $42 million negative ceding commission and $134 million in purported "surplus" taken from Trusts, because but for their improper conduct those amounts would never have been paid to Beechwood, and then to them, and equity and good conscience militate against permitting Defendants to retain those amounts, and other amounts they have personally received as a result of the Reinsurance Agreements.

220.    Plaintiffs are entitled to damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, as a result of the foregoing, Plaintiffs demand judgment in the amount of actual damages proven at trial, treble damages pursuant to 18 U.S.C. § 1964 (RICO), punitive damages under state law, plus interest, attorneys' fees, costs of suit, and such other and further relief as this Court deems just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs demand a trial by jury on all issues so triable.

Dated:        New York, New York            WINSTON & STRAWN LLP
              September 29, 2016
                                    By:        /s/  Adam J. Kaiser

                                    Adam J. Kaiser
                                    John M. Aerni
                                    Matthew A. Stark
                                    WINSTON & STRAWN LLP
                                    200 Park Avenue
                                    New York, New York 10166
                                    (212) 294-6700
                                    (212) 294-4700 (fax)
                                    akaiser@winston.com
                                    jaerni@winston.com
                                    mstark@winston.com

                                    *Attorneys for Plaintiffs*