UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| BANKERS CONSECO LIFE INSURANCE COMPANY and WASHINGTON NATIONAL INSURANCE COMPANY, | ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| MOSHE M. FEUER, SCOTT TAYLOR, DAVID LEVY and BEECHWOOD CAPITAL GROUP, LLC, | ) ) ) |
| | ) |
| Defendants. | ) |

Case No. 16 Civ. 7646 (ER)(BM)

**FIRST AMENDED COMPLAINT**

_____

Plaintiffs Bankers Conseco Life Insurance Company ("BCLIC") and Washington National Insurance Company ("WNIC"), by and through their counsel, hereby allege as follows for their First Amended Complaint against Defendants:

## NATURE OF THE ACTION

1.     Plaintiffs are affiliated insurance companies that, in 2013, sought to reinsure certain blocks of long term care business.  In May 2013, Plaintiffs were approached by Defendants Moshe M. Feuer and Scott Taylor, who represented to Plaintiffs that they owned and controlled Beechwood Capital Group, LLC ("Beechwood Capital"), a New York private investment fund, which was developing a "new entrant into the life and health reinsurance market."

2.     Feuer and Taylor, on behalf of Beechwood Capital, represented that they were forming and investing in a reinsurance company, Beechwood Re Ltd. ("Beechwood Re"). Beechwood Capital, Feuer and Taylor wanted to submit a proposal for Plaintiffs' reinsurance business.  Feuer and Taylor held themselves out as legitimate businessmen who would establish

a world-class reinsurance company with at least $100 million in capital that would effectively and conservatively manage reinsurance trust funds.  Ultimately, in reliance on the misrepresentations of Defendants and others, each Plaintiff entered into a reinsurance agreement with Beechwood Re.

3.      Unbeknownst to Plaintiffs, however, most everything told to them by Taylor, Feuer and Beechwood Capital was a lie.  For example, Beechwood Re was never capitalized with anywhere near $100 million, as Defendants represented.  It had virtually no capital at all.  In addition, Beechwood Re was not owned solely by some combination of Beechwood Capital, Taylor and Feuer, as Defendants represented.  Rather, it was largely owned and controlled by racketeers whose identities were hidden from Plaintiffs.  Approximately 70% of Beechwood Re's common stock was owned by the interests of Mark Nordlicht, Murray Huberfeld and David Bodner.  Taylor and Feuer owned only approximately 30% of Beechwood Re's common stock between them.

4.      Nor was Beechwood Re established with any intention to conservatively manage reinsurance trust funds, as Defendants represented.  Rather, Beechwood Re's owners used Beechwood Re as an artifice and front to commit a fraud, to enrich themselves and aid and abet the widely-publicized fraud scheme of Platinum Partners and its affiliates ("Platinum").  That fraud scheme has to date resulted in the criminal indictments of eight individuals (including Levy, Nordlicht and Huberfeld) – while other co-conspirators remain under investigation by multiple agencies of the federal government.

5.      Platinum was founded by Nordlicht, Huberfeld and Bodner.  For years, Platinum's hedge funds had reported outsized returns, supposedly by making high-risk investments.  However, as has now been revealed in the criminal complaints or indictments

brought against Huberfeld (*U.S. v. Seabrook and Huberfeld*, 16-CR-467 (S.D.N.Y.) (the "SDNY Indictment")) and Nordlicht, Levy, and others (*U.S. v. Nordlicht, et al.*, 16-CR-640 (E.D.N.Y.) (the "EDNY Indictment"), as well as the Securities and Exchange Commission ("SEC") complaint brought against certain Platinum entities and Defendant Levy and others (*SEC v. Platinum Management (NY) LLC, et al.*, 16-cv-6848 (KAM) (VMS) (E.D.N.Y.) (the "SEC Complaint" and "SEC Action") (attached hereto as Exhibits A-C, respectively), Platinum's purported outsized returns were overstated.  By at least early 2014, Platinum was relying almost exclusively on new investments and inter-fund loans to pay redemptions to investors.  In other words, Platinum was, as described by the U.S. Attorney for the Eastern District of New York, operating as a "Ponzi-esque" scheme.

6.      The co-conspirators in the Ponzi-esque scheme knew they needed to get creative to obtain the investments they needed to keep the scheme afloat and continue enriching themselves.  They knew that institutional investors like Plaintiffs would not make significant (or any) investments in the high-risk Platinum funds, much less entrust assets to the kind of individuals associated with Platinum.  Thus, in or around 2013, Nordlicht, Bodner, Huberfeld and Levy, along with other co-conspirators, devised a scheme to defraud institutional investors into entrusting their assets with the co-conspirators, albeit under the name of a purportedly legitimate enterprise named "Beechwood Re."

7.      Specifically, Nordlicht, Huberfeld, Levy, Feuer, Taylor, Beechwood Capital and others (collectively, the "co-conspirators") conspired to establish and market Beechwood Re as a purportedly legitimate reinsurer, and then use Beechwood Re as the vehicle for fraudulently inducing insurers like Plaintiffs to enter into reinsurance agreements with it.  Once Beechwood Re entered into these agreements, the co-conspirators would take control of the assets Plaintiffs

3

and other counterparties had entrusted to Beechwood Re and then use those assets to enrich themselves.

8. The co-conspirators needed to install suitable front-men for Beechwood Re, ones who were not overtly tied to Platinum. The co-conspirators agreed upon Feuer and Taylor. Unlike the Platinum founders, Feuer and Taylor were seemingly upstanding professionals with sufficiently strong reputations to attract institutional investors like Plaintiffs, based on the false promise that they owned Beechwood Re, were well capitalized and would invest the insurers' assets prudently.

9. Built on this framework of lies and deception, the co-conspirators caused Beechwood Re to seek out business in the reinsurance marketplace. In 2013, the co-conspirators made Plaintiffs their first victims.

10. Using the mails and wires of interstate commerce, the co-conspirators, including Feuer, Taylor and Beechwood Capital, continuously and repeatedly misrepresented that Beechwood Re was well capitalized and would prudently invest the reinsurance trust assets, while concealing and affirmatively misrepresenting Beechwood Re's true ownership structure and purpose.

11. Feuer, Levy and Taylor told Plaintiffs that they and an unidentified "passive" investor or investors owned Beechwood Re and that it was capitalized with Feuer's and Taylor's family money and the fortunes each had earned during their professional careers. They carefully and intentionally hid from Plaintiffs that Beechwood Re had virtually no capital at all, was majority owned by the interests of Nordlicht, Huberfeld and Bodner, and that all of its so-called "capital" consisted of a $100 million "Demand Note" issued by Beechwood Re Investments,

LLC ("Beechwood Investments"), an entity operated by Nordlicht and wholly owned by the interests of co-conspirators Nordlicht, Huberfeld, Bodner and Levy.

12.     Feuer, Taylor, Beechwood Capital, Levy and their co-conspirators induced Plaintiffs to enter into the reinsurance arrangements with Beechwood Re by affirmatively misrepresenting not only Beechwood Re's ownership and capital, but also its operation and management.  During a series of meetings between Feuer and Taylor and Plaintiffs in late 2013 when Plaintiffs were selecting a reinsurer, Feuer, Taylor and Levy presented a team of managers to Plaintiffs which they represented as Beechwood Re's senior officers.  However, as Plaintiffs learned only much later, almost all, if not all, of these "Beechwood" officers were Platinum officers and employees.

13.     A September 17, 2016 *Wall Street Journal* article (the "9/17 *WSJ* Article") shows the extent to which the co-conspirators used Beechwood Re as the vehicle for plundering assets of institutional investors such as Plaintiffs.  After the co-conspirators had induced Plaintiffs to enter into the reinsurance arrangements with false promises and representations, Plaintiffs assigned some $550 million in reinsurance trust assets to Beechwood Re in February 2014.  The 9/17 *WSJ* Article reports that, within *ten minutes* of Beechwood Re's beginning to receive these assets, Feuer and Taylor contacted Huberfeld and Nordlicht to notify them that the funds were pouring in, that is, that their scheme was working.[1]

14.     As detailed in the EDNY Indictment and below, over the next two to three years, the co-conspirators plundered Plaintiffs' reinsurance trust assets, using them to enrich themselves

---

[1] *Adviser With Ties to Hedge Fund Platinum Put Client Funds in It*, WSJ, Sept. 17, 2016, available at http://www.wsj.com/articles/adviser-with-ties-to-hedge-fund-platinum-put-client-funds-in-it-1473997753 ("Less than 10 minutes after Beechwood received word that money for its first transaction had arrived, Beechwood's founders notified Nordlicht and Huberfeld, documents reviewed by the Journal show.")

and further their Ponzi-esque scheme.  During that time, Feuer, Taylor, Levy and other co-conspirators sent quarterly reports to Plaintiffs, using the mails and wires of interstate commerce, in which they misrepresented and inflated the value of the reinsurance trust assets, with the intent of lulling Plaintiffs into a false sense of security regarding the safety of their investments; they then used those misrepresentations to pilfer approximately $134 million from the trusts as purported "surplus."  Feuer, Taylor, Levy and others were unjustly enriched when they distributed large portions of that $134 million to themselves.

15.     The co-conspirators also succeeded in luring other insurers into entrusting their funds to Beechwood Re, which the co-conspirators also used to enrich themselves and further their Ponzi-esque scheme.  Upon information and belief, the co-conspirators' racketeering activity continues to this day, as Beechwood Re continues to control reinsurance trust funds.

16.     By reason of the co-conspirators conducting the affairs of Beechwood Re through a pattern of racketeering activity, Plaintiffs have been injured in their business and property.

## THE PARTIES, CO-CONSPIRATORS AND RICO ENTERPRISES

### Plaintiffs

17.     Plaintiff BCLIC is an insurance company domiciled in New York with its principal places of business in New York and Indiana.

18.     Plaintiff WNIC is an insurance company domiciled in Indiana with its principal place of business in Indiana.

### The Co-Conspirator Defendants

19.     Defendant Moshe M. Feuer is a resident of Long Island, New York.  He and Taylor founded Beechwood Capital, owned common stock of Beechwood Re, and on behalf of Beechwood Capital, himself, Taylor, and the co-conspirators, induced Plaintiffs to enter into Reinsurance Agreements with Beechwood Re.

6

20.     Defendant Scott Taylor is a resident of New York, New York.  He and Feuer founded Beechwood Capital, owned common stock of Beechwood Re, and on behalf of Beechwood Capital, himself, Feuer, and the co-conspirators, induced Plaintiffs to enter into Reinsurance Agreements with Beechwood Re.

21.     Defendant David Levy is a resident of New York, New York, and Murray Huberfeld's nephew.  During certain of the relevant times, he served as Chief Financial Officer ("CFO") and Chief Investment Officer ("CIO") of B Asset Manager L.P. ("BAM"), a New York based investment advisor that managed Beechwood Re's assets, while simultaneously serving as a senior executive at Platinum entities.  According to the EDNY Indictment (Ex. B, ¶5), "Platinum principals controlled approximately 68 percent of the voting power of BAM."  Levy was also a shareholder of Beechwood Re.

22.     Defendant Beechwood Capital is a limited liability company formed and existing in New York with its principal place of business in Lawrence, New York.  Taylor and Feuer, along with others, directed its affairs.

**The RICO Enterprises**

23.     Beechwood Re is an enterprise within the meaning of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO").  "Beechwood" – the association-in-fact of Beechwood Re, Beechwood Capital, Beechwood Investments, Beechwood Holdings and BAM – constitutes a second RICO enterprise.  And, the association-in-fact of Defendants and the co-conspirators, including but not limited to Feuer, Taylor, Levy, Beechwood Capital, Nordlicht, Huberfeld, Bodner and others, constitutes a third RICO enterprise.  As set forth in this Complaint, as well as the SDNY and EDNY Indictments and SEC Complaint, these Defendants

and their co-conspirators functioned as a unit and conducted the affairs of each of these three RICO enterprises through a pattern of racketeering activity.

24.   These RICO enterprises shared common purposes and a structure.  The purposes were to use the vehicle of Beechwood Re to obtain funds from institutional investors, particularly insurance companies via reinsurance arrangements, take control of such funds and use them to enrich the co-conspirators while furthering their ongoing Ponzi-esque scheme. These Defendants' (and their co-conspirators') use of the mails and wires of interstate commerce was integral to their perpetration of their common purposes and fraudulent schemes.  Each of the co-conspirators agreed and committed to participate in these RICO enterprises and their common purposes and fraudulent schemes through two or more predicate acts of racketeering activity.

25.   These RICO enterprises had an ascertainable structure and organization that existed apart from the predicate acts of racketeering activity, as is proven by (a) the ownership and management structures of Beechwood Re, Beechwood Holdings, BAM and Beechwood Investments, (b) the roles the co-conspirators played in the establishment of, acquisition of interests in, and operation and management of Beechwood Re, Beechwood Investments, Beechwood Holdings and BAM, and (c) many of the co-conspirators' often overlapping roles and positions at Beechwood Re, Beechwood Investments, Beechwood Holdings, BAM, and Platinum entities.  As is demonstrated not only by each of these Defendants' roles and positions, but also by the facts set forth in this Complaint, the EDNY Indictment and the SEC Complaint, the co-conspirators functioned as a unit, each of these Defendants participated in the operation or management of the RICO enterprises and played vital roles in directing the enterprises' affairs through a pattern of racketeering activity.

26.     The co-conspirators' pattern of racketeering activity has been continuous and is ongoing.  As is demonstrated in this Complaint, the EDNY Indictment and the SEC Complaint, the pattern of racketeering, as it relates to Plaintiffs and other insurers, commenced in 2013 and remains ongoing and open-ended.  For example, upon information and belief, Beechwood Re's reinsurance relationships with other insurers are continuing at present, and Beechwood Re still maintains control of reinsurance trust assets.  The predicate acts of racketeering activity are all related, as all are tied to the enterprises' central purposes, identified above, and all have had the same or similar results (*e.g.*, inducing institutional investors such as insurers to entrust assets with Beechwood Re), participants (*e.g.*, the co-conspirators, including those identified as Defendants in this action), victims (BCLIC, WNIC, and other insurers), methods of commission (*e.g.*, deceptive schemes and promises, misrepresentations and fraudulent concealment of material facts, over-valuation of assets) and other distinguishing characteristics (*e.g.*, using Platinum plants to simultaneously serve as Beechwood Re managers).  The predicate acts of racketeering activity have been an integral part of the enterprises' regular way of doing business.

## JURISDICTION AND VENUE

27.     This Complaint is filed, and this Court has subject matter jurisdiction of the matters complained of, under 28 U.S.C. § 1331 and 18 U.S.C. § 1964.

28.     This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367, as the claims against Defendants are related to the claims upon which subject matter jurisdiction is based.

29.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b)(2) because a substantial part of the events, actions, or omissions giving rise to the dispute occurred in this District.

## FACTUAL BACKGROUND

### A.     The Co-Conspirators Devise Their Ponzi-esque Scheme

30.     For years, Platinum had reported steady, outsized returns, averaging 17% annually from 2003 to 2015.  It also guaranteed its investors liquidity upon a short 60- to 90-days' notice.

31.     As has since been revealed in the SDNY and EDNY Indictments, SEC Complaint and *Wall Street Journal* publications, however, Platinum's investment performance was overstated.  In reality, as early as 2012, Platinum was using incoming funds, including new investor moneys and substantial borrowings, simply to repay existing investors who were beginning to ask for their money back.  By at least early 2014, Platinum was relying almost exclusively on new investments and inter-fund loans to pay redemptions to its investors.  That is, Platinum was operating as a Ponzi-esque scheme.  By late 2015, Nordlicht and other co-conspirators considered fleeing the country to avoid the consequences of their criminal actions.

32.     The co-conspirators were acutely aware of the need to attract significant sources of outside funding, particularly from institutional investors, to maintain their Ponzi-esque scheme.  That was the genesis of their scheme to establish Beechwood Re as a vehicle for their racketeering activity.

### B.     The Formation of Beechwood Re

33.      The co-conspirators recognized not only their need to attract institutional investors with the deep pockets to keep their scheme afloat, but also their difficulties in attracting such investors.  Institutional investors were generally unwilling to entrust their funds to enterprises led by individuals with checkered pasts, such as of Huberfeld, Bodner and Nordlicht.  Each had a long history of unscrupulous conduct:

a.  In 1990, Huberfeld and Bodner were arrested for sending imposters to take their
    Series 7 brokerage licensing exams.  They eventually pled guilty to misdemeanors
    and were sentenced to two years of probation and paid substantial fines to the
    SEC.[2]

b.  In 1998, Huberfeld and Bodner settled civil allegations that they sold more than
    513,000 shares of restricted stock in a particular company.[3]  Huberfeld made an
    even larger payment to the SEC, in addition to the fine imposed on the fund they
    were then operating.[4]

c.  In 2007, a Nordlicht fund, Optionable Inc., collapsed in a trading scandal when
    another of its co-founders, Kevin Cassidy, was arrested for deliberately misstating
    the value of natural gas derivatives.[5]  Cassidy, who had served two prior stints in
    prison, was sentenced to another 30 months.[6]  When he was released from prison
    in 2014, Nordlicht, Bodner and Huberfeld had him installed as the *managing
    director* of Agera Energy, a distressed company that Platinum had acquired.  As
    discussed below, while serving as BAM's CIO and CFO, David Levy made

---

[2] *See* Zeke Faux, *No Blow Up Is Big Enough to Tarnish Platinum Partners' Returns*, Bloomberg,
Oct. 21, 2015, available at https://www.bloomberg.com/news/articles/2015-10-21/no-blow-up-is-
big-enough-to-tarnish-platinum-partners-returns.
[3] *See* Lorena Mongelli and Bruce Golding, *Hedgie Accused of Bribing Union Boss Has Criminal
Past*, NY Post, June 8, 2016, available at http://nypost.com/2016/06/08/hedgie-accused-of-
bribing-union-boss-has-criminal-past.
[4] *Id.*
[5] *See* SEC Press Release: SEC Charges Banker and Brokerage Executives With Multi-Million
Dollar Financial Fraud, Nov. 18, 2008, available at https://www.sec.gov/news/press/2008/2008-
274.htm.
[6] *See* Bill Singer, *Commodities CEO Gets 30 Months in Prison in Mark to Market Scheme*,
Forbes, Apr. 26, 2012, available at http://www.forbes.com/sites/billsinger
/2012/04/26/commodities-ceo-gets-30-months-in-prison-in-mark-to-market-
scheme/#62116c652089.

substantial investments of Plaintiffs' reinsurance trust assets in Agera's high-risk debt.[7]

d.  In 2012, another Nordlicht fund, Centurion Credit Management, L.P., entered into a sizeable settlement with the Chapter 11 Trustee of the Rothstein Rosenfeldt Adler PA Ponzi scheme (the "Rothstein Ponzi scheme").  The Chapter 11 Trustee charged Nordlicht's fund with arranging and accepting fraudulent transfers from Rothstein Ponzi scheme.[8]  According to published reports, both Huberfeld and Nordlicht and their wives were sued in connection with the Rothstein Ponzi scheme.

e.  Upon information and belief, Nordlicht and Huberfeld, while serving as officers of Platinum entities, were implicated when a Platinum subsidiary, BDL Manager, entered into yet another settlement with the SEC in 2014.  That settlement involved a scheme to profit from the imminent deaths of terminally ill patients in nursing homes and hospice care.[9]  Specifically, BDL Manager's brokers tricked dying patients into providing personal information that the brokers then used to purchase variable annuities, the benefits from which were paid to BDL Manager upon the patients' death.[10]  Because the insurance companies which sold the annuities would not allow the policies to be purchased by entities, Platinum arranged for close friends and relatives of its principals to serve as "nominees" on the policies, and then paid them each $20,000 to pass along the insurance

---

[7] *Id.*
[8] *See* SEC Press Release: SEC Announces Charges Against Brokers, Adviser, and Others Involved in Variable Annuities Scheme to Profit From Terminally Ill, Mar. 13, 2014, available at https://www.sec.gov/News/PressRelease/Detail /PressRelease/1370541121951.
[9] *Id.*
[10] *Id.*

proceeds to a Platinum-owned investment vehicle (BDL Group).  Huberfeld, who

was Platinum's CIO at the time, was personally briefed on the scheme and

recruited at least half of the nominees himself, including his own sister and

brother-in-law – the parents of David Levy.[11]

34.     Given their inability to attract institutional investors directly, the co-conspirators

hatched and developed a scheme to lure investors to a new entity that created the false

appearance of being unrelated to Nordlicht, Huberfeld or Bodner.  The scheme was to have

institutional investors, such as insurers, entrust their funds to a seemingly legitimate, independent

reinsurance company, while unaware that the reinsurer was funneling the entrusted funds to the

co-conspirators to enrich themselves and aid their fraud scheme.  The reinsurer that the co-

conspirators established was Beechwood Re.

35.     To effectively deploy Beechwood Re as an artifice and vehicle for perpetrating

their racketeering activity, the co-conspirators needed to acquire complete ownership and control

over Beechwood Re while concealing any trace of the fact that it was majority owned by the

interests of Nordlicht, Huberfeld and Bodner.

36.     The common stock of Beechwood Re was owned by Beechwood Re Holdings,

Inc. ("Beechwood Holdings").  For nominal consideration of less than $200,000, Nordlicht,

Bodner and Huberfeld acquired approximately 70% of all of Beechwood Re's common shares,

all of which were purportedly non-voting.  To hide their identities, however, they acquired that

stock through non-descript family trusts – denominated as "Beechwood Trust No. 1" through

"Beechwood Trust No. 19" – in which each of their children were the beneficiaries (the

---

[11] *See* SEC Initial Decision Release No. 733, *In the Matter of Michael A. Horowitz and Moshe Marc Cohen*, File No. 3-15790, Jan. 7, 2015, available at https://www.sec.gov/alj/aljdec/2015/id733bpm.pdf.

"Beechwood Trusts").[12]   Moreover, because BAM would control the actual investments,

Nordlicht, Bodner and Huberfeld owned more than two-thirds of BAM's voting shares.

     37.    Nordlicht, Bodner and Huberfeld would also acquire all of Beechwood Re's

preferred shares using a limited liability company, Beechwood Investments, which provided

virtually all of Beechwood Re's so-called "capital."  Beechwood Investments' managing

member was an entity controlled by Nordlicht (N Management LLC), and its other nine

members were denominated as "Beechwood Re Investments, LLC Series A" through

"Beechwood Re Investments, LLC Series I" (each a "Beechwood Series").  Each Beechwood

Series, in turn, was beneficially owned by the interests of Nordlicht, Bodner and Huberfeld.[13]

### C.    The Co-Conspirators Induce Plaintiffs to Enter Into Reinsurance Arrangements

     38.    In 2013, BCLIC and WNIC turned to the reinsurance marketplace to explore

ceding certain long term care liabilities to a qualified reinsurer.  In that process, Rick Hodgdon

and Michael Kaster of Willis Re Inc. ("Willis Re"), a reinsurance subsidiary of Willis Group

Holdings plc, introduced Plaintiffs, via email, to Beechwood Capital.  Beechwood Capital was

purportedly owned by Feuer and Taylor.

---

[12] Each beneficiary of Beechwood Trusts Nos. 1 through 6 was a different child of Nordlicht; each beneficiary of Beechwood Trusts Nos. 7 through 14 was a different child of Bodner; and each beneficiary of Beechwood Trusts Nos. 15 through 19 was a different child of Huberfeld. Huberfeld and Levy established Beechwood Trust No. 20 with Huberfeld's nephew, Defendant David Levy, as the beneficiary.

[13] Series A, D and I were beneficially owned by a combination of Nordlicht and his wife and relatives; Series B was beneficially owned by Huberfeld's children; Series C was beneficially owned by Bodner's wife and children; Series E was beneficially owned by Bodner, Huberfeld, Nordlicht and their respective families, collectively; and Series F, G and H were beneficially owned by Bodner's and Huberfeld's wives, collectively.

39.     Kaster had formerly worked for CNO companies and thus had some familiarity with the lines of business Plaintiffs wished to cede.  Kaster was known to be a credible insurance professional.

40.     Hodgdon, it turned out, left Willis Re and joined Platinum while Plaintiffs were evaluating competing reinsurance proposals, including Beechwood Re's proposal, even though Hodgdon, Taylor and Feuer advised Plaintiffs that Hodgdon had joined Beechwood Re.

**1.   The Co-Conspirators' Misrepresentations as to Managing Reinsurance Assets**

41.     To entice institutional investors and conceal their true involvement and ownership interests in Beechwood Re, Nordlicht, Bodner, Huberfeld, Levy and other co-conspirators ensured that Beechwood Re had suitable front men with no readily apparent ties to them or Platinum.  They selected Feuer and Taylor for the job.  Unlike Nordlicht, Bodner and Huberfeld, Beechwood Re's front men, Feuer and Taylor, were both seemingly upstanding professionals with excellent reputations.  Feuer had been the CEO of Marsh USA Inc., and Taylor had been an executive of Marsh & McLennan and COO for Merrill Lynch Wealth Management's Private Banking and Investments Group.  However, unknown to Plaintiffs, Feuer and Taylor also had long-time personal ties to both Huberfeld and Nordlicht.[14]  The stage was now set for the co-conspirators to put their scheme into action.

42.     On or about May 10, 2013, Taylor, on behalf of Beechwood Capital and using a Beechwood Capital email address, sent Hodgdon at Willis Re an "Executive Summary" bearing

---

[14] *Adviser With Ties to Hedge Fund Platinum Put Client Funds in It*, WSJ, Sept. 17, 2016, available at http://www.wsj.com/articles/adviser-with-ties-to-hedge-fund-platinum-put-client-funds-in-it-1473997753 ("Mr. Feuer had long known some at Platinum, whose executives were active in the same religious community on New York's Long Island.  He and Mr. Huberfeld served at a charity together, and Mr. Feuer's sister went to the same school as Platinum co-founder Mark Nordlicht, according to people familiar with the matter.")

the caption "Beechwood Capital Group."  The Executive Summary indicated that Beechwood Capital was a "New York-based private investment fund" and that the fund's "management team" decided to create a new reinsurance company.

43.     Beechwood Re was then to be a new reinsurance company; it had no existing business.  Feuer, Taylor and their co-conspirators correctly recognized that Plaintiffs, as institutional investors, would not select Beechwood Re as their reinsurer unless they could induce Plaintiffs into believing a lie, namely, that Beechwood Re intended to make conservative and prudent investments with the assets that Plaintiffs would transfer under any reinsurance arrangement.  In accordance with New York and Indiana law, which would govern reinsurance arrangements with BCLIC and WNIC, respectively, Beechwood Re would be required to place the assets transferred in any reinsurance arrangement in reinsurance trusts.

44.     Feuer, Taylor and Beechwood Capital's pitch for BCLIC's and WNIC's business was thus twofold.  *First*, Feuer and Taylor represented that they had strategies to manage claims more effectively, which they allegedly learned from their stints at prior companies.  *Second*, they claimed that they would employ experienced investment professionals, who would bring superior management of trust assets.

45.     Beechwood Capital, Feuer, Taylor and Levy made these representations in written materials prepared by Feuer, Taylor and Levy, among other co-conspirators, which were disseminated by email to Plaintiffs and then parroted by Feuer, Taylor and Levy in emails and telephone conversations with Plaintiffs throughout 2013.  The co-conspirators made these representations to Plaintiffs using the mails and wires of interstate commerce, in furtherance of the fraud and conspiracy Feuer, Taylor, Levy, Beechwood Capital and others perpetrated on Plaintiffs.

16

46.     For example, in July 2013, Beechwood Capital sent Plaintiffs, through Willis Re,
a PowerPoint deck entitled "Beechwood Re/Discussion Document/June 2013."  The deck,
prepared by Feuer, Taylor, Levy and others, represented that Beechwood Re:

    a.  had an investment team with "extensive experience utilizing credit-based
        investment strategies to generate returns while using strong risk management
        processes";

    b.  "Must Deploy a Responsible Investment Strategy Capable of Generating
        Adequate Returns";

    c.  "plan[ned] to independently employ quarterly third party valuation services to
        independently value liquid and non-liquid assets held in trusts – for the benefit of
        Beechwood Re, Cedant, and Corporate Trustee"; and

    d.  as per its "Sample Target Investment Guidelines," the majority of investments
        would be allocated to secured asset-based collateralized loans to U.S. institutions,
        with only 10% in direct loans to U.S. corporations.[15]

47.     Beechwood Capital included similar representations regarding its investment
experience in the written materials accompanying the letter of intent it sent to Plaintiffs, which
Feuer and Taylor emailed on or around August 23, 2013.

48.      On or about September 29, 2013, Taylor emailed Plaintiffs a document entitled
"BRe_CNO Term Sheet Key Points DRAFT 092813," noting that the document was "an
amended version of the talking points document we sent around before the call last week.  As
promised, we have added some key messages regarding Beechwood Re, that may be helpful in

_____

[15] Defendants caused Beechwood Re to invest nearly three times that amount in direct (and often
unsecured) loans alone, the vast majority of which were to Platinum or Platinum-related entities
– *i.e.*, entities owned or controlled by the co-conspirators.

conversations with the [New York] regulators." The term sheet again touted Beechwood Re's executive management's experience and plan to regularly engage qualified actuarial and valuation services to ensure that the reinsurance trust assets were prudently invested and properly valued.

49.     On or about October 7, 2013, Hodgdon, by then a Platinum employee parading as a Beechwood Re employee, emailed Plaintiffs the investment guidelines by which Beechwood Re would purportedly abide in investing Plaintiffs' reinsurance trust assets. The cover email, on which Taylor, Feuer and Levy were all copied, noted that Beechwood Re "took the CNO Invst Guidelines as our guide to ensure CNO internal compliance, and trust we were able to adhere to such." Beechwood Re's investment guidelines asserted that, "[c]ognizant of the fiduciary character of the insurance business, Beechwood Re, Ltd. and its affiliated insurance companies (the 'Companies') seek to protect the asset base, earn a return that allows the Companies to meet their liabilities, and provide a return for their shareholders. The assets shall be managed in a manner that acknowledges the importance of matching asset and liability durations, while minimizing the risk of impairment of Investments."

50.     To further entice Plaintiffs to invest trust assets with a purportedly prudent reinsurer, on or about November 19, 2013, Taylor, with copy to Feuer, Levy and Hodgdon, emailed Plaintiffs a set of "sample valuation reports from a vendor that David [Levy] has used in the past." According to Taylor, these heavily redacted reports evidenced the type of thorough valuations that would be performed on Plaintiffs' trust assets; that is, valuations based on "fair value, being defined as the price at which two willing market participants would buy/sell without being compelled to do so, and at arms [sic] length."

51.     On or about January 21, 2014, following telephone calls and the exchange of
drafts from Defendants to Plaintiffs, Plaintiffs submitted to state insurance regulators a variety of
documents prepared by Feuer, Taylor and others responding to multiple questions that the
regulators raised regarding the proposed reinsurance transactions.  These materials represented to
the state insurance regulators what Feuer and Taylor had been falsely telling Plaintiffs for several
months: Beechwood Re intended to ensure the prudent investment of trust assets, and that "[a]ll
transactions are subject to a rigorous peer review process."  Hodgdon circulated drafts of these
materials and engaged in telephone calls with Plaintiffs reiterating these representations prior to
submitting them to state regulators.

52.     These representations were both false and material, and Beechwood Capital,
Feuer, Taylor and Levy knew they were false when they made them to Plaintiffs (and state
regulators).  Plaintiffs relied on their false representations to Plaintiffs' detriment.  Beechwood
Re was not made up of seasoned professionals who would prudently and conservatively manage
the trust fund assets as fiduciaries.  Instead, Beechwood Re, BAM (which controlled the
investments), and the co-conspirators intended to invest trust fund assets for their personal
benefit, including but not limited to supporting the Platinum fraud scheme.

## 2.   The Co-Conspirators' Misrepresentations as to Beechwood's Ownership and Capitalization

53.      To attract institutional investors and induce Plaintiffs to reinsure their blocks of
business with Beechwood Re and transfer some $550 million of assets to it, Beechwood Capital,
Feuer, Taylor, Levy and other co-conspirators repeatedly misrepresented to Plaintiffs –
beginning in 2013 and continuing for several years thereafter – the nature of Beechwood Re's
capitalization, falsely portraying it as an entity backed by solid and substantial capital.

54.     Using the wires and mails of interstate commerce, Beechwood Capital, Feuer, Taylor, Levy and other co-conspirators repeatedly represented to Plaintiffs, orally and in writing, that Beechwood was owned by Feuer, Taylor and Levy and largely capitalized with their family money and the fortunes they had earned during their professional careers.

55.     On May 20, 2013, Kaster forwarded Plaintiffs written materials provided by Beechwood Capital entitled "Beechwood Re Executive Summary May 2013," indicating that "[t]his company wants to participate in the RFP process."  Taylor had sent the materials to Hodgdon under the subject line "Overview as requested" and Hodgdon then forwarded them to Kaster with the note "for CNO [Plaintiffs' ultimate parent company]."  The materials indicated that Beechwood Re's "initial capitalization will be $50MM" and "[t]he company has procured additional capital commitments as the operation expands over the course of the next 18 to 24 months."  Unbeknownst to Plaintiffs at the time, Beechwood had virtually no capital, either then or at any time before Plaintiffs entered into the reinsurance agreements with Beechwood Re. Almost all of its "financing" would come from a debt instrument under which Nordlicht, Huberfeld and Bodner agreed to loan money to Beechwood Re, if needed.

56.     A little over a month later, on July 8, 2013, Hodgdon forwarded Plaintiffs the informational deck prepared by Beechwood Capital, Feuer, Taylor and Levy, which represented that Beechwood Re was "capitalized with over $100MM in capital, with access and intent to fund up to $500 million additional over coming years."  These representations were false, as Beechwood Re had virtually no capital.

57.     Likewise, the term sheet Taylor emailed to Plaintiffs on September 29, 2013 – which was "an amended version of the talking points document" circulated earlier that week and discussed on a telephone call – represented that Beechwood Re was:

a.  "Owned by three U.S. individuals, including the former CEO of Marsh USA";

b.  "Capitalized with ~$130M of private funds, non-redeemable, with no connection to 'private equity'; access to $500M additional funding";

c.  "[C]urrently clean, with no liabilities and all the original capital as surplus (~$130M)"; and

d.  "[W]ill provide additional assets in excess of the Statutory Reserves equal to 7% of the reserves or the amount of the negative ceding commission whichever is greater.  This required collateral shall be held in the US Reserve Credit Trust."

58.     All of the above representations were false and Defendants knew them to be false when made.  Beechwood Re was not "[o]wned by three U.S. individuals", Feuer, Taylor and Levy.  A majority of its stock, through Beechwood Holdings, was owned by Nordlicht, Huberfeld, and Bodner, through their family trusts.  Taylor and Feuer combined owned approximately 30% of Beechwood Holdings' common stock.  Nor did Beechwood Re have $130 million in capital.  In fact, it had virtually no capital.

59.     In September 2013, Taylor and Feuer provided Plaintiffs a letter from an outside accounting firm to Levy regarding a valuation the firm purportedly performed "of certain Subject Interests of Beechwood Re Investors LLC that are anticipated to be contributed to the capital of Beechwood Re" – that is, "Partnership Interests in Investment Funds 'A'" and "'B'" and "Private Shares in a Public Traded Company."  According to the September 10, 2013 accountant's letter, based on "financial and legal documentation, including audited financials (as of December 31, 2012), regarding these assets and the facts and circumstances of each such Subject Interest", the accounting firm estimated that "the Fair Value of the combined Subject Interests as of December 31, 2012 is between $100 million and $130 million," and the firm understood "Beechwood Re,

Ltd is also investing $10 million in cash." These representations were false and Defendants knew them to be false. Beechwood Re had virtually no capital at all.

60.     Defendants and their co-conspirators repeatedly made these misrepresentations and commissioned this valuation to convince Plaintiffs that Feuer, Levy and Taylor brought to the table the significant capital needed to shoulder the burdens and risks of a reinsurance relationship of the magnitude that was being negotiated with Plaintiffs, and to perpetuate the falsehood that Beechwood Re would independently value and prudently invest the trusts' assets in the process.

61.     Feuer and Taylor also provided Plaintiffs with an "Unaudited Balance Sheet September 1, 2013" that stated that Beechwood Re had total assets of $114,801,585, including over $37 million in shares issued by a publicly traded company and over $10 million in "cash and cash equivalents," but no liabilities.

62.     In September 2016, Beechwood Re admitted to regulators in New York State that it had virtually no capital when it was formed. In response to a direct written question from regulators asking Beechwood Re how much capital it had when it was formed, Beechwood Re responded that its initial capitalization was $257,289.04, which was the subscription price for all of Beechwood Re's common stock.

63.     Instead of having solid and substantial capital, Beechwood Re received a $100 million "Demand Note" from Beechwood Investments, which was controlled by Nordlicht and owned by the family trusts established by Nordlicht, Huberfeld and Bodner.

64.     Under the terms of the Demand Note, Beechwood Re could seek funds from Beechwood Investments. Beechwood Investments could then fund Beechwood Re's demand, and Beechwood Holdings would issue preferred stock in the amount of the demand, which

would provide a 4% return.  That is, Beechwood Re's so-called "capital" was effectively a $100 million line of credit backed only by Nordlicht, Huberfeld and Bodner.

65.     Through this Demand Note, their ownership of a majority of Beechwood Holdings' common stock, and their control of BAM, Platinum principals effectively controlled Beechwood Re.  Nordlicht, Huberfeld and Bodner had (along with Feuer, Taylor and Levy), formed Beechwood Re as an artifice and front to commit fraud and enrich themselves, but, Beechwood Capital, Feuer, Taylor and Levy concealed Beechwood Re's true ownership structure from Plaintiffs and instead misrepresented that Feuer and Taylor largely owned, and controlled, Beechwood Re.

66.     Three months after entering into the reinsurance agreements, the co-conspirators unilaterally reduced the Demand Note from $100 million to $25 million.  None of this was disclosed to Plaintiffs either; instead, the co-conspirators repeatedly told Plaintiffs that they had over $100 million in capital, including interests in investment funds and publicly traded stock.

67.     Plaintiffs asked Beechwood Capital, Feuer, Taylor and Levy, and others, to disclose the sources of the "over $100MM in capital" and other "significant capital" with which they claimed Beechwood was "capitalized."  Feuer, Taylor, Levy, and other co-conspirators refused to disclose this information, however, repeatedly assuring Plaintiffs that this capitalization was provided by "passive investors."

68.     The co-conspirators' representations about "passive investors" were false and material, and Feuer, Taylor, Levy and Beechwood Capital knew they were false when they made them. Nordlicht, Bodner and Huberfeld were not "passive investors," as they had been instrumental in establishing Beechwood Re as the enterprise through which they and their co-conspirators perpetrated the pattern of racketeering activity.  They owned a majority of

Beechwood Holdings' common stock, a majority of the controlling stock of BAM, and also controlled Beechwood Re's access to financing – the Demand Note.  Huberfeld had an office at Beechwood Re, a fact that Plaintiffs did not learn until the publication of an article in the *Wall Street Journal* in July 2016.  From that article, Plaintiffs also learned that Huberfeld, Feuer, Taylor, Levy and other co-conspirators had installed Huberfeld's son and son-in-law as Beechwood employees.[16]  Likewise, communications referenced in the SEC Complaint show that Nordlicht told a third-party in early 2014 that he planned to leave Platinum for Beechwood Re's investment advisor, BAM, beginning January 1, 2015.  *See* Ex. C, ¶ 89.  Nordlicht, Huberfeld and others controlled Beechwood Re and BAM, and would use BAM to direct Beechwood Re's investments to support their fraud schemes.  These were not "passive investors."

69.     Feuer, Taylor, Levy and other co-conspirators used the mails and wires of interstate commerce in disseminating their misrepresentations as to Beechwood Re's allegedly "passive investors."  They used the mails and wires of interstate commerce in their establishment and operation of the RICO enterprises through which they conducted their pattern of racketeering activity.

70.     Had Feuer, Taylor, Levy, Beechwood Capital and the other co-conspirators not misrepresented the true state of affairs to Plaintiffs and revealed the identities of the entities that provided the Demand Note, and the persons who had beneficial interests in those entities, as well as the entities that owned Beechwood Investments, Beechwood Holdings and BAM, Plaintiffs never would have entered into reinsurance arrangements or any other agreements with

---

[16] *See Fraud Probe Ricochets Through Platinum Partners, A Hedge Fund with Ties to Jewish Community*, WSJ, July 25, 2016, available at http://www.wsj.com/articles/fraud-investigation-ricochets-through-hedge-fund-known-for-ties-to-jewish-community-1469439181.

Beechwood Re.  Plaintiffs would have had nothing to do with Beechwood Capital or Beechwood
Re had they become aware in 2013 of the interests that Huberfeld, Nordlicht and Bodner held in
Beechwood Re, Beechwood Holdings, Beechwood Investments, and BAM.

71.     Defendants' misrepresentations continued into 2016.  Taylor and Feuer advised
*state insurance regulators*, in writing, on September 13, 2016, that "[a]t no time in Beechwood's
history has Platinum Partners or its employees had voting or management control over
Beechwood."  In fact, the exact opposite is true:  Nordlicht, Bodner and Huberfeld controlled
virtually all of Beechwood Re's so-called "capital" – the Demand Note; they also owned,
through their family trusts' ownership of Beechwood Holdings, the vast majority of Beechwood
Re's stock; they also owned and controlled BAM, which controlled the Trust assets; their plants
at BAM and Beechwood Re controlled the investment and day-to-day operations concerning
Plaintiffs' reinsurance trust assets; and Platinum employees routinely directed BAM and
Beechwood Re employees in their work.

### 3.  Defendants Misrepresent the Nature of the Beechwood "Team"

72.     The co-conspirators also affirmatively misrepresented Beechwood Re's boots-on-
the-ground operation and management.

73.     For example, in November 2013, Beechwood Re sent its purported "team" to
meet with Plaintiffs in Indiana.  In connection with that meeting, the co-conspirators used the
mails and wires of interstate commerce to identify the so-called Beechwood Re "team" who
would be attending.

74.     By email dated November 5, 2013, Hodgdon, in agreement with Feuer, Taylor,
Levy and their co-conspirators, represented to Plaintiffs using the wires of interstate commerce
that the following represented the Beechwood Re "team": Feuer and Taylor; Will Slota, who was

identified as Beechwood Re's "Chief Operations Officer"; Paul Poteat, who was identified as Beechwood Re's "Chief Technology Officer"; David Ottensoser, who was identified as Beechwood Re's "General Counsel"; Dan Small, who was identified as the "Senior Secured Collateralized Loans PM" of Beechwood Re; and David Leff, who was identified as the "US Fixed Income PM" of Beechwood Re.

75.     As Plaintiffs learned only much later (in 2016), however, at least the following individuals identified as being part of Beechwood Re's "team" – Slota, Poteat, Ottensoser and Small – were officers or employees of *Platinum* entities.  Hence, Feuer, Taylor, Levy, Hodgdon and their co-conspirators affirmatively misled Plaintiffs as to the Beechwood Re's "team" with which Plaintiffs were then doing business and their connections to Platinum.

76.     Subsequently, the co-conspirators planted additional Platinum employees at Beechwood or otherwise directed its activities:  Stewart Kim, a former Platinum employee, was hired by Feuer and Taylor as Beechwood Re's Chief Risk Officer; Ezra Beren, Huberfeld's son, was hired by Feuer and Taylor to be a portfolio manager at BAM; Hodgdon was actually a Platinum employee "seconded" to Beechwood Re; after Levy left Beechwood, Feuer and Taylor hired Daniel Saks, another former employee of Platinum with strong ties to Nordlicht, to replace Levy as CIO of BAM; and Naftali Manela and Eli Rakower, both employees of Platinum, provided extensive and regular consulting services to Beechwood Re.

77.     In conjunction with their ownership and management control over Beechwood Re, Beechwood Holdings, Beechwood Investments and BAM, the co-conspirators controlled Beechwood Re's day-to-day operations and personnel and used Beechwood Re as a front and artifice to advance their fraud scheme for the benefit of the co-conspirators.

78.     Beechwood Capital, Feuer, Taylor, Levy and other co-conspirators intentionally made these misrepresentations to Plaintiffs when they enacted their fraudulent charade in November 2013.  They enacted the charade to fraudulently induce Plaintiffs to enter into reinsurance arrangements and transfer some $550 million of assets to the co-conspirators to further the Ponzi-esque scheme and enrich themselves.  These misrepresentations were not only false, but also material, in that Plaintiffs needed to know the team of personnel with whom they would be dealing in their reinsurance relationships.  Plaintiffs relied on these misrepresentations and were duped by Defendants' charade.

   **D.     The Reinsurance Arrangements**

79.     Under the reinsurance arrangements between BCLIC and WNIC, on the one hand, and Beechwood Re, on the other, BCLIC and WNIC ceded certain long term care liabilities to Beechwood Re and paid Beechwood Re over $42 million as a negative ceding commission – that is, BCLIC and WNIC paid Beechwood Re $42 million to enter into the reinsurance arrangements.

80.     Under the arrangements, Beechwood Re assumed control over claims administration, and BCLIC and WNIC transferred approximately $550 million into reinsurance trusts ("Trusts") to be invested and managed by Beechwood Re, and ultimately BAM, subject to certain investment guidelines and the insurance laws of New York and Indiana.  The assets in the Trusts were intended to serve as reliable (*i.e.*, safe and liquid) collateral for Beechwood Re's obligations to reimburse BCLIC and WNIC for claims on the transferred liabilities and for Plaintiffs to obtain reserve credits in accordance with insurance regulations.

81.     The reinsurance arrangements empowered Beechwood Re to direct the Trustee to invest or reinvest the Trust assets.

82.     The reinsurance arrangements required Beechwood Re to top-up the Trusts at the end of each quarter if the market value of the assets in the Trusts fell below certain amounts.

83.     The reinsurance arrangements also allowed Beechwood Re to withdraw funds from the Trusts at the end of each quarter if the fair market value of the Trust assets exceeded certain amounts.  Beechwood Re was permitted to withdraw such funds as "surplus" and distribute them as Beechwood Re saw fit.

84.     Beechwood Re was required, at the end of each quarter, to provide written reports to BCLIC and WNIC that demonstrated the fair market value of assets in the Trusts.  The reports were required to contain supporting detail and other information necessary for BCLIC and WNIC to verify that the assets were properly valued and that the Trusts' investment guidelines had been followed.

### E.     The Co-Conspirators Funnel Trust Assets to Themselves and Their Other Entities and Overstate the Value of Trust Assets to Enrich Defendants

85.     To further entice Plaintiffs to invest their trust assets with a purportedly prudent reinsurer, on or about November 19, 2013, Taylor, with copy to Feuer, Levy and Hodgdon, emailed Plaintiffs a set of "sample valuation reports from a vendor that David [Levy] has used in the past."  According to Taylor, these heavily redacted reports evidenced the type of thorough valuations that would be performed on Plaintiffs' Trust assets; that is, valuations based on "fair value, being defined as the price at which two willing market participants would buy/sell without being compelled to do so, and at arms [sic] length."

86.     In fact, the quarterly valuation reports submitted each month to justify their withdrawal of monies from the Trusts were not based on fair value.  Rather, they relied heavily on Beechwood Re's *own* estimation of value.

87.    Beginning immediately in or around February 2014, Beechwood Re, through Levy and other co-conspirators, began investing the Trust assets in high volume directly in Platinum funds and in other Platinum-owned or controlled entities – *i.e.*, entities owned and controlled by the co-conspirators.

88.    BCLIC and WNIC began receiving quarterly reports from Beechwood Re in March 2014, which were transmitted to Plaintiffs in Indiana using the wires of interstate commerce.  Upon receiving these reports and seeing the nature of the investments BAM had been making on Beechwood Re's behalf, BCLIC and WNIC became concerned.  Among other things, Plaintiffs learned that Levy, Feuer and Taylor had done the following with the Trust assets:

  a.    Invested tens of millions of dollars directly in certain Platinum funds;

  b.    Purchased a loan to George Levin, who was a principal in the Rothstein Ponzi scheme, from Platinum using Trust assets;

  c.    Loaned Trust assets to a Platinum-controlled entity run by Moshe Oratz and Aaron Elbogen.  Oratz was jailed in connection with a gambling ring, and Elbogen settled SEC charges over fraudulent trade executions; and

  d.    Loaned Trust assets to Cashcall Inc., which had been sued by the Consumer Financial Protection Bureau and 17 states for violating consumer protection and usury laws setting interest-rate caps.

89.    Plaintiffs objected to these uses of Trust assets.  They were not suitable investments for reinsurance trust funds, which should be conservative investments to ensure that there are sufficient assets to pay policyholder claims.

90.     In addition to funneling Trust assets to Platinum, the co-conspirators also began overstating the value of Trust assets, so that they could claim that the Trusts contained "surplus" assets that they could then skim off from the Trusts to enrich themselves.  Feuer, Taylor, Levy and other co-conspirators inflated the value of the Trust assets, and then provided that information to the valuation firms which, in turn, included the over-valuations in their quarterly reports.  Accordingly, the representations that Feuer, Taylor, Levy and other co-conspirators repeatedly made to Plaintiffs and others, including state regulators, that Beechwood Re's investments would be and had been independently valued by a reputable valuation firm, were materially false and misleading, and Plaintiffs relied on those misrepresentations to their detriment.

91.     Taylor and Feuer have continuously misrepresented the independence of the valuation reports they submitted to justify their withdrawal of funds from the Trusts.  On September 13, 2016, they advised *state insurance regulators* in writing that Beechwood Re had provided Plaintiffs with "independent valuations of holdings" and that all of the Trusts' investments in Platinum-linked business had "been independently valued" by an outside firm. Those representations were false and designed to mislead regulators and Plaintiffs.  The valuations submitted by Defendants to withdraw Trust assets for their personal benefit were never independent.

92.     Another way Feuer, Taylor, Levy and other co-conspirators artificially inflated the value of the Trusts' investments by affirmatively concealing their connections to the entities in which assets were invested – connections that could impact the ability to rate the transactions or provide a fair market valuation of the assets.  Only investments with a fair market value

exceeding the threshold that resulted from investments in unaffiliated entities could count toward the calculation of available "surplus."

93.    By way of example, the first quarterly valuation report Plaintiffs received contained an analysis of Beechwood Re's investment in a retail energy supplier called Agera Energy LLC ("Agera").  The report noted that in June 2014, Beechwood Re had invested nearly $22 million of Trust assets in Agera's Senior Secured Promissory Notes so that Agera could acquire the assets of another energy company, Glacial Energy Holdings.

94.    What the report did *not* disclose to Plaintiffs – because Feuer, Taylor, Levy and others affirmatively concealed it – was that Agera was wholly owned by a holding company that was 95% owned by Nordlicht's relative, Michael Joseph Nordlicht.  Nearly all of Michael Nordlicht's voting interests were, in turn, owned and controlled by Nordlicht's Beechwood Re Investments, LLC, with day-to-day control vested in a Beechwood Re affiliate, BAM Management Services LLC.[17]  Upon information and belief, the other 5% of Agera Holdings was owned by "MF Energy Holdings, LLC," a company that, upon information and belief, was wholly owned by Feuer.[18]  What is more, Levy sat on the Board of Directors of Glacial Energy Holdings, the company from which Agera purchased all of the assets.[19]  In other words, Agera was controlled by the co-conspirators, who placed themselves on all sides of the transaction. However, Feuer, Taylor, Levy and other co-conspirators affirmatively concealed this information, and as a result, the quarterly valuation report provided to Plaintiffs made no

_____

[17] *See* Energy Choice Matters at www.energychoicematters.com/stories/20150311a.html; www.energychoicematters.com/stories/20160718c.html.
[18] *See* Energy Choice Matters at www.energychoicematters.com/stories/20150311a.html.
[19] The acquisition itself was funded by a Senior Secured Loan for $51.9 million, which BAM and its subsidiaries purchased from Platinum on June 18, 2014.

mention of these conflicts of interest.  On the contrary, the valuation estimated that the value of the notes to Agera "as determined by Beechwood is 100% of cost."

95.    Six months later, Feuer, Taylor, Levy and other co-conspirators again used Trust assets to issue a $10 million Line of Credit to Agera.  Between February and September 2015, Agera acquired additional energy companies, including Lumens Energy Holdings LLC.  One of Lumens' two holding companies was 25% owned by Levy.[20]  Then, on June 9, 2016 – one day after Huberfeld was indicted and charged with bribing a union official to invest the union's pension funds with Platinum – Feuer, Taylor and others invested even more Trust assets in loans to Agera as part of a restructuring.  In an attempt to justify these loans, Feuer, Taylor and others, at the direction and for the benefit of the co-conspirators, represented to Plaintiffs that Agera's enterprise value had increased *by 550%* between June 2014 and June 2016.  They further represented that, during June 2016 alone, Agera's enterprise valuation had increased by 46% *in just 3 weeks*.

96.    Feuer, Taylor, Levy and other co-conspirators used the mails and wires of interstate commerce to disseminate such false and overstated quarterly valuation reports to Plaintiffs and others, including the New York State insurance regulators, all throughout 2014, 2015 and 2016.  The secret ownership and control that Huberfeld, Nordlicht, Bodner and others had over Beechwood Re and BAM enabled them to direct investments of Trust assets into other entities they owned and controlled without scrutiny from independent, senior level executives who would otherwise routinely question such transactions.  At no time during the 2013 or 2014 discussions leading up to the closing of the reinsurance arrangements did Feuer, Taylor, Levy or

---

[20] *See* Energy Choice Matters at www.energychoicematters.com/stories/20150311a.html.

anyone else advise Plaintiffs of this secret control over Beechwood, or that they would be making such high-risk investments in Platinum and Platinum-related entities with Trust assets.

97.     The co-conspirators used these false and overstated quarterly valuation reports to enrich themselves by skimming funds directly from the Trusts, claiming they were entitled to do so because the Trusts had "surplus" funds.  The co-conspirators did so practically every quarter, beginning in 2014 and lasting until the middle of 2016.  Over the course of these two years, the co-conspirators skimmed off approximately $134 million in Trust assets under the false premise that such funds were "surplus."

98.     The co-conspirators paid these ill-gotten gains to themselves.  Upon information and belief, Feuer, Taylor and Levy took their ill-gotten gains in the form of compensation and bonuses, among other means of distribution.

99.     The co-conspirators also benefited themselves greatly when, in mid-May 2014, Nordlicht, with the agreement of co-conspirators Huberfeld, Bodner, Levy, Feuer and Taylor, *unilaterally* amended and restated the Demand Note capitalizing Beechwood Re downward *from $100 million to $25 million*.  Nordlicht and the co-conspirators did so a mere three months after Plaintiffs accepted and relied upon the representations of Feuer, Taylor and Levy, among others, that Beechwood Re's capitalization was robust and sufficient enough to support their obligations under the reinsurance arrangements.  This $75 million reduction in personal liability to Beechwood Re inured to the benefit of Nordlicht, Bodner and Huberfeld, through their various family trusts that owned beneficial interests in the LLC that was providing credit to Beechwood Re.

100.    Of course, the co-conspirators did not inform Plaintiffs of this $75 million benefit to which Nordlicht, Bodner and Huberfeld treated themselves and their family members.  On the

contrary, for several months after the Demand Note to Beechwood Re was reduced, Feuer and

Taylor repeatedly reassured Plaintiffs that Beechwood Re was capitalized with over $100 million

in funding.  In December 2014 and January 2015 alone – nearly eight months after the Demand

Note was amended and restated – Feuer and Taylor represented to Plaintiffs that Beechwood Re

was capitalized with "over $140 million of capital and surplus between the Beechwood

companies," plus "[c]ommitments from Beechwood's partners of a minimum of $300 million in

additional surplus"; that Beechwood Re had "an irrevocable right to the assets within a Delaware

Series LLC … valued in excess of $100M"; and that its holding companies also had "irrevocable

rights under two different demand note facilities to draw" additional assets.  All of those

statements were knowingly false and misleading.

101.    Plaintiffs did not learn that Beechwood Re's purported $100 million-plus

capitalization was mere fiction until nearly a *year* after they entered into the reinsurance

arrangements, and even then, Taylor and Feuer provided Plaintiffs with only a heavily redacted

copy of the $25 million Amended and Restated Demand Note.  The redactions purposefully

concealed all evidence that it was executed by Nordlicht on behalf of Beechwood Investments.

**F.    Feuer and Taylor Falsely Promise to Divest the Trusts of Platinum
       Investments**

102.    In late 2014, Plaintiffs insisted to Feuer and Taylor that Beechwood Re

immediately begin to unwind its many significant investments in Platinum-related companies

and funds.  Using the mails and wires of interstate commerce, Feuer and Taylor agreed and told

Plaintiffs they would do so.

103.    Unbeknownst to Plaintiffs at the time – but which the EDNY Indictment, SEC

Complaint and 7/25 *WSJ* Article have all since made clear – Platinum had run out of cash in the

2014-2015 period as a result of increasing redemption requests from investors.

34

104.    Thus, from the time the Trusts were established and funded, BAM, Feuer, Taylor and Levy, functioning as a unit with the other co-conspirators, invested Trust assets in Platinum-linked entities.  These included the investment and manipulation of Trust assets in Black Elk Energy Offshore Operations, LLC ("Black Elk"), which is discussed the SEC Complaint and EDNY Indictment.  The co-conspirators' Black Elk swindle exemplifies how they executed their fraudulent scheme, using Beechwood Re as an artifice, to plunder Plaintiffs' Trust assets for their own benefit.  Using Trust assets, Beechwood Re and BAM caused the Trusts to invest over $100 million in more than a dozen Platinum-related investments, including direct investments in the Platinum funds.

105.    And, rather than divesting the Trusts of Platinum-related investments and replacing them with suitable investments as promised, Feuer and Taylor and other co-conspirators only partially redeemed the Trusts' direct investments in Platinum funds.  They also then *increased* the amount of Trust assets that were invested in companies owned or controlled by the co-conspirators.  Although Levy and (and later, Daniel Saks), as officers of BAM, were the individuals primarily responsible for making and approving investments in Platinum-linked entities, they made these investments at the direction of, and with the agreement of, the other co-conspirators, all of whom were benefited by them.  As of January 2016, Platinum and Platinum-related entities still "owed more than $140 million to Beechwood," much of which constituted Beechwood Re's investment of Trust assets.  Ex. B, ¶ 72.

106.    To lull Plaintiffs into a false sense of security, Feuer and Taylor also represented to Plaintiffs in late 2014, using the mails and wires of interstate commerce, that Beechwood Re's investment in Platinum-linked entities would cease because Levy supposedly "left" BAM.  This was another false promise.

107.    *First*, Levy "left" in name only, as he retained his ownership rights in Beechwood Re through at least all of 2015.  *Second*, the person who "replaced" Levy as CIO, Saks, was himself a key player in the co-conspirators' Ponzi-esque scheme and shared a long history with Nordlicht.  *Third*, the racketeering activity remained ongoing regardless of which racketeer sat as BAM's CIO.  Beechwood Re and BAM continued to invest Trust assets in Platinum-related companies.  Taylor, Feuer and the other co-conspirators ensured that the promised total unwinding of the Trusts' investments in Platinum-linked investments never happened, because the co-conspirators needed those investments to further their fraud scheme.

### G.    Huberfeld Is Arrested; Plaintiffs Begin Auditing The Trust's Assets

108.    On or about June 8, 2016, the FBI arrested Huberfeld and the Justice Department charged him with bribing a union official to invest $20 million of the union's pension funds in Platinum funds.  In connection with Huberfeld's arrest, articles began reporting on Huberfeld's and Nordlicht's connections to Beechwood Re, which the co-conspirators had concealed from Plaintiffs.[21]  Plaintiffs invoked the audit provisions of their reinsurance arrangements shortly after Huberfeld's arrest in June 2016.  In light of the arrest and related press coverage, Plaintiffs specified that the audit would include Beechwood Re's valuation of Trust assets and Beechwood Re's relationship with Platinum.

### H.    The Regulatory Orders

109.    On September 29, 2016, Plaintiffs' domiciliary insurance regulators, the New York State Department of Financial Services ("NY DFS") and the Indiana Department of Insurance ("IDOI"), issued letters concerning BCLIC and WNIC, respectively, declaring that,

---

[21] *See* Jody Godoy, *NYC Fund Manager, Union Head Accused of $20M Fraud*, Law360, June 8, 2016, available at http://www.law360.com/articles/804854/nyc-fund-manager-union-head-accused-of-20m-fraud.

after their investigation of the Trusts, "a substantial portion of the current assets held within the Trust[s] are not in compliance" with state law requirements. The NY DFS required Plaintiffs to remediate this deficiency within ten days, and the IDOI directed that corrective actions be taken immediately.

110.    These directives from the NY DFS and IDOI effectively required Plaintiffs to recapture the business ceded to Beechwood Re or else face disciplinary action, including the loss of their reinsurance credits for the ceded risks. As Feuer and Taylor have admitted, Beechwood Re was not capable of bringing many of the non-qualified Trust assets – largely assets invested in Platinum-related entities – into "compliance with state law requirements" for months or perhaps years after the date that the NY DFS and IDOI required those Trust assets to be brought into compliance.

I.      **BCLIC and WNIC Terminate Their Relationship With Beechwood Re**

111.    On September 29, 2016, the same date that Plaintiffs received the regulatory directives effectively requiring Plaintiffs to recapture the business they had ceded to Beechwood Re, Plaintiffs issued Notices of Termination to Beechwood Re, terminating the reinsurance arrangements between the parties due to the co-conspirators' fraud in the inducement of the parties' relationship, among other reasons. Plaintiffs also issued a notice to Wilmington Trust, the trustee of the Trusts, to transfer all Trust assets to Plaintiffs.

J.      **The EDNY Indictment and SEC Complaint**

112.    On or about December 14, 2016, Nordlicht, Levy, and five other Platinum executives were indicted by a federal grand jury in the Eastern District of New York on eight fraud and conspiracy counts, including securities fraud and conspiracy to commit securities fraud, wire fraud and investment adviser fraud. They were arrested shortly after being indicted. The United States Attorney for the Eastern District of New York described defendants' acts as

"one of the largest and most brazen investment frauds perpetrated on the investing public, earning Platinum more than $100 million in fees during the charged conspiracy," which "eventually led to Nordlicht and his co-conspirators [including nine unnamed co-conspirators] operating Platinum like a Ponzi scheme, where they used loans and new investor funds to pay off existing investors."[22]  *See* Ex. B.

113.    Contemporaneously, the SEC filed a parallel civil complaint against the same individuals and others for, among other things, various direct and/or aiding and abetting violations of Section 17(a) of the Securities Act of 1933, and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)-5 thereunder.  *See* Ex. C.

114.    The SEC's allegations against Nordlicht, Levy and the other defendants arose, in large part, out of their involvement in the Black Elk swindle.  *See, e.g.*, Ex. C, ¶¶ 69-102.  As the SEC Complaint makes clear, "[c]rucial to this effort [of Nordlicht, Levy and Small to pursue a rigged vote in the consent solicitation] was the transfer of a large number of notes from [Platinum] to [ ] Beechwood affiliates."  *Id.*, ¶ 89.

## **COUNT ONE**

### **Violation of Civil RICO – 18 U.S.C. § 1962(c)**
### **(Against All Defendants)**

115.    Plaintiffs incorporate each and every allegation above as if set forth verbatim in this paragraph.

116.    Plaintiffs are "persons" as defined in 18 U.S.C. § 1961(3).

117.    Each of Defendants Feuer, Taylor, Levy, and Beechwood Capital is a "person," as that term is defined in 18 U.S.C. § 1961(3).

---

[22] *Platinum Partners Execs Charged in $1B mini-Madoff Fraud*, December 19, 2016, USA Today, available at http://www.usatoday.com/story/money/2016/12/19/platinum-partners-execs-charged-1b-fraud/95605808/.

118.    Each of these Defendants was employed by or associated with the following enterprises: (a) Beechwood Re; (b) Beechwood – the association-in-fact of Beechwood Re, Beechwood Capital, Beechwood Investments, Beechwood Holdings and BAM; and (c) the association-in-fact of Defendants and their co-conspirators, including but not limited to Feuer, Taylor, Levy, Beechwood Capital, Nordlicht, Huberfeld and Bodner.  Each of these entities or associations-in-fact constitute an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4). Each of these RICO enterprises had an ascertainable structure and organization, common purposes and existed apart from the predicate acts perpetrated by these Defendants.  At all relevant times, each enterprise engaged in, and its activities affected, interstate commerce.  Each of the Defendants participated directly or indirectly in the management, direction or operation of each enterprise.

119.    As was set forth above in detail, each Defendant conducted or participated in the conduct of the affairs of each of these three RICO enterprises through a pattern of racketeering activity, as set forth in 18 U.S.C. § 1961(5).  That is, as is set forth above, each Defendant perpetrated and agreed to perpetrate numerous predicate acts of racketeering activity identified under 18 U.S.C. § 1961(1), specifically mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.  Each Defendant perpetrated and agreed to perpetrate two or more acts of racketeering activity in furtherance of their fraudulent schemes or artifices to defraud, with a specific intent to defraud Plaintiffs and other institutional investors and to obtain their money and property by means of false pretenses, representations and promises.  Each such communication constitutes a distinct and separate offense.

120.    These predicate acts of racketeering activity are all related, as Defendants have perpetrated the predicate acts for the common purpose of furthering their fraudulent schemes,

identified and discussed in detail above.  And, their predicate acts of racketeering activity have all had common (a) results (furthering their fraudulent schemes to induce institutional investors such as insurers to entrust assets with Beechwood Re), (b) participants (Defendants and their co-conspirators), (c) victims (insurers, such as BCLIC and WNIC), (d) methods of commission (the use of fraudulent and deceptive devices to induce insurers into entrusting their assets with Beechwood Re, the false and fraudulent over-valuation of Trust assets) and (e) other distinguishing characteristics (such as using Platinum plants as purported Beechwood Re managers).

121.    The predicate acts of racketeering have also been continuous.  Defendants began perpetrating predicate acts of racketeering in furtherance of their fraudulent schemes in 2013, at least as to Plaintiffs, and perpetrated them continuously for several years thereafter.  Their predicate acts of racketeering remain ongoing and open-ended.  The predicate acts of racketeering activity have been an integral part of the enterprises' regular way of doing business. Thus, Defendants have engaged in a "pattern" of racketeering activity, as that phrase is defined in 18 U.S.C § 1961(5).

122.    Each Defendant has therefore violated 18 18 U.S.C § 1962(c) by conducting or participating in the conduct of the enterprises' affairs through a pattern of racketeering activity.

123.    Plaintiffs have been injured in their business and property by reason, and as a proximate result, of each Defendant's violations of 18 U.S.C. § 1962(c), in at least the following ways: (a) by being fraudulently induced to enter into reinsurance arrangements with Beechwood Re and paying a negative ceding commission to Beechwood in an amount exceeding $42 million; (b) by having more than $134 million of Trust assets unlawfully withdrawn from the Trusts and then distributed to Defendants and others; and (c) by not having the Trusts

replenished and restored to their proper and lawful asset levels upon Plaintiffs' recapture of the

Trust.  Defendants' conduct poses a continued threat of harm to Plaintiffs into the future.

## COUNT TWO

### RICO Conspiracy – 18 U.S.C. § 1962(d)
### (Against All Defendants)

124.    Plaintiffs incorporate each and every allegation above as if set forth verbatim in

this paragraph.

125.    In violation of 18 U.S.C. § 1962(d), Defendants Feuer, Taylor, Levy, Beechwood

Capital and their co-conspirators agreed and conspired among themselves to violate 18 U.S.C. §

1962(c).

126.    The purposes of the conspiracy included obtaining funds from institutional

investors, particularly insurers such as Plaintiffs, via reinsurance arrangements, taking control of

such funds and using them to further and perpetuate the co-conspirators' ongoing Ponzi-esque

scheme and to enrich Defendants and their co-conspirators.

127.     Each Defendant agreed and combined with the co-conspirators to engage in a

pattern of racketeering activity.  Each Defendant agreed to the commission of two or more

predicate acts of mail and/or wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343 and in

furtherance of the co-conspirators' fraudulent schemes and common purposes.  Each Defendant

knew that participation in acts of mail and wire fraud formed part of a pattern of racketeering

activity and agreed to the commission of those acts to further the schemes and common purposes

described in this Complaint.

128.    Moreover, each Defendant's agreement can reasonably be inferred from the close

ties to the other co-conspirators and their mutually dependent, coordinated efforts to achieve the

common purposes of the co-conspirators and each enterprise.

129.    Plaintiffs have been injured in their business and property by reason, and as a proximate result, of each Defendant's conspiracy to violate 18 U.S.C. § 1962(c).  Plaintiffs have been injured in their business or property in at least the following ways: (a) by being fraudulently induced to enter into reinsurance arrangements with Beechwood Re and paying a negative ceding commission to Beechwood Re in an amount exceeding $42 million; and (b) by Beechwood Re's unlawful withdrawal of more than $134 million of Trust assets from the Trust and its distribution of those Trust assets to Defendants and others; and (c) by Beechwood Re's and Defendants' failure to replenish the Trust and thereby restore it to its proper and lawful asset level upon Plaintiffs' recapture of the Trust.  Defendants' conduct poses a continued threat of harm to Plaintiffs into the future.

## COUNT THREE

### Violation of Indiana Corrupt Business Influence Statute
### (Indiana RICO) – Ind. Code § 35-45-6-2(3)
### (Against All Defendants)

130.    Plaintiffs incorporate each and every allegation above as if set forth verbatim in this paragraph.

131.    Each Defendant was employed by or associated with the following enterprises: (a) Beechwood Re; (b) Beechwood Investments; (c) BAM and (d) the association-in-fact of Defendants and their co-conspirators, including but not limited to Feuer, Taylor, Levy, Beechwood Capital, Nordlicht, Huberfeld and Bodner.  Each of these entities or associations-in-fact constitute an "enterprise" within the meaning of Ind. Code § 35-4-6-1(c).  Each of these RICO enterprises had an ascertainable structure and organization, common purposes and existed apart from the predicate acts perpetrated by Defendants.  At all relevant times, each enterprise engaged in, and its activities affected, interstate commerce.  Each Defendant participated directly or indirectly in the management, direction or operation of each enterprise.

42

132.    As was set forth above in detail, each Defendant conducted or participated in the conduct of the affairs of each of these three RICO enterprises through a "pattern of racketeering activity," as that phrase is defined under Ind. Code § 35-4-6-1(d).  That is, as is set forth above, each Defendant perpetrated and agreed to perpetrate numerous predicate acts of racketeering activity identified under Ind. Code § 35-45-6-1(e), specifically fraud in violation of Ind. Code § 35-43-5-4(8) and § 35-43-4-2 .  Each Defendant perpetrated and agreed to perpetrate two or more acts of racketeering activity in furtherance of their fraudulent schemes or artifices to defraud, with a specific intent to defraud Plaintiffs and other institutional investors and to obtain their money and property by means of false pretenses, representations and promises, and did in fact conceal, encumber or transfer Plaintiffs' property, the conduct or result of which occurred in Indiana.  Each such communication constitutes a distinct and separate offense.

133.    These predicate acts of racketeering activity are all related, as Defendants have perpetrated the predicate acts for the common purpose of furthering their fraudulent schemes, identified and discussed in detail above.  And, their predicate acts of racketeering activity have all had common (a) results (furthering their fraudulent schemes to induce institutional investors such as insurers to entrust assets with Beechwood Re), (b) participants (Defendants and their co-conspirators), (c) victims (insurers, such as BCLIC and WNIC, and others), (d) methods of commission (the use of fraudulent and deceptive devices to induce insurers into entrusting their assets with Beechwood Re, the over-valuation of Trust assets) and (e) other distinguishing characteristics (such as using Platinum plants as purported Beechwood Re managers).

134.    The predicate acts of racketeering have also been continuous.  Defendants began perpetrating predicate acts of racketeering in furtherance of their fraudulent schemes in 2013, at least as to Plaintiffs, and perpetrated them continuously for several years thereafter.  Their

predicate acts of racketeering remain ongoing and open-ended. The predicate acts of

racketeering activity have been an integral part of the enterprises' regular way of doing business.

Thus, Defendants have engaged in a "pattern" of racketeering activity, as that phrase is defined

in Ind. Code § 35-4-6-1(d).

135.   Each Defendant has therefore violated Ind. Code § 35-45-6-2(3) by conducting or

participating in the conduct of the enterprises' affairs through a pattern of racketeering activity.

136.   Plaintiffs have been injured in their business and property by reason, and as a

proximate result, of each Defendant's violations of Ind. Code § 35-45-6-2(3), in at least the

following ways: (a) by being fraudulently induced to enter into reinsurance arrangements with

Beechwood Re and paying a negative ceding commission to Beechwood Re in an amount

exceeding $42 million; (b) by having more than $134 million of Trust assets unlawfully

withdrawn from the Trusts and then distributed to Defendants and others; and (c) by not having

the Trusts replenished and restored to their proper and lawful asset levels upon Plaintiffs'

recapture of the Trust. Defendants' conduct poses a continued threat of harm to Plaintiffs into

the future.

## COUNT FOUR

**Fraud/Fraudulent Concealment**
**(Against All Defendants)**

137.   Plaintiffs incorporate each and every allegation above as if set forth verbatim in

this paragraph.

138.   As set forth above, Defendants Feuer, Taylor, Levy and Beechwood Capital made

numerous false representations of material fact to Plaintiffs, knowing such statements were false

when making them, concerning (a) the ownership and capitalization of Beechwood Re, (b) the

nature of Beechwood Re's "team" and its ties with Platinum, and (c) the true purposes behind

Beechwood Re's entering into the reinsurance arrangements with Plaintiffs and the plans and strategies for managing and investing Plaintiffs' reinsurance Trust assets, among other things, with the intent of fraudulently inducing Plaintiffs to enter into reinsurance arrangements with Beechwood Re and not terminate those arrangements after they were entered into.

139.   Plaintiffs justifiably relied upon such misrepresentations to their detriment, both in entering into the reinsurance arrangements and then not terminating them earlier.

140.   Plaintiffs have been injured as a proximate result of each of these Defendants' fraudulent misrepresentations and concealments in at least the following ways: (a) by being fraudulently induced to enter into reinsurance arrangements with Beechwood Re and paying a negative ceding commission to Beechwood Re in an amount exceeding $42 million; (b) by having more than $134 million of Trust assets unlawfully withdrawn and then distributed to Defendants and others; and (c) by being forced to pay significant sums to outside professionals in connection with terminating the reinsurance agreements and recapturing Trust assets.

## COUNT FIVE

### Unjust Enrichment/Constructive Trust
### (Against Feuer, Taylor and Levy)

141.   Plaintiffs incorporate each and every allegation above as if set forth verbatim in this paragraph.

142.   Defendants Feuer, Taylor and Levy were unjustly enriched, at Plaintiffs' expense. Approximately $134 million in Trust assets were skimmed off of the Trusts as purported "surplus" when, but for the improper conduct alleged in this Complaint, those amounts would have never been released.  All or a significant portions of these $134 million in ill-gotten gains were siphoned off to pay Feuer, Taylor and Levy, in the form of compensation, bonuses, dividends and/or other payouts.

143.     It is against equity and good conscience to permit any of these Defendants to

retain any portion of $134 million removed from the Trusts, as Beechwood Re made all of these

payouts with the ill-gotten gains it received from Plaintiffs.  Plaintiffs seek an accounting of the

monies paid to these Defendants, and a constructive trust should be imposed on all funds

removed from the Trust that constitutes Plaintiffs' property.

## PRAYER FOR RELIEF

WHEREFORE, as a result of the foregoing, Plaintiffs demand judgment in the amount of

actual damages proven at trial, trebled in accordance with 18 U.S.C. § 1964 and Ind. Code § 35-

24-2-6(b), plus interest, attorneys' fees, the costs of suit, and such other and further relief as this

Court deems just and proper.


## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: New York, New York                            SILLS CUMMIS & GROSS P.C.
          April 27, 2017

                                                     By:      /s/  Joseph L. Buckley

                                                          Joseph L. Buckley
                                                          Richard H. Epstein
                                                          SILLS CUMMIS & GROSS P.C.
                                                          One Riverfront Plaza
                                                          Newark, New Jersey 07102
                                                          (973) 643-7000
                                                          (212) 643-6500 (fax)
                                                          jbuckley@sillscummis.com
                                                          repstein@sillscummis.com

                                                          ALSTON & BIRD LLP
                                                          Adam J. Kaiser
                                                          John M. Aerni (JA 3394)
                                                          Daniella P. Main
                                                          Elizabeth A. Buckel
                                                          90 Park Avenue
                                                          New York, New York 10016

(212) 210-9400
(212) 210-9444 (fax)
adam.kaiser@alston.com
john.aerni@alston.com
daniella.main@alston.com
elizabeth.buckel@alston.com

*Attorneys for Plaintiffs Bankers*
*Conseco Life Insurance Company*
*and Washington National Insurance*
*Company*