H5PLBANC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     BANKERS CONSECO LIFE INSURANCE
3    COMPANY, et al.,

4                    Plaintiffs,

5           v.                             16 CV 7646 (ER)

6    MOSHE M. FEUER, et al.,

7                    Defendants.
     ------------------------------x
8                                          New York, N.Y.
                                           May 25, 2017
9                                          4:08 p.m.

10   Before:

11                      HON. EDGARDO RAMOS,

12                                         District Judge

13                            APPEARANCES

14   ALSTON & BIRD, LLP
          Attorneys for Plaintiffs
15   BY:  ADAM J. KAISER
          JOHN M. AERNI
16        -and-
     SILLS CUMMIS & GROSS, P.C.
17   BY:  JOSEPH L. BUCKLEY
          RICHARD H. EPSTEIN
18

19   WILLIAMS & CONNOLLY LLP
          Attorneys for Defendant Taylor
20   BY:  DAVID M. ZINN
          ANKIT BAHRI

21   LIPSIUS-BENHAIM LAW, LLP
          Attorneys for Defendant Feuer
22   BY:  IRA S. LIPSIUS

23   WILSON, SONSINI, GOODRICH & ROSATI, PC
          Attorneys for Defendant Levy
24   BY:  MORRIS J. FODEMAN
          KATHERINE T. McCARTHY

25

H5PLBANC

1           (Case called)

2           THE COURT:  Good afternoon to you all.  This matter is

3    on for a premotion conference.  However, this is the first time

4    that the parties have appeared before me, and I know that

5    there's been some amount of activity before today.  So,

6    Mr. Kaiser or Buckley or Epstein or Aerni, which one of you is

7    going to be able to tell me what's been going on and what this

8    case is about.

9           MR. KAISER:  Sure.  Good afternoon, your Honor.  In

10   terms of this case, really nothing has gone on.  We filed the

11   complaint in September of last year.  That was before, of

12   course, the U.S. Attorney in Brooklyn issued indictments in

13   connection with the Platinum Partners' alleged fraud, which

14   included indictments against certain Platinum entities and

15   individuals, one of whom is a defendant in this case, Mr. Levy.

16   So it was shortly after we filed the civil complaint that's

17   before your Honor now that those indictments were issued and

18   the SEC filed its civil enforcement action against the same

19   Platinum entities and a bunch of individual defendants, again

20   including Mr. Levy.

21          THE COURT:  Is Mr. Levy the only defendant here that

22   is under indictment in Brooklyn?

23          MR. KAISER:  Yes, your Honor.

24          THE COURT:  Any other entities that are defendants

25   here that are under indictment in Brooklyn?

H5PLBANC

1          MR. KAISER:  No, your Honor.

2          THE COURT:  Okay.

3          MR. KAISER:  So in light of the indictments and the

4    fact that we had been in contact after we filed the complaint

5    with the U.S. Attorney and the SEC, we did not immediately

6    serve the complaint.  We wanted to continue our investigation

7    based upon information that had become available to us as a

8    result of the indictments issued in Brooklyn, as well as the

9    SEC complaint.

10          We served the complaint in this action.  Defense

11    counsel requested an extension of time to respond.  We of

12    course consented.  And on their last day that they had to

13    respond to the complaint, they asked for a premotion conference

14    before your Honor on their motion to compel arbitration and

15    that was I believe on March 15.

16          And since March 15, there hasn't been any activity in

17    the case.  The plaintiffs haven't sought to take any discovery

18    in the matter, understanding it's the defendant's position that

19    the entire matter should be sent to arbitration and that it's

20    appropriate for the Court to determine that threshold issue

21    before we move forward with any discovery in this case.

22          There is also, as the Court is aware from the letters,

23    a companion arbitration that was filed by Bankers and

24    Washington National against Beechwood Reinsurance, who is the

25    respondent in that case.  That arbitration is even less

H5PLBANC

1     advanced, if possible, than this case.

2              THE COURT:  Who was that arbitration sought before?

3              MR. KAISER:  That arbitration is before the AAA.  And

4     the arbitration agreement contemplates a tripartite arbitration

5     panel so that each party to the arbitration agreement appoints

6     a party appointed arbitrator, who has to be a neutral

7     arbitrator under the AAA rules.  And then those two party

8     appointed arbitrators select what's colloquially referred to as

9     an umpire.

10             So the panel has just been constituted recently, so we

11    have our three arbitrators in place, but we have not appeared

12    before the arbitrators.  There's been no preliminary

13    organizational meeting or anything else.  And, in fact, that is

14    scheduled for June 12 here in New York, which will be the first

15    time that we appear before the arbitration panel.

16             THE COURT:  Am I correct that your clients are the

17    ones that sought the arbitration?

18             MR. KAISER:  We filed the arbitration, your Honor.

19    There is an arbitration provision in the reinsurance treaties

20    with Beechwood that says any dispute "between the parties" has

21    to be subject to mandatory arbitration under the terms of the

22    reinsurance treaties.  So we commenced that arbitration on

23    September 29 because we can't sue Beechwood Reinsurance.

24             I doubt Beechwood Reinsurance will have sufficient

25    funds to satisfy any arbitral award.  My understanding is that

H5PLBANC

1    the insurance companies they were doing reinsurance deals with,

2    I've heard, have all terminated their reinsurance agreements.

3    I'm not sure if that's true.  But I know that they've been

4    trying to sell themselves in light of all of the allegations

5    that have been made not only in this lawsuit, but in the

6    indictments and the SEC complaint concerning Beechwood.

7              THE COURT:  Who represents Beechwood Reinsurance in

8    that arbitration?

9              MR. KAISER:  Locke Lord and Mr. Lipsius.

10             THE COURT:  Okay.

11             MR. KAISER:  I should note that in the indictment of

12   the owners -- and I think this is important to say -- Beechwood

13   Reinsurance was owned by a series of individuals, including

14   Mr. Feuer and Mr. Taylor, but including Murray Huberfeld, who

15   is under indictment here in the Southern District of New York

16   for allegedly trying to bribe Norm Seabrook, the corrections

17   officer union president, to make a $20 million investment in

18   the Platinum funds.  And he was actually arrested and indicted

19   I believe it was last June in connection with trying to

20   allegedly bribe Mr. Seabrook into investing in the Platinum

21   funds.  He owns a substantial part of Beechwood Reinsurance's

22   holding company stock.

23             Mark Nordlicht, who is the alleged kingpin of the

24   Platinum Partners fraud and the main individual defendant in

25   the Eastern District criminal action and SEC civil enforcement

H5PLBANC

| | |
|---|---|
| 1 | action, was another substantial owner of the stock of |
| 2 | Beechwood.  In fact, the majority of the stock in Beechwood, as |
| 3 | alleged in the indictment -- |
| 4 | THE COURT:  Beechwood? |
| 5 | MR. KAISER:  Beechwood Reinsurance -- was owned by |
| 6 | Mr. Huberfeld, the guy who allegedly bribed Norm Seabrook; |
| 7 | Mr. Nordlicht, the guy who has been indicted in Brooklyn as the |
| 8 | kingpin of the Platinum fraud; and Mr. Levy.  Mr. Taylor and |
| 9 | Mr. Feuer were also shareholders in Beechwood, but I believe, |
| 10 | according to the government, they are minority shareholders of |
| 11 | Beechwood. |
| 12 | THE COURT:  Now, Huberfeld and Nordlicht are not |
| 13 | defendants here, correct? |
| 14 | MR. KAISER:  They are not defendants here. |
| 15 | THE COURT:  What is the status of Mr. Huberfeld's -- |
| 16 | if I'm pronouncing that correctly -- what's the status of his |
| 17 | indictment, if you know? |
| 18 | MR. KAISER:  I believe it's Huberfeld, your Honor, and |
| 19 | there was a conference in the case recently and trial is |
| 20 | scheduled for October. |
| 21 | THE COURT:  And who is that before, what judge, if you |
| 22 | know? |
| 23 | MR. KAISER:  I'm not sure.  I don't know if any of the |
| 24 | defense counsel may be aware. |
| 25 | THE COURT:  Okay. |

H5PLBANC

1          MR. KAISER:  Along with the criminal actions, there's

2    an SEC civil enforcement action where the SEC petitioned and

3    was granted a receiver over a hedge fund known as PPCO, which

4    is the major domestic fund of the Platinum funds that's the

5    subject of the SEC complaint and which participated in the

6    alleged securities fraud that's set forth in the indictment.

7          There is another fund called PPVA, which is an

8    international fund.  It's headquartered and domiciled in the

9    Cayman Islands, and that fund is currently in liquidation

10   before a Cayman Islands liquidator.  And that there's been a

11   lot of cooperation, as I understand it, between the liquidator

12   and the SEC receiver because the group of investors in the

13   funds are, you know, similar.

14         THE COURT:  What is the identity, if any, between the

15   parties before me and the SEC civil enforcement action?

16         MR. KAISER:  Mr. Levy is a defendant in all of the

17   actions -- not the arbitration, of course, but the criminal

18   action, the civil action by the SEC, and this case.

19         THE COURT:  So he's the one that cuts across all three

20   of those actions.

21         MR. KAISER:  He's the individual that cuts across all

22   three of those actions.

23         THE COURT:  Is there an entity that cuts across all

24   three of those actions?

25         MR. KAISER:  Well, not in the caption of any of the

H5PLBANC

1    actions, but certainly in the substance of the actions.  In the

2    indictment and the SEC complaint, the securities fraud, among

3    other things, but the major securities fraud that's alleged has

4    to do with a company called Black Elk.

5          THE COURT:  Okay.

6          MR. KAISER:  And among other things that are alleged

7    in the indictment and the SEC complaint is that the criminal

8    defendants, including Mr. Levy, controlled Beechwood, the

9    reinsurance company.

10          And I'll just put a footnote there that a federal

11    bankruptcy judge found on a preliminary injunction application

12    that Platinum had controlled Beechwood as well.  But the

13    allegations in the federal indictment in Brooklyn is that

14    Platinum used its control over Beechwood to vote Beechwood's

15    shares of Black Elk stock in a way that stripped senior

16    noteholders, like Beechwood, of their rights --

17          THE COURT:  Beechwood Reinsurance.

18          MR. KAISER:  -- Beechwood Reinsurance, in order to

19    allow Platinum basically to get a superior position on the sale

20    of these Black Elk notes.

21          It's a little complicated, but the bottom line of the

22    allegation is that Platinum controlled Beechwood to vote shares

23    being held in these reinsurance trusts, these bonds, including

24    bonds our clients owned, in a way that was detrimental to the

25    senior bondholders and was beneficial to Platinum, Nordlicht,

H5PLBANC

1    and his coconspirators or alleged coconspirators in the

2    criminal case.

3           So Beechwood is not a defendant in the criminal case,

4    but it is discussed in the criminal case because it was one of

5    the artifices or vehicles, if you will, under which Nordlicht

6    and Levy, both of whom have substantial or had substantial

7    interests in Beechwood, committed securities fraud, at least

8    according to the government.

9           So there is a lot of interconnectedness between the

10   different actions, including the SEC receivership and the PPVA

11   liquidation in the Cayman Islands.

12          THE COURT:  What about this bankruptcy proceeding, is

13   that related to this in any way that you mentioned?

14          MR. KAISER:  Well, it was before it was stayed.  There

15   was a dispute between the SEC receiver and the trustee in the

16   Black Elk bankruptcy as to which action should proceed because

17   there was quite a lot of money that was involved with these

18   Black Elk bonds and the SEC receiver took the position that

19   those should be receivership assets and that any legal actions

20   with respect to Black Elk should take place here in New York.

21          THE COURT:  And Black Elk is owned by any parties

22   here, if you know?

23          MR. KAISER:  In this court, it's really owned by

24   Platinum.

25          MR. AERNI:  PPVA.

H5PLBANC

1              THE COURT:  You said nothing had gone on in this case.

2              MR. KAISER:  Well, nothing has gone on in this case,

3    your Honor, but there's been a tremendous amount of activity

4    because you do have a receivership here and a liquidation.  You

5    have criminal actions, both in the Southern District and in the

6    Eastern District, and the other substantial criminal cases and

7    substantial civil enforcement action.

8              THE COURT:  Okay.  So who wants to speak on behalf of

9    the defendants and what it is that you want me to do?

10             MR. ZINN:  Thank you, your Honor.  David Zinn on

11   behalf of Mr. Taylor.  We filed the premotion letters with the

12   Court.

13             THE COURT:  Mr. Zinn, you can be seated.  Just please

14   speak directly into the microphone.

15             MR. ZINN:  Thank you, your Honor.  Just a habit to

16   stand up in court.

17             THE COURT:  I understand.

18             MR. ZINN:  We agree with some of what Mr. Kaiser said,

19   which is that nothing has gone on in this case.  And as

20   plaintiffs are wont to do in a lot of cases, they want to talk

21   about criminal indictments.  They want to talk about an SEC

22   action.  And there are an overlap and one party there, but that

23   is a different case than this case.  It raises different

24   issues, it raises different facts, and involves different

25   parties.

H5PLBANC

1          In this case, there are two proceedings that have been

2     filed.  One by the plaintiffs, the demand for arbitration, and

3     that is ongoing.  And as Mr. Kaiser said, there's a hearing

4     scheduled in that case, to which Mr. Taylor is not a party, by

5     the way, next week.  Excuse me, June 12.

6          The second case is this case, obviously, your Honor.

7     And if you look at the two complaints, the demand for

8     arbitration and the complaint in this case, they raise the same

9     issues.  When they were first filed, they were verbatim copies

10    of each other.  And what they've done is they sued the entity

11    in the arbitration and they've sued my client, Mr. Taylor, who

12    was the president of the company in court.  And the cases

13    really raise the same issues.  The allegation essentially is

14    that the plaintiffs claim that they entered into this

15    reinsurance agreement with Beechwood, that Beechwood failed to

16    disclose certain facts.

17         THE COURT:  Again, when you say Beechwood, you mean

18    Beechwood Reinsurance?

19         MR. ZINN:  Yes, your Honor.

20         THE COURT:  Okay, because there's a Beechwood Capital.

21    I just want to make sure that I understand and that we keep

22    those two distinct.

23         MR. ZINN:  Thank you, your Honor.  It really is all

24    about Beechwood Reinsurance.  And the thrust of the

25    allegations, the theory of both cases is exactly the same, that

H5PLBANC

1      the plaintiff insurers entered into a reinsurance agreement

2      with Beechwood Reinsurance, that they ceded liabilities to

3      Beechwood Reinsurance, which Beechwood assumed and managed, and

4      they ceded assets to Beechwood Reinsurance, that all the facts

5      were not disclosed to them, they contend -- we dispute that,

6      your Honor -- and that investments were made by the reinsurance

7      company in Platinum related businesses or assets which they

8      associate now with the indictment and claim are bad.

9              And we dispute and will dispute the valuation of those

10     assets.  We think the valuations in this case will prove that

11     the assets and the investments in most instances, if not all,

12     were good investments and paid off.

13             But the crux of the issue before the Court and the

14     reason why we filed the letters that we filed is this case

15     arises in a very unusual posture because of the fact that there

16     are basically two identical cases that are pending now -- one

17     in the arbitration against the entity, and the other here

18     against the officers.  And there is abundant case law which we

19     cited to the Court that provides that in a situation where a

20     nonsignatory to a very broad arbitration clause like this one

21     is sued, that the nonsignatory can move to compel the case to

22     arbitration because otherwise, the federal policy favoring

23     arbitration, which the Court is well aware of, would be

24     undermined because a plaintiff in any case could just sue the

25     officers instead of the entity.

H5PLBANC

1          And so the courts have held consistently that an

2     officer can invoke an arbitration clause.  And the one here

3     provides that all disputes or differences between the parties

4     arising under or relating to the agreement, the reinsurance

5     agreement, shall be subject to arbitration.

6          THE COURT:  Is there unanimity amongst the defendants

7     that this entire matter should be arbitrated?

8          MR. ZINN:  Yes, there is, your Honor.

9          THE COURT:  Okay.

10         MR. ZINN:  The only argument that the plaintiffs have

11    really made in their papers is that this language in the

12    arbitration agreement, it says, well, this covers agreements or

13    disputes between the parties, that that language somehow ought

14    to change the result here.  And, again, courts in this district

15    and the Second Circuit have rejected that argument.  They've

16    said you can't get around the arbitration clause that easily

17    because what the clause was intended to cover was that all

18    disputes related to the agreement would be sent to arbitration,

19    regardless of whether they were filed against the entity or an

20    individual associated closely with the entity.

21         THE COURT:  It appears certainly at a surface level

22    that plaintiffs are not looking to avoid their obligation to

23    arbitrate.  They're arbitrating against a party against whom

24    they believe arbitration is compelled.  So it doesn't appear at

25    least at this point from this perspective that they're looking

H5PLBANC

1    to not arbitrate.  They're arbitrating.

2         MR. KAISER:  Fair enough, but I think they're looking

3    for two bites at the apple and that's why this case presents

4    itself in such an unusual posture.  In most of the cases that

5    we've cited to the Court that have involved situations where a

6    party has been sued in court, in federal court, and sought to

7    compel arbitration, there was no pending arbitration and yet

8    the courts nonetheless, in instances where there were clauses

9    like this one, found that the clauses mandated arbitration.

10        Here, the record is about as strong as it could be

11   because the plaintiffs, as your Honor correctly acknowledges,

12   they've already acknowledged that this case is arbitrable.

13   They brought it in arbitration.  So what they're trying to do

14   here is very unfair, which is to basically subject the entity

15   to litigation in one forum and the individuals to the same

16   litigation -- it's the same issues, same claims in large

17   part -- in a different forum.  And that's the reason why we

18   wrote the letter to the Court seeking to file our motion to

19   arbitrate.

20        THE COURT:  Mr. Kaiser, the case law seems to support

21   Mr. Zinn's argument that certainly the officers of the entity,

22   that the signatory to the arbitration agreement can insist upon

23   arbitration.  So why aren't those individuals in arbitration?

24        MR. KAISER:  Well, your Honor, first, to begin, I

25   think it's important to look at the actual language of the

H5PLBANC

1    arbitration agreements because the Supreme Court has stated

2    over and over again in cases that are not cited in any of the

3    defendants' language that arbitration is a matter of consent,

4    not coercion.  And the starting point of the analysis is the

5    arbitration agreement because the Court can't compel

6    arbitration of issues or order parties to arbitrate where it's

7    not expressly contemplated by the agreement.  And there's been

8    lots of case law dealing with narrow arbitration clauses such

9    as the one at bar where arbitration is expressly limited to

10   "disputes between the Parties," capital P.  And that's exactly

11   what the arbitration provision in the reinsurance agreement

12   says.

13           THE COURT:  Mr. Zinn says this is a broadly worded

14   arbitration provision.

15           MR. KAISER:  It's broad in this respect -- any and all

16   disputes between the parties has to be arbitrated.  So if it

17   was just disputes arising under the agreement, that would be

18   narrow.  If it was related to or concerning, it's broad.  So

19   the scope of the arbitration, meaning the issues that need to

20   be arbitrated, are broad.  But, but, the language "between the

21   parties" has been interpreted to be a narrow clause with

22   respect to the parties who can invoke the right to arbitrate

23   and, on the flip side, be bound to arbitrate.

24           The arbitration agreement here says that only a Party,

25   capital P, may demand arbitration.  Only a Party, capital P,

H5PLBANC

1    may appoint an arbitrator.  Only a Party, capital P, can file a

2    motion in court to enforce an award, that the arbitrator's

3    jurisdiction is limited to resolving disputes between the

4    Parties, capital P.  And so the Court -- and we'll obviously

5    address this in detail in our brief -- needs to look at cases

6    that specifically involve the kinds of arbitration agreements

7    that have limitations as to who may invoke the arbitration

8    clause.

9            Now, I should tell the Court because it's not in any

10   of the parties' letters but there's been some very significant

11   developments in this area of the law over the last few years as

12   a result of a few really seminal Supreme Court decisions.  And

13   if I can just spend 60 seconds on each of them, I think it will

14   be helpful for the Court.

15            THE COURT:  Sure.

16            MR. KAISER:  The first case that I'll just briefly

17   discuss is called *Carlisle v. Arthur Andersen* or *Arthur*

18   *Andersen v. Carlisle* in 2009.  And that's a really important

19   case because prior to 2009, federal courts would create these

20   doctrines like equitable estoppel, direct benefits estoppel,

21   alter ego estoppel, agency law, to allow nonsignatories to an

22   agreement to compel arbitration.

23            It's a pretty big deal when a nonsignatory is allowed

24   to compel arbitration if you think about it.  If arbitration is

25   a matter of consent and not coercion and A agrees to arbitrate

H5PLBANC

with B, then why should it be that C, D, and E get to wiggle

into those parties' arbitration agreement.  How is that a

matter of consent if A only agreed to arbitrate with B, that

now A has to arbitrate with C, D, and E.

        But the federal courts believed at the time, prior to

2009, that this was a matter of federal common law and that

they could develop these doctrines that were really founded in

efficiency, as a bunch of courts in the Southern District noted

in opinions, and really weren't based on consent.  What

happened in 2009 is that the United States Supreme Court said,

well, sorry, federal courts, but you should have applied state

law.  You can't just make up your own federal law.  The FAA

requires you to apply state law.  And so whether a nonsignatory

can compel arbitration shouldn't be decided by the federal

courts based on federal common law, by state law.

        So what happened after 2009.  After 2009, federal

circuit courts expressly abrogated their pre-2009 case law.  In

fact, the Eleventh Circuit in 2011 said, oops, it was our bad.

From now on, courts going forward, ignore everything we said

before 2011 and decide these equitable estoppel and agency

issues on the basis of state law.

        The Fifth Circuit expressly abrogated its law.  And

within the Southern District and the Eastern District, the

courts recognized *Carlisle* and started applying New York state

law, Nevada law, Pennsylvania law, Texas law, you name it, if

H5PLBANC

1    it was applicable.

2           So I understand looking at the defendants' letters

3    that they're relying on these Second Circuit cases and the

4    Second Circuit cases look scary because they talk about if you

5    have a litigation that touches upon an agreement that has an

6    arbitration clause or is intertwined with a contractual

7    obligation in an agreement that has an arbitration clause,

8    playing the game of connect the dots, that's enough to send a

9    litigation to arbitration and deprive a plaintiff of his

10   constitutional right to a jury trial.

11          But the court can't do that anymore after 2009, and

12   the courts in this district have taken that very seriously by

13   applying the law of New York state or the law of any state that

14   might apply.  And New York state law, as we will explain in our

15   brief, is actually pretty hostile to this.

16          There's been an even bigger development in Supreme

17   Court law which is equally, if not more applicable to this case

18   and that development really started in 2010 with a case called

19   *Stolt-Nielsen* where the court held that arbitration was a

20   matter of consent and not coercion and that -- a direct quote

21   from the case, your Honor -- "The parties may specify with whom

22   they choose to arbitrate their disputes."  That was a new

23   concept in 2010, okay -- the idea that the parties couldn't

24   only limit the scope of issues to be arbitrated, but that they

25   could specifically limit with whom they choose to arbitrate

H5PLBANC

1    their dispute.

2              And then in 2013, the Supreme Court issued a very

3    important decision called *Italian Colors*, which if I could just

4    read something very quickly, I think it will help crystallize

5    the issue for your Honor.  "Courts must rigorously enforce

6    arbitration agreements according to their terms, including

7    terms that specify with whom the parties choose to arbitrate

8    their dispute.  A clause that limits arbitration to the two

9    contracting parties is entitled to rigorous enforcement under

10   the FAA."  The Supreme Court of the United States, your Honor.

11             So what do we have before you in this court?  We have

12   an agreement that undeniably -- none of the defendants' trio of

13   letters to the Court dispute this at all, okay -- undeniably,

14   the agreement limits, limits any arbitration to "disputes

15   between the Parties," capital P.  That agreement, your Honor,

16   according to *Italian Colors*, has to be rigorously enforced by

17   this Court.

18             And so what does that mean?  What that means is that

19   parties, small P, other than Parties to the agreement, capital

20   P, really can't seek or invoke the arbitration clause in the

21   Parties' agreement.  And there have been cases subsequent to

22   *Italian Colors* in this district and elsewhere where the courts

23   have had language like and including "between the parties" and

24   the courts have said, well, we're in a new world now.  We're

25   not in the world of these 1980s, 1990s, early 2000 cases that

H5PLBANC

1    have been cited to you by the defendants.  We're in the *Italian*

2    *Colors* world and in the *Italian Colors* world, the district

3    court is under an obligation to rigorously enforce a clause

4    that "limits arbitration to the two contracting parties."  And

5    that is precisely, precisely what is before your Honor here.

6             So I understand the defendants' argument and I

7    understand the temptation to say, well, the issues are kind of

8    the same and you're going to have two proceedings going on.

9             THE COURT:  The issues are identical, correct?

10            MR. KAISER:  The complaints are not identical and not

11   all of the claims are identical and the parties are not

12   identical.  So, for example, Beechwood Capital is not a party

13   in the arbitration, nor is it an affiliate of Beechwood

14   Reinsurance.

15            THE COURT:  Let me ask in the post–*Italian Colors*

16   world, are there cases that have construed that language in the

17   context of a corporate entity being a party to the arbitration

18   agreement but also the CEO or other principals of the entity as

19   opposed to some other unrelated entity?

20            MR. KAISER:  Yes, absolutely.  And I could discuss

21   some of those cases if your Honor wants and provide some

22   citations today.

23            THE COURT:  No.

24            MR. KAISER:  So there have been cases in this district

25   where, for example, an agent who is not an individual, but was

H5PLBANC

1    another entity who allegedly made all of the fraudulent

2    representations to the plaintiff that induced the plaintiff to

3    enter into the contract, that that agent sought to compel

4    arbitration on the grounds of agency.  And the district court

5    said, first of all, this is an issue now of New York law under

6    *Carlisle*, but I can't do it because under *Italian Colors*, I'm

7    under an obligation to rigorously enforce an agreement that

8    limits arbitration between the two contracting parties.

9           And so there may be grounds for equitable estoppel

10   here under pre-*Italian Colors* case law; and there may be

11   grounds for agency here under pre-*Italian Colors* case law.  But

12   this agreement before me has the "between the parties" language

13   in it and because it has the "between the parties" language in

14   it, I have to rigorously enforce that agreement to limit the

15   arbitration between the two contracting parties.

16          And I'll add, your Honor, that that is absolutely the

17   right result.  Arbitration is a matter of consent and not

18   coercion.  And all of these doctrines that have developed over

19   the years that have funny names like equitable estoppel and

20   direct benefits estoppel and alternative estoppel, none of

21   which we ever read about when anyone here was in law school

22   because they didn't exist at the time.  But none of these

23   doctrines have any foundation or basis in the concept of

24   consent and courts have noted that.

25          Judge Kaplan in a well-known case, *Carroll v. LeBoeuf*

H5PLBANC

1    *Lamb*, looked at these doctrines in a case that's just like

2    *Camferdam*, which they cite, where the court compelled

3    arbitration.  He said, "The doctrine therefore appears to

4    depend upon the broad federal policy favoring arbitration and

5    considerations of adjudicative economy, not consent."  Judge

6    Kaplan is a hundred percent right.  The problem, the problem is

7    that starting in 2009, 2010, the Supreme Court started to

8    reemphasize, including *Italian Colors*, that arbitration is a

9    matter of consent, not coercion.

10            And the bottom line here, your Honor, and we'll argue

11   this in our papers, is that if you deprive the plaintiffs of

12   their constitutional right to a jury trial against Mr. Levy --

13   who was not even an employee of Beechwood Reinsurance.  He

14   worked for another company, B Asset Manager -- and against

15   Beechwood Holding or Beechwood Capital, which isn't even an

16   affiliate; and Mr. Taylor and Mr. Feuer on the basis of agency

17   or estoppel, that it would run afoul of this principle in the

18   case law that arbitration is a matter of consent and not

19   coercion.

20            THE COURT:  So, Mr. Zinn, no matter how good of an

21   idea I may think it is to not have two matters go on fairly

22   parallel tracks, Mr. Kaiser is telling me that you're relying

23   on old-timey authority which is no longer persuasive, so you

24   lose.  Or do you?

25            MR. ZINN:  I don't, your Honor, at least I hope I

H5PLBANC

1    don't.  Let me just be very brief and I just want to reference

2    for the Court two post-*Italian Colors* cases in this district.

3    *Kartagener Enterprises*, Judge Scheindlin.  I'm going to quote

4    the case.  I'm not going to summarize the case or describe what

5    I think the case means.  "Even where an arbitration clause is

6    limited to disputes between the parties, a nonsignatory may be

7    able to compel arbitration of arbitrable issues."

8         Second case, *Lapina v. Men Women New York Model*

9    *Management Inc*., 86 F.Supp.3d 277.  Same question, arbitration

10   clause had language that said between the parties.  The court

11   permitted the nonsignatory nevertheless to invoke the clause

12   and send the case to arbitration.

13        THE COURT:  Is that a Southern District case?

14        MR. ZINN:  It is, your Honor.  I didn't write the name

15   of the judge down and I apologize.

16        This case is stronger than both of those.  This case

17   is stronger than both of those because there's a pending

18   arbitration.  There couldn't be a much better record than this

19   case in which a federal court ought to advance the policy under

20   the Federal Arbitration Act favoring arbitration and move the

21   case to arbitration.

22        And as a matter of fairness, it doesn't make sense.

23   It doesn't make sense.  And the reason why there are no

24   decisions that they can cite where there are cases arising in

25   this posture with two parallel cases in this situation, with

H5PLBANC

1  the one case against the entity and the other against the

2  president and the CEO, it doesn't make sense to litigate the

3  same case twice in two different fora at the same time with the

4  same issues, the same discovery, the same witnesses.  It makes

5  no sense.  And so this case actually presents a stronger record

6  to compel arbitration than virtually any case that's been cited

7  by any of the parties in their papers.

8         And I would note, although I don't know what case

9  Mr. Kaiser was referring to, he referenced a case where the

10 agent sought to compel arbitration.  This is a case where the

11 nonsignatory, not the signatory, is seeking to compel

12 arbitration.  And the cases they cited in their papers have

13 involved for the most part signatories that are seeking to

14 compel the arbitration, not a nonsignatory like Mr. Taylor is

15 here and like Mr. Feuer is here.

16             THE COURT:  Okay.

17             MR. LIPSIUS:  Your Honor.

18             THE COURT:  Yes, Mr. Lipsius.

19             MR. LIPSIUS:  Thank you.  I just feel a couple facts

20 here, I'm not going to get into -- I'll let these two very able

21 attorneys argue the law on this issue, but I feel that some of

22 the facts here are not really clear and have to really be

23 cleared up.

24             Let's talk about the proceedings in the arbitration.

25 Significant documentation was provided by Beechwood Re prior to

H5PLBANC

even the commencement of the arbitration and after the

commencement of the arbitration.  And we're talking about how

does that move forward.  To the extent that the plaintiffs in

this action brought an emergency motion before the AAA to

compel additional discovery, not only was that motion denied

and not only did the arbitrator, the single arbitrator

appointed by the AAA on that issue, find that it was fully

produced, but full attorneys' fees were granted to Beechwood

Re.  So, therefore, they have gotten it.  So it has really

moved forward.  There's even a decision having to do with

discovery before there was an impanelment.  I think that just

goes.

          Now, the other thing that's interesting, we've been

told about the ownership of Beechwood Re.  And in fact I think

more importantly, 100 percent of the ownership of Beechwood Re

is Mr. Feuer and Mr. Taylor, the defendants in this action.  So

we're now dealing with the sole shareholders of Beechwood Re,

which are now being brought in a second time.

          There are a number of other facts that I think may be

of interest toward why this should really be in arbitration,

this proceeding should be in the arbitration and lend it toward

it, but I just suggest to the Court -- and I'm sure these able

attorneys will fully brief all of these issues -- that the

Court does have the discretion to stay the litigation until the

arbitration is resolved.  So, as an alternative, that should be

H5PLBANC

1   considered as an alternative if the Court is not leading toward

2   dismissing this litigation and forcing the arbitration.

3            THE COURT:  Even if the arbitration proceeds just as

4   to Beechwood Re?

5            MR. LIPSIUS:  Yes.  And there is precedent that allows

6   the stay because every deposition that's going to be taken is

7   going to have to be taken otherwise twice.  The parties will be

8   bound by their depositions.  There's going to be

9   cross-examination.  The attorneys here who are representing

10   Beechwood, who are representing the plaintiffs are the

11   plaintiff attorneys in the arbitration.  Therefore, you're

12   going to have -- and, of course, in that arbitration, if

13   there's depositions, I can't imagine the principals of

14   Beechwood Re's depositions will not be taken.  And there's

15   broad discretion on an arbitration panel which is given the

16   power of the court to subpoena witnesses.  So, therefore, those

17   are all things that are going to definitely take place whether

18   this Court or when this Court decides this issue.

19            And, in fact, in a few days, we're talking about two

20   weeks from now, the panel is going to set a schedule for both

21   depositions, discovery, document discovery, etc.  And I assume

22   this Court will give a briefing schedule.  The parties I

23   believe have agreed upon a potential briefing schedule in this

24   motion.  So by the time this briefing is completed, it is my

25   belief that the discovery will be well along the way and the

H5PLBANC

1   arbitration will be very far developed and along the way.

2           THE COURT:  Mr. Kaiser, judges always perk up when

3   provided with an opportunity to do nothing.  So I listened very

4   intently as Mr. Lipsius was speaking.  What is your position on

5   a stay?

6           MR. KAISER:  Sure.  Just a couple of quick points,

7   your Honor.

8           The arbitration is not well along.  The documentation

9   that Mr. Lipsius refers to is documentation that was given to

10  my clients when they exercised their audit rights in June and

11  July of last summer at the insistence of the New York State

12  Department of Financial Services after the Wall Street Journal

13  reported that Murray Huberfeld had an office at Beechwood Re in

14  an article reporting that he had been arrested for allegedly

15  bribing Mr. Seabrook.  So the idea that a lot of documents have

16  been handed over in the context of the arbitration is not

17  correct.

18          THE COURT:  How do you anticipate the arbitration will

19  proceed, how quickly?

20          MR. KAISER:  Well, it's a good question, your Honor,

21  because the standard for a stay of a litigation when there's a

22  parallel arbitration in New York is high.  The Second Circuit

23  has held, quote, the party seeking the stay has a heavy burden

24  in seeking the stay.  And among the things the court looks at

25  is whether the arbitration is expected to conclude within a

H5PLBANC

1    reasonable time and that such delays may occur will not cause

2    undue hardship.  That's a direct quote from a recent 2013

3    Second Circuit case.

4           So the issue of how long the arbitration is going to

5    take is a central issue in this case because if it's going to

6    take years to complete, which it will, then it is completely

7    inappropriate to stay a litigation and deny a plaintiff of his

8    right to his day in court only to have to wait a period of

9    years and start the process anew.

10          So I get it.  I get it.  It's convenient for the

11   defendants to say, well, the arbitration is really moving

12   along.  We've produced documents.  We're going to have a

13   hearing on June 12.  No, we're not.  We're not having a hearing

14   on June 12.  We're having an organizational meeting.  It's the

15   first time the parties will be before the panel.  And I would

16   be very surprised if the judge, if the arbitration panel sets a

17   discovery schedule or a briefing deadline on any issues.

18          And just to give the Court just a sense of the

19   enormity of the discovery that's going to be necessary in the

20   arbitration and why it's going to take years to complete, the

21   SEC recently filed a letter with the court in Brooklyn

22   detailing document collection and criminal discovery to date.

23   And in that letter, they revealed that they had served some 76

24   third party subpoenas on different entities and had over

25   2 million documents.

H5PLBANC

1            THE COURT:  Who issued this letter?

2            MR. KAISER:  The SEC.

3            Now, not all of those third parties are going to be

4    subject to discovery in this case, but a lot of them are.  And

5    the reason a lot of them are is because while Beechwood and

6    Platinum are legally separate entities, the reality is, as

7    alleged by the government in the indictment and the SEC

8    complaint and as a bankruptcy court judge in Texas has already

9    found, is that Platinum controlled Beechwood.

10           Mr. Lipsius says, well, Mr. Feuer and Taylor own all

11   of the stock of Beechwood now, may be true.  They didn't last

12   year.  Last year when all of the fraud had come to light, the

13   majority of the stock of Beechwood was owned by Murray

14   Huberfeld, under indictment; Mark Nordlicht, under indictment;

15   a guy by the name of David Bodner, criminal record; and

16   Mr. Levy, under indictment, okay; Mr. Feuer and Mr. Taylor,

17   undeniably minority shareholders in Beechwood.

18           And I think it's another really important point here

19   that's getting lost.  In the agency cases they cite, okay, they

20   proceed on the basis that a corporation is a fictional entity

21   and can only act through individuals, a decidedly common sense

22   proposition we would all agree with.  So if a corporation or

23   other entity, a legal fiction, breaches a contract and you sue

24   those individuals for engaging in the conduct that caused the

25   breach, well, then under agency principles, if the arbitration

H5PLBANC

agreement doesn't have the "between the parties" language or

similar language, the agents under agency principles can try to

latch on because they're saying, look, you're just suing me for

engaging in conduct that you contend violates the terms of the

reinsurance treaties.  We're not alleging that here.

        We're saying a year before the reinsurance treaties

were entered into, in February of 2014, that our clients were

approached by a company called Beechwood Capital.  Beechwood

Capital was purportedly owned -- and I'm sure it is owned, but

we'll find out -- by Mr. Feuer and Mr. Taylor.  They said,

listen, we don't have a reinsurance company, but we're thinking

of forming one, and we're going to put initial capitalization

in of $50 million.  We're going to own the company.  We're

going to invest your assets prudently.  We're going to surround

ourselves with competent professionals and we're going to have

a first class reinsurance company that can handle your

reinsurance business, some $550 million of assets that were

ceded to the defendants as part of this deal.

        Throughout the course of 2013, again, ten months,

eight months, six months before this agreement was ever entered

into, there is a series of fraudulent misrepresentations that

are made to the plaintiffs by the defendants.

        For example, we have a hundred million dollars in

capital.  When the New York State Department of Financial

Services asked them how much capital they had at inception last

H5PLBANC

1     year as part of an exam, it was less than $300,000, not a

2     hundred million dollars.

3          We don't have any other investors.  We own the

4     company, Scott Taylor and Moshe Feuer said.  No, you didn't.

5     Mr. Nordlicht, Mr. Huberfeld, Mr. Bodner -- they owned the

6     company, okay.

7          We're going to conservatively manage your assets to

8     give you good returns and to make sure they're stable because

9     this money backstops policyholder obligations -- not so much,

10    your Honor.  They took that money, they invested it in Platinum

11    and companies Platinum owned and controlled.

12         So we are not saying Beechwood Reinsurance violated

13    Section 7(v) of the reinsurance treaty and they did that

14    through Mr. Feuer and Mr. Taylor and we're suing them for that

15    breach.  Far from it, your Honor.  We're saying that in the

16    year-long period prior to the time that the contract was

17    entered into, they engaged in a massive fraud against us by

18    lying to us about who owned the company, how much capital they

19    had, what the purpose of the company was they never disclosed.

20    They never disclosed any connection between Beechwood and

21    Platinum until the summer of 2016 when the Wall Street Journal

22    exposed a relationship.  And that is what this case is about.

23    It's about the fraud, this massive fraud that was committed by

24    the defendants against our clients.

25         Is this a case that should be resolved by industry

H5PLBANC

1    reinsurance arbitration before three reinsurance arbitrators

2    who make a living arbitrating typical reinsurance disputes?  We

3    didn't agree to that.  We agreed that disputes between the

4    parties relating to the agreement would be arbitrated.  When

5    did we agree to arbitrate these big fraud claims against these

6    individual defendants in Beechwood Capital?  The answer is

7    never.

8              THE COURT:  If you win in the arbitration, will you be

9    made whole?

10             MR. KAISER:  No.  I'm sure I'll have the largest proof

11   of claim in Beechwood Reinsurance's bankruptcy or Cayman Island

12   liquidation.

13             MR. ZINN:  There's absolutely no basis for that

14   assertion at this point, your Honor.  We can sit here and

15   listen to the plaintiffs' lawyers make all sorts of allegations

16   about what the Wall Street Journal might have said or what

17   their complaint says.  And, by the way, I don't want to do this

18   to the Court, but what he's saying now is not even consistent

19   with what's in his complaint.  So he can go on and on and we'll

20   have our opportunity to defend the case and we intend to do

21   that.  I do want to note our objection for the Court.  We don't

22   agree with him.  We have a different view of the case.  And the

23   fact that Mr. Kaiser can make sensational allegations has

24   nothing do with the legal issue before the Court.

25             There are many cases where RICO claims, like here,

H5PLBANC

where fraud claims, like here, where fraud in the inducement

claims, like here, where Sherman Act violation claims, unlike

here, have been sent to arbitration.  There's nothing unusual

about this case because the plaintiffs happen to have made

sensational allegations that we dispute.  That happens in many

cases and it happens in many cases where there's an indictment

where there's some degree of overlap that the plaintiffs can

point to.

             And typical plaintiffs -- and I understand it.  We see

it all the time.  It's a typical plaintiff strategy.  If I were

in his shoes, I might do it too.  It doesn't resolve the legal

issue before the Court -- should this case be in arbitration,

should we have two cases or should we have one.

             MR. LIPSIUS:  More importantly, your Honor, if I can

just speak here, we've heard all about why the fraud should be

heard in the civil litigation and everything else, the breach

of contract should be heard in the arbitration.  But

interestingly enough, all these fraud allegations are all

contained in the arbitration complaint.  So if he really

believed his own argument, why didn't he just raise breach of

contract in the arbitration proceeding.  But he's decided and

he's made that decision, not he, but his client has made the

decision in the arbitration to have all the fraud issues looked

at and determined by the panel and, therefore, that decision

has been made not by us.  And maybe we'd be in a different

H5PLBANC

1   posture if he just raised breach of contract in the arbitration

2   and we'd be here and this is fraud, but that's not what

3   happened.

4          If you look at the original complaint, they are

5   almost, I should said exactly the two complaints are in the

6   litigation and in the arbitration are identical.  And he made a

7   few changes, if you look at the changes in the amended

8   complaint.  And the major change was he said, oh, let me

9   think -- this is what I believe is happening.  They look there

10   and they say let me get another party that I can come there,

11   squeeze a party that's in there, Beechwood Capital Group.  And

12   if he knew about it then, he should have known about it in his

13   original complaint.  This is nothing that came out in any of

14   the indictments, which is what we were told about.

15          As the Court itself noted, Beechwood is not under

16   any -- no Beechwood, current Beechwood officer, namely,

17   Mr. Feuer and Mr. Taylor, are not under indictment.  Beechwood

18   itself is not a party with the SEC action or the indictments,

19   etc.  These are really a tale that's been spun here.  And, one,

20   the pleadings don't match even half of the tale that's said.

21   And, second of all, the truth is not what's in these pleadings.

22   And I think you just look at the two pleadings and it begs to

23   not have two courts doing it.

24          The last issue is one that I cannot think of one

25   witness that would be deposed in this action that would not be

H5PLBANC

1    deposed as well in the arbitration action, and an arbitration

2    panel is given subpoena power to get them.  So there's nothing

3    lost by having the discovery and everything done through the

4    arbitration panel.  And when the decision comes down, if the

5    Court then deems it necessary, the Court can then determine

6    whether to lift the stay.

7            MR. ZINN:  Judge, I just want to be clear.  Our

8    argument is not that the original complaint and the demand for

9    arbitration are the same.  They were.  They were identical.

10   They were verbatim.  But the amended complaint also raises the

11   same issues.  I have a chart I prepared -- I can save it for

12   future argument; I'm happy to hand it up to the Court -- that

13   demonstrates verbatim taking quotes from the demand and from

14   the amended complaint.  The theory of the case is the same.

15   The factual allegations are the same.  There is largely uniform

16   overlap in terms of the causes of action.  And the damages that

17   are alleged are the same.  It's the same case.

18           THE COURT:  I discerned from everything that has been

19   argued that there is no consent on staying this proceeding.  So

20   forward we will go.

21           The parties, I understand, have agreed to a briefing

22   schedule?

23           MR. KAISER:  We have, your Honor.

24           THE COURT:  And tell me what it is.

25           MR. KAISER:  Yes.  So the defendants' initial papers

H5PLBANC

1    will be due June 15, our opposition papers July 24, and the

2    reply brief August 15.  And we penciled in argument for

3    August 15.  So that's the schedule.  It's June 15, July 24,

4    August 14.

5              MR. ZINN:  Your Honor, may I be heard on that.  I

6    agree with his rendition of the briefing schedule.  We didn't

7    discuss when argument might be and I haven't conferred.

8              MR. KAISER:  I was joking about the argument.

9              THE COURT:  There is no -- and I typically don't hear

10   oral argument unless I find there's some particular need for

11   it.

12             Just one comment on what Mr. Lipsius said earlier

13   about the depositions, etc.  To the extent these matters go

14   forward on parallel tracks, I assume that the parties will see

15   it in both of their interests or in all of your interests to

16   coordinate discovery with respect to both.  Not that I'm saying

17   that both will go forward on parallel tracks, but to the extent

18   that they will, that that concern can be easily addressed by

19   cooperation amongst the parties.  So maybe not so easily

20   addressed, but possible.

21             Okay.  So we have all of the dates.  Is there anything

22   else that we need to do today, Mr. Kaiser?

23             MR. KAISER:  No, your Honor.

24             THE COURT:  Mr. Zinn.

25             MR. ZINN:  No, your Honor.  Thank you.

H5PLBANC

1          THE COURT:  Mr. Lipsius.

2          MR. LIPSIUS:  No, your Honor, I just want to make

3    clear that with the motions pending, there will not be answers

4    necessary.

5          THE COURT:  Correct.

6          MR. LIPSIUS:  Okay.

7          THE COURT:  Anyone else, Mr. Fodeman?

8          MR. FODEMAN:  No, Judge.  Thank you very much.

9          THE COURT:  Okay.  We're done.  Thank you folks.  It's

10   been very helpful.

11         MR. LIPSIUS:  Have a wonderful Memorial Day.

12                          o0o

13

14

15

16

17

18

19

20

21

22

23

24

25