UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BANKERS CONSECO LIFE INSURANCE
COMPANY and WASHINGTON NATIONAL
LIFE INSURANCE COMPANY,

Plaintiffs,

–against–

MOSHE M. FEUER, SCOTT TAYLOR,
DAVID LEVY, and BEECHWOOD CAPITAL
GROUP, LLC,

Defendants.

**OPINION AND ORDER**

16 Civ. 7646 (ER)

Ramos, D.J.:

Bankers Conseco Life Insurance Company ("BCLIC") and Washington National Life Insurance Company ("WNLIC") (collectively, "Plaintiffs"), are suing Moshe M. Feuer, Scott Taylor, David Levy, and Beechwood Capital Group, LLC (collectively, "Defendants"), alleging a conspiracy to fraudulently obtain and appropriate assets in violation of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. §§ 1961–1968, New York State law, and Indiana State law. First Amended Complaint ("Am. Comp.") (Doc. 52) ¶ 115–143. Defendants move to compel arbitration and/or stay all proceedings pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1–16 *et seq.*, contending that Plaintiffs are attempting to simultaneously litigate this suit and arbitrate an identical matter.[1] *See*

---

[1] The instant motion was filed by Defendant Scott Taylor. Defendants Moshe M. Feuer, David Levy, and Beechwood Capital, LLC joined in the motion. Defendants filed this motion in lieu of responding to the Amended Complaint. If the Court denies the instant motion, they request the Amended Complaint be dismissed under Fed. R. Civ. P. 12(b)(1) and/or 12(b)(6). *See* Defs' Mem. at 1.

Memorandum in Support of Defendant Scott Taylor's Motion to Compel Arbitration and/or Stay all Proceedings ("Defs' Mem.") (Doc. 64) at 2; *see also* Declaration of Anne C. Malinee ("Malinee Decl.") (Doc. 65), Ex. A, Claimants' Demand for Arbitration, Statement of Claim, and Request for Emergency Relief, *Bankers Conseco Life Insurance Co. & Washington National Life Insurance Co. v. Beechwood Re, Ltd.,* AAA Case No. 01-16-0004-2510 ("Arbitration Demand") (Doc. 65-1). For the reasons set forth below, Defendants' motion to compel arbitration is GRANTED, and this action is STAYED pending arbitration.

I. **Factual Background**

The following facts are based on the allegations set forth in Plaintiffs' First Amended Complaint, which the Court accepts as true for purposes of the instant motion. *In re A2P SMS Antitrust Litigation,* 972 F. Supp. 2d 465, 473 (S.D.N.Y. 2013) (citing *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012) (with a "motion to compel arbitration, [the Court] accept[s] as true . . . [the] factual allegations in the plaintiffs' complaint that relate to the underlying dispute between the parties")).

In 2013, Plaintiffs, as affiliated insurance companies, sought reinsurance for certain blocks of long term business. Am. Comp. ¶ 1. In May 2013, Defendants Feuer and Taylor allegedly met with Plaintiffs in their capacity as the owners of a New York private investment firm, Beechwood Capital Group, LLC ("Beechwood Capital"), and informed Plaintiffs that they were developing a reinsurance company, Beechwood Re. *Id.* ¶ 2. Shortly thereafter, Feuer and Taylor submitted proposals to Plaintiffs for their reinsurance business on behalf of Beechwood Capital. *Id.*

On February 10, 2014, Beechwood Re (represented by Defendant Taylor) executed reinsurance agreements with both BCLIC and WNLIC, which are governed by New York and

Indiana law, respectively. *Id.* ¶ 13; *see also* Malinee Decl., Ex. B, New York Reinsurance Agreement ("NY Re. Ins.") (Doc. 65-2); Ex. C, Indiana Reinsurance Agreement ("Ind. Re. Ins.") (Doc. 65-3) (collectively, "the Reinsurance Agreements"). Pursuant to the Reinsurance Agreements, Plaintiffs assigned $550 million in trust assets to Beechwood Re for investment and management. *Id.* ¶ 78–80. Plaintiffs allege that Defendants fraudulently misrepresented the financial situation[2] and corporate structure[3] of Beechwood Re and used the trust assets for their personal enrichment. *Id.* ¶ 87–90, 99.

Both Reinsurance Agreements contain the following, nearly identical, arbitration provisions, which are of particular significance here:

> Except as otherwise provided in this [New York] Reinsurance Agreement, all disputes or differences *between the Parties* arising under or relating to this [New York] Reinsurance Agreement upon which an amicable understanding cannot be reached shall be decided by arbitration pursuant to the terms of this Section. Except as otherwise provided in this [New York] Reinsurance Agreement, the arbitration proceeding shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association.

Malinee Decl., Ex. B, NY Re. Ins. § 10.1(a); Ex. C, Ind. Re. Ins. § 10.1(a) (emphasis added).[4]

Application of the language of the arbitration provisions, specifically whether the provisions can be enforced against the Defendants here—who are not signatories to the

---

[2] Plaintiffs allege that Feuer and Taylor fraudulently represented that Beechwood Re had at least $100 million in capital when, in fact, Beechwood Re had "virtually no capital." *Id.* ¶ 2–3.

[3] Plaintiffs allege that Feuer and Taylor fraudulently represented that they controlled Beechwood Re when, in fact, the assets were also being controlled by a number of other individuals: Mark Nordlict, Murray Huberfeld, David Levy, and David Bodner. Further, Plaintiffs contend that Beechwood Re was being used as a front as part of the "widely-publicized fraud scheme of Platinum Partners." *Id.* ¶ 4, 7.

[4] As noted here, the sole difference between the two arbitration provisions is that the New York Agreement uses the term "New York Reinsurance Agreement" in the provision, while the Indiana Agreement uses the term "Reinsurance Agreement." Both agreements require arbitration to "be held in the City of New York, New York, unless a different location is mutually agreed upon by the Parties." Malinee Decl., Ex. B, NY Re. Ins. § 10.1(c); Ex. C, Ind. Re. Ins. § 10.1(c).

Reinsurance Agreements—is the issue to be determined in the instant motion. On September 29, 2016, the same day this suit was filed, Plaintiffs also filed an arbitration demand[5] against Beechwood Re invoking the above provision. *See* Malinee Decl., Ex. A, Arbitration Demand. As noted in Defendants' memorandum in support of this motion, the Arbitration Demand and First Amended Complaint contain markedly similar language, factual allegations, and causes of action. *See* Defs' Mem. at 7–8; *see also Beechwood Re, Ltd.,* AAA Case No. 01-16-0004-2510.

## II. Applicable Law

### A. Procedural Framework

Under the FAA, "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The FAA reflects "a liberal federal policy favoring arbitration agreements," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)), and places arbitration agreements on "the same footing as other contracts." *Schnabel*, 697 F.3d at 118 (quoting *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 511 (1974)). Thus, parties are not required to arbitrate unless they have agreed to do so. *Id.* Before an agreement to arbitrate can be enforced, the district court must first determine whether such agreement exists between the parties. *Id.* This question is determined by state contract law principles. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016).

In the context of motions to compel arbitration, allegations related to the question of whether the parties formed a valid arbitration agreement are evaluated to determine whether they

---

[5] The Arbitration Demand sets forth claims for various violations and breaches of the Reinsurance Agreements and demands compensatory, consequential, and punitive damages from Beechwood Re for "participation in its civil conspiracy." *See* Malinee Decl., Ex. A, Arbitration Demand.

4

raise a genuine issue of material fact that must be resolved by a fact-finder at trial, which is a similar standard to that applicable for a motion for summary judgment. *Schnabel*, 697 F.3d at 113; *see also Bensadoun v. Jobe–Riat*, 316 F.3d 171, 175 (2d Cir. 2003) ("In the context of motions to compel arbitration brought under the [FAA] . . . , the court applies a standard similar to that applicable for a motion for summary judgment. If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary.") (citations omitted). On a motion for summary judgment, the court considers "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits," and draws all reasonable inferences in favor of the non-moving party. *Meyer v. Uber Techs., Inc.*, No. 16-2750-CV, 2017 WL 3526682, at *4 (2d Cir. Aug. 17, 2017) (internal quotation marks and citations omitted).

If the Court determines that a valid agreement to arbitrate exists, the Court must then determine whether the particular dispute falls within the scope of arbitration agreement. *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 26 (2d Cir. 2002) (quoting *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987)). If the dispute falls within the scope of the arbitration clause, the "role of the court ends and the matter is one for arbitration." *Unique Woodworking, Inc. v. N.Y. City Dist. Council of Carpenters' Pension Fund*, No. 07 Civ. 1951 (WCC), 2007 WL 4267632, at *10 (S.D.N.Y. Nov. 30, 2007).

Here, the arbitration provisions assert that "except as otherwise provided . . . the arbitration proceeding shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association." Malinee Decl., Ex. B, NY Re. Ins. § 10.1(a); Ex. C, Ind. Re. Ins. § 10.1(a). Rule 7 of the Commercial Arbitration Rules provides that the arbitrator has the power to choose his/her own jurisdiction, which includes the scope of the provision.

5

Rule R-7 (a); *see also Contec Corp. v. Remote Solution, Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) ("when . . . parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator"). Accordingly, the Court need not determine whether the dispute is within the scope of the arbitration provision, but rather, whether the arbitration provision is enforceable between the parties.

### B. Choice of Law and State Contract Law

In deciding whether parties agreed to arbitrate a certain matter, a court should generally apply state-law principles to the issue of contract formation. *Specht*, 306 F.3d at 27; *Nicosia*, 834 F.3d at 231 ("State law principles of contract formation govern the arbitrability question."). State law principles also apply in determining whether a contract can be enforced against a non-signatory. *Arthur Andersen LLP v. Carlisle,* 556 U.S. 624, 631 (2009) ("'[T]raditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel.'"). By their terms, the Reinsurance Agreement with BCLIC is governed by New York State law, and the Reinsurance Agreement with WNLIC is governed by Indiana State law. *See* Malinee Decl., Ex. B, NY Re. Ins. § 10.7(a) ("This New York Reinsurance Agreement and any dispute, suit, action or proceeding arising under . . . will be governed by and construed in accordance with the substantive laws of the State of New York"); Ex. C, Ind. Re. Ins. § 10.7 ("This Reinsurance Agreement shall be construed in accordance with the laws of the State of Indiana without giving effect to the principles of conflicts of law thereof.").

6

However, relying on such contractual provisions before a contract has been found to have been entered into by the parties as enforceable is inappropriate. *Schnabel*, 697 F.3d at 119, 126–27 ("Applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established."). Accordingly, either the law of New York or Indiana may apply to this dispute. *See Schnabel*, 697 F.3d at 119. Although—as stated in *Nicosia*—state contract law generally governs the question of arbitrability, this is such when the parties are engaged in a choice-of-law dispute. *Ragone v. Atlantic Video at Manhattan Center,* 07 Civ. 6084 (JGK), 2008 WL 4058480, at *8 (S.D.N.Y. Aug. 29, 2008). Absent a substantive argument from the parties that state contract law should apply, courts generally apply federal law. *Id.* ("In the absence of a dispute between the parties, most courts dealing with the issue of whether to compel a signatory to arbitrate claims with a non-signatory apply the federal substantive law of arbitrability.") Here, neither party addresses which state's law should apply. Moreover, Plaintiffs and Defendants rely, in pertinent part, on federal law in their opposing arguments.[6] Accordingly, the Court analyzes this issue under federal substantive law. *Id.* (citing *Thomson-CSF, S.A. v. Am. Arbitration*, 64 F.3d. 773, 779 (2d Cir. 1995)). ("The Court of Appeals for the Second Circuit has apparently looked to the federal substantive law of arbitrability to determine whether a non-signatory to an arbitration agreement can compel a signatory to that agreement to arbitrate a dispute.")

---

[6] Both parties reference New York and Indiana State law in their briefs, but rely heavily on federal substantive law to support their legal arguments. *See generally* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Compel Arbitration and/or Stay All Proceedings ("PL's Mem.") (Doc. 69); *see also* Def's Mem.

### III. Discussion

#### A. Equitable Estoppel

Because arbitration is a matter of contract, principles of contract law apply. *Thomson-CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d. 773, 779 (2d Cir. 1995).[7] This includes the doctrine of equitable estoppel. *Id*. The Second Circuit has consistently held that non-signatories may invoke equitable estoppel to compel arbitration against signatories when the "issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Choctaw Generation Ltd. Partnership v. American Home Assur. Co.,* 271 F.3d 403, 404 (2d Cir. 2001) (citing *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 98 (2d Cir. 1999)); *see also Ross v. American Express Co.*, 478 F.3d 96, 98 (2d Cir. 2007) (non-signatories may invoke equitable estoppel if the claims against them are "inextricably intertwined" with the arbitration agreements). Thus, the determination of whether non-signatories may equitably estop signatories from avoiding arbitration turns on the "existence, scope, [and] validity of the arbitration agreements." *Contec Corp.,* 398 F.3d at 209. Neither party challenges the existence or validity of the Arbitration Agreements between the Plaintiffs and Beechwood Re. Rather, the parties dispute whether they extend to the individual Defendants.

In determining whether an arbitration agreement allows non-signatories to invoke equitable estoppel, courts in this district have relied on a two-part "intertwined-ness" test. *See Chase Mortg. Company-West v. Bankers Trust Co.*, 00 Civ. 0234 (MBM), 2001 WL 547224, at

---

[7] Although the court in *Thomson-CSF, S.A.* was faced with a signatory seeking to compel a non-signatory to arbitrate—the inverse of this matter—the Second Circuit articulated that the theory of estoppel can bind signatories to arbitration. *Id.* ("Several courts of appeal have recognized an alternative estoppel theory requiring arbitration between a signatory and non-signatory.")

*2–3 (S.D.N.Y. May 23, 2001); *see also Thomson-CSF, S.A.,* 64 F.3d at 778–79. This test requires the court to examine (1) whether the signatory's claims arise under the same subject matter of the agreement and (2) whether the non-signatory has a 'close relationship' to a signatory of the agreement. *Id.*; *see also JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 177 (2d Cir. 2004) (quoting *Choctaw Generation Ltd. P'ship*, 271 F.3d at 406) (signatories can be compelled to arbitration by non-signatories where "a careful review of 'the relationship among the parties, the contracts they signed . . . and the issues that ha[ve] arisen among them discloses that 'the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed'"). If a factual inquiry of the subject matter of the claims and the relationship between non-signatory and signatory renders them sufficiently close, the court may compel the parties to arbitration under the doctrine of equitable estoppel. *See id.* However, mere evidence of a relationship between the parties and similarities in subject matter will not justify estoppel. "[T]here must be a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." *Sokol Holdings, Inc. v. BMB Munai, Inc.,* 542 F.3d 354, 359 (2d Cir. 2008)

   1. *Subject Matter of the Agreement*

The first prong of the "intertwined-ness" analysis considers whether Plaintiffs' claims arise from the subject matter of the Reinsurance Agreements with Beechwood Re. *See Ragone,* 2008 WL 4058480, at *8; *see also Thomson-CSF, S.A.,* 64 F.3d at 779 (stating that circuit courts "have been willing to estop a *signatory* from avoiding arbitration with a non-signatory when the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement

9

that the estopped party has signed").[8] This analysis is heavily dependent on the facts and circumstances surrounding Plaintiffs' claims and the underlying agreement. *See Chase Mortg. Company-West,* 2001 WL 547224 at *2 (noting that "the key" to the subject matter requirement "was the nature of the claims asserted by the signatory against the non-signatory"); *see also JLM Indus., Inc.,* 387 F.3d at 178 ("we have cautioned that this estoppel inquiry is fact-specific, and have had no occasion to specify the minimum quantum of "intertwined-ness" required to support a finding of estoppel").

Here, the Reinsurance Agreements arose from Defendants Feuer and Taylor's business arrangement with Plaintiffs in their capacity as corporate officers of Beechwood Re. *See* Am. Comp. ¶ 2. Plaintiffs argue that their claims in this matter do not arise from the subject matter of the Reinsurance Agreements or its associated fiduciary duties; however, the bulk of Plaintiffs' claims in the First Amended Complaint arise from the formation, execution, and existence of the Reinsurance Agreements. *See generally* Am. Comp. Specifically, the first six pages of Plaintiffs' Amended Complaint detail the conspiracy allegations against Defendants via the creation and utilization of Beechwood Re as a means to defraud. *Id.* ¶ 1–16 ("Ultimately, in reliance on the misrepresentations of Defendants and others, each Plaintiff entered into a Reinsurance Agreement with Beechwood Re."). Plaintiffs describe the connections between the individual Defendants and Beechwood Re, noting that Defendants Feuer and Taylor are owners of common stock of Beechwood Re who personally negotiated the Reinsurance Agreements, and

---

[8] The Second Circuit adopted this analysis from the 11th, 4th, and 7th Circuits which have all compelled "a signatory [to be] bound to arbitrate with a non-signatory at the non-signatory's insistence because of "the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract . . . and [the fact that] the claims were 'intimately founded in and intertwined with the underlying contract obligations.'" *Id.* (citing *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.,* 10 F.3d 753, 757-58 (11th Cir. 1993) (quoting *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co.,* 741 F.2d 342, 344 (7th Cir. 1984)).

that Defendant Levy is a shareholder and manager of Beechwood Re's assets.[9] Additionally, Plaintiffs' legal claims rely heavily on the formation of Beechwood Re in order to establish the requisite components of the statutory violations. *See id.* ¶ 23 ("Beechwood Re is an enterprise within the meaning of [RICO]"); *see also id.* ¶ 118 (establishing the requisite RICO "enterprise" via Defendants "association-in-fact" with Beechwood Re). Lastly, the substantial similarities between the Arbitration Demand served on Beechwood Re and the First Amended Complaint served on these Defendants support a finding that the subject matters are inextricably linked. *See* Defs' Mem. at 7–8; *see also Beechwood Re, Ltd.,* AAA Case No. 01-16-0004-2510. In their memorandum, Defendants chart the similar language from the Arbitration Demand and the First Amended Complaint, including the theory of the case, factual allegations, and alleged injury. Furthermore, both documents contain almost identical causes of action: Civil RICO/RICO Conspiracy, Fraud/Fraudulent Inducement/Concealment, and New York and Indiana State law claims.[10] *See id.*

Accordingly, the Court finds that the Reinsurance Agreements are significantly intertwined with the allegations in the First Amended Complaint. It is difficult to see a basis for Plaintiffs' claims without the existence of the agreements. *See Denney v. Jenkens & Gilchrist*, 412 F. Supp. 26 293 (S.D.N.Y. 2005) ("plaintiff's *actual dependence* on the underlying contract

---

[9] Plaintiffs reference Defendant Beechwood Capital in its connection with Defendants Taylor and Feuer. *See* Am. Comp. ¶ 22 ("Defendant Beechwood Capital is a limited liability company formed and existed in New York with its principal place of business in Lawrence, New York. Taylor and Feuer, along with others, directed its affairs.") In their initial allegations, Plaintiffs describe Beechwood Capital as the vehicle through which Taylor and Feuer fraudulently induced Plaintiffs into doing business with Beechwood Re. *See id.* ¶ 1–3.

[10] The only differences between the causes of action in the Arbitration Demand and First Amended Complaint are that the First Amended Complaint contains allegations of violations of the Indiana "Little Rico" Act, Ind. Code § 35-45-6-2(3), and allegations against Beechwood Capital, both of which are absent in the Arbitration Demand. *See* Am. Comp. ¶ 130–36.

in making out the claim against the non-signatory defendant is therefore always the *sine qua non* of an appropriate situation for applying equitable estoppel"). The Court now turns to the second prong of the "intertwined-ness" analysis to determine whether principles of equitable estoppel can be invoked to compel arbitration.

### 2. *Relationship "Between the Parties" to the Agreement*

The second prong of the "intertwinded-ness" analysis—the closeness of the relationship between non-signatory and signatory—is centered on the role of the non-signatory defendants when the misconduct occurred. *Chase Mort. Company-West*, 2001 WL 547224, at *3 (finding the relationship between a mortgage company and its parent bank sufficiently close when the "purpose of [the] relationship factor is to determine whether [the] claims against [the non-signatory] are intertwined with [the signatory's] contract obligations"). Courts generally look to the pleadings to determine whether the underlying allegations infer a close relationship between a signatory and non-signatory movant. *Denney v. BDO Seidman, LLP*, 412 F.3d 58, 70 (2d Cir. 2005) ("plaintiffs cannot [on a motion to compel arbitration] escape the consequences of [their RICO] claims" that alleged the signatory and non-signatory defendants "acted in concert to defraud").[11] Furthermore, an agency relationship may permit a non-signatory to compel arbitration. *Astra Oil Co., Inc. v. Rover Navigation, Ltd.*, 344 F.3d. 276, 280–81 (2d Cir. 2003).

Plaintiffs contend that the "*between the parties*" language of the arbitration provision is strict and must be 'rigorously enforced' by the Court, thereby precluding Defendants from compelling arbitration. *See* PL's Mem. at 6–8. In support of their argument, Plaintiffs rely

---

[11] Although, the Second Circuit in *Denney* made a finding that the non-signatory defendant possessed the requisite "close relationship" to a signatory to the agreement, the Court remanded the action to the District Court for consideration of whether the non-signatory defendants could compel arbitration. 412 F.3d at 70. On remand, the District Court held that the subject matter of the underlying claims were not "sufficiently intertwined" to compel arbitration under equitable estoppel. *See Denney v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293 (S.D.N.Y. 2005).

heavily on *American Express Co. v. Italian Colors Rest.*, 570 U.S. 228 (2013).[12] Specifically, they cite the language from *Italian Colors* that "courts must 'rigorously enforce' arbitration agreements according to their terms" and contend that all pre-2009 case law is abrogated by this statement. *See id.*; *see also Italian Colors,* 570 U.S. at 233 (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985)). Although Plaintiffs are correct in stating that *Italian Colors* is precedential regarding the contractual nature of arbitration agreements, that case is factually distinguishable from the case at hand. While here, the issue is whether a non-signatory can invoke equitable estoppel to compel a signatory to arbitration, the Court in *Italian Colors* was faced with the distinct issue of the enforceability of a class action waiver provision in an arbitration clause of a credit card agreement.[13] *Italian Colors*, 570 U.S. at 231. The Court did not address the application of equitable estoppel—indeed, the term "equitable estoppel" is never mentioned in the *Italian Colors* opinion—nor purport to undo this entire and well-established body of law. *See id.* Furthermore, the Court expressly cites the phrase "rigorously enforce[d]" from a 1985 opinion, thereby rendering Plaintiffs' contention that all pre-2009 case law is abrogated, based on that statement alone, unjustified. *See id.* at 233; *see also Dean Witter Reynolds, Inc.,* 470 U.S. at 221 (stating that the "preeminent concern of Congress in passing the

---

[12] Plaintiffs cite the Supreme Court holdings in *Carlisle* and *Italian Colors* to support their contention that all pre-2009 federal case law applying equitable estoppel is no longer precedential. In support of their argument, Plaintiffs cite to 11th and 5th Circuit case law and state that "numerous federal courts have declared their pre-2009 precedent inapplicable to future cases, unless it was based on state law." Defs' Mem. at 16. However, courts in this district have continued to recognize and apply equitable estoppel to compel arbitration, citing to pre-2009 precedent. *See In re A2P SMS Antitrust Litigation,* 972 F. Supp. 2d 465 (citing *Chocatow Generation Ltd. P'ship*, 271 F.3d 403); *see also In re Document Technologies Litigation,* 17 Civ. 2405 (JSR), 2017 WL 4350597 (S.D.N.Y. June 27, 2017) (citing *JML Industries,* 387 F.3d 163).

[13] Plaintiffs also cite the Supreme Court case *Stolt-Nielsen, S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010) in support of their argument that the terms of the arbitration agreement must be strictly enforced. Just as in *Italian Colors*, this case involved the imposition of class arbitration on a group of antitrust claims. *See id.* The Court did not discuss equitable estoppel.

13

[Federal Arbitration] Act was to enforce private agreements into which parties had entered, and that concern requires that we *rigorously enforce* agreements to arbitrate") (emphasis added).  As Defendants correctly contend, *Italian Colors* reaffirmed the long-standing principle that arbitration is a creature of contract.  Defs' Mem. at 16.  But it did not do away with the equally longstanding principle of equitable estoppel in determining which parties "may be bound by an agreement to arbitrate."  *McAllister Bros. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980) (noting that it is "the established law of this circuit that a party may be bound by an agreement to arbitrate even in the absence of a signature") (citing *A/S Custodia v. Lessin International, Inc.*, 503 F.2d 318 (2d Cir. 1974); *Fisser v. International Bank*, 282 F.2d 231, 235 (2d Cir. 1960)).  As a result, "ordinary principles of contract and agency determine which parties are bound by an agreement to arbitrate," *id.*, and, following *Italian Colors* federal courts around the country have continued to apply equitable estoppel in the arbitration context.  *Pagaduan v. Carnival Corp.*, No. 16-465, 2017 WL 4117339, at *2 (2d Cir. Sept. 18, 2017) (affirming district court's grant of motion to compel arbitration by non-signatory based on application of equitable estoppel); *Color-Web, Inc. v. Mitsubishi Heavy Indus. Printing & Packaging Mach., Ltd.*, No. 16CV1435 (DLC), 2016 WL 6837156, at *5 (S.D.N.Y. Nov. 21, 2016) (granting non-signatory's motion to compel arbitration based on principles of agency and equitable estoppel); *Muecke Co. v. CVS Caremark Corp.*, 615 F. App'x 837, 840 (5th Cir. 2015) (affirming district court's grant of motion to compel arbitration by non-signatory based on application of equitable estoppel); *see also In re Henson*, 869 F.3d 1052, 1060, 1062 (9th Cir. 2017) (denying motion to compel, but recognizing that principle of equitable estoppel applied).

      The individual Defendants argue that the agency relationship between themselves and Beechwood Re is sufficient to invoke the arbitration provisions in the Reinsurance Agreements.

Defs' Mem. at 12 ((citing *Camferdam v. Ernst & Young Int'l, Inc.,* No. 02 Civ. 101000 (BSJ), 2004 WL 307292, at *6 (S.D.N.Y. Feb. 13, 2004) ("The weight of authority across the nation indicates that an agent can avail himself of its principal's arbitration powers under a contract so long as the claim against the agent relates to that contract.")). In support of their contention, Defendants cite the Amended Complaint, which clearly alleges that Defendants Feuer, Taylor, and Levy were acting as agents of Beechwood Re. *See* Am. Comp. ¶ 1–16 (alleging that Feuer and Taylor represented their formation of Beechwood Re, Taylor executed the Reinsurance Agreements on behalf of Beechwood Re, and all three Defendants managed the trust assets and investments of Beechwood Re). Although Beechwood Capital is not an agent of Beechwood Re, Plaintiffs allegedly were fraudulently induced into executing the Reinsurance Agreements with Beechwood Re via representations made by the individual defendants on behalf of Beechwood Capital. *See id.* ¶ 2 ("Feuer and Taylor, on behalf of Beechwood Capital, represented they were forming and investing in a reinsurance company, Beechwood Re. Ltd."). As emphasized by the Second Circuit in *Denney,* Plaintiffs cannot make conspiracy allegations connecting signatories and non-signatories and then avoid arbitration by claiming those parties do not possess the requisite close relationship. *Denney,* 412 F.3d at 70.

Accordingly, the Defendants satisfy the second-prong of the "intertwinded-ness" analysis and possess the essential close relationship required to permit equitable estoppel.

### B. "Unclean Hands" Doctrine

Although an agency relationship may permit a non-signatory to compel arbitration, such a relationship is insufficient to compel arbitration under the theory of equitable estoppel "where it is formed as a result of the wrongdoing alleged in the pleadings." *In re Document Technologies Litigation*, 2017 WL 4350597, at *3 (citing *Sokol Holdings, Inc.*, 542 F.3d at

15

362).[14] This centuries-old doctrine of "unclean hands" precludes a party accused of fraud from obtaining relief in equity. *Bein v. Heath*, 47 U.S. 228, 247 (1848) ("The equitable powers of this court can never be exerted on behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage.") In the context of equitable estoppel as a means to compel arbitration, the Second Circuit held in *Sokol Holdings, Inc.* that a third-party who has allegedly obtained the requisite "close-relationship" via tortious interference with the underlying contract may not be awarded specific performance of said contract from the court. *Sokol Holdings, Inc.*, 542 F.3d at 361.

Plaintiffs argue that the allegations of bad-faith and fraudulent activity render the Defendants' hands "unclean" and preclude equitable estoppel in this instance. *See* PL's Mem. at 25–26. In support of their contention, Plaintiffs rely on *Motorola Credit Corp. v. Uzan,* 274 F. Supp. 2d 481 (S.D.N.Y. 220), *aff'd in part, vacated in part*, 388 F.3d 39 (2d Cir. 2004), in which the court barred a party accused of fraud from compelling arbitration. *Id.* at 505. *Motorola* is readily distinguishable. The defendants in *Motorola* instructed their counsel to conceal the existence of certain injunctions from the Court and reveal them at a later date. *Id.* at 505 n.15. In so doing, they perpetrated a fraud before the court, in addition to the fraudulent activity alleged in the complaint. *Id.* at 505. ("[D]efendants, through inconsistencies, omissions, false representations, and tactical diversions, effectively carried their fraud right into the courtroom. A court faced with such conduct is constrained to deny the equitable relief of estoppel that defendants here seek to invoke in aid of arbitration.") Here, there is no allegation that

---

[14] "Where $y^1$ has become aligned or associated with $y$, which is a party to an arbitration contract with $x$, and has done so by wrongfully inducing $y$ to breach its obligation under that contract with $x$, there would be no unfairness in allowing $x$, the victim of the tortious interference, to insist that, while he agreed to arbitrate with his contractual counterparty $y$, he in no way consented to extend that agreement to an entity which tortuously subverted his rights under the agreement." *Id.*

16

Defendants have acted fraudulently before the Court, or that they have "tortious[ly] interfere[d]" with the Reinsurance Agreements, as required by *Sokol Holdings, Inc.* In *Sokol Holdings, Inc.*, the Second Circuit barred equitable estoppel when the non-signatory seeking to compel arbitration had interfered with the signatory's contractual obligations, convincing them to breach their sales agreements. 542 F.3d at 362. Although allegations of fraud, misrepresentation, and deceit are present here, the Plaintiffs do not contend that non-signatory Defendants tortiously interfered with their contractual obligations.

Based on the aforementioned precedent and persuasive authority, this Court cannot find Defendants hands to be "unclean" and as such, declines to bar equitable estoppel in this instance.

### C. Staying Pending Arbitration

Defendants further request that this case be stayed while the parties proceed to arbitration.[15] Defs' Mem. at 17–18. The Second Circuit has held that a district court must stay an action—rather than dismiss it—if a party so requests, even if all the claims are sent to arbitration. *Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir.), *cert. denied,* 136 S. Ct. 596 (2015) ("[T]he text, structure, and underlying policy of the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested."); *see also Celltrace Commc'ns Ltd. v. Acacia Research Corp.*, No. 16-2006, 2017 WL 1476600, at *1 (2d Cir. Apr. 25, 2017) ("When all claims are referred to arbitration and a stay requested, as happened here, the Federal Arbitration Act . . . *requires* a stay of proceedings.") (internal quotation marks and citations omitted). Accordingly, the Court will retain jurisdiction and stay the proceedings in this matter pending arbitration. *Katz,* 794 F.3d at 347; *see also Consol.*

---

[15] In the alternative, in the event the Court denied the motion to compel, Defendants requested that this action be stayed pending the arbitration between Plaintiffs and Beechwood Re. Defs' Mem. at 18.

*Precision Prod. Corp. v. Gen. Elec. Co.*, No. 15 Civ. 8721 (PKC), 2016 WL 2766662, at *6 (S.D.N.Y. May 12, 2016) (granting motion to stay action where terms broadly incorporated the Commercial Arbitration Rules of the AAA, and those rules granted the arbitrator the authority to decide arbitrability).

### IV. Conclusion

For the reasons set forth above, Defendant's motion to compel arbitration is GRANTED, and this action is STAYED pending arbitration. The parties are instructed to advise the Court within 48 hours of the outcome of the arbitration. The Clerk of the Court is respectfully directed to stay this action pending arbitration and terminate the motion, Doc. 63.

SO ORDERED.

Dated: March 13, 2018
New York, New York

Edgardo Ramos, U.S.D.J.